Jose Ramirez-Salgado  CDCR# C-11124
Calipatria State Prison
D2-233-L
P.O. Box 5002
Calipatria CA 92233-5002
Petitioner, In Pro Se

## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE RAMIREZ-SALGADO, <br>     Petitioner, <br><br>   Vs. <br><br> L.E. SCRIBNER, Warden(A), <br>     Respondent, <br><br> JERRY BROWN, Attorney General of <br> California, <br>     Additional Respondent. | ) CASE NO;_____ <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM OF FACTS,
### POINTS AND AUTHORITIES
### ON HABEAS CORPUS PETITION.

# TABLE OF CONTENTS

Table of Exhibits ..................................... ii

Table of Authorities ................................. ii

Memorandum of Facts .................................. 1
      Parole Hearings ............................ 3
      State Habeas Courts ........................ 5
      Note ...................................... 5

Memorandum of Points and Authorities ................. 6

Issue I:  State Courts deprived Petitioner of Due
Process and Equal Protection of law by
Refusing to hold an Evidentiary Hearing
and Denying Discovery. .................... 6

Issue II:  State Parole Board have Violated Petitioner's
Due Process and Equal Protection of Law,
and Constitutionally Protected Liberty
Interest in Parole. ...................... 7

      A.
Board has Continued to use the Unchanging
Facts of the Commitment Offense to Deny
Parole after Petitioner has Served the
Minimum Term Set by Law. .................. 7

      B.
The BPH Violated Petitioner's Due Process
Rights by Arbitrally Determining That His
Parole Plans in Mexico where not Viable nor
Realistic – Thus not Suitable for Parole. ... 8

      C.
The Board Violated Petitioner's Civil Rights
Under the ADA and Constitutions by Holding
Petitioner Responsible for CDCR Policies that
Keep Prisoners with Seizures from Attending
Vocational Training Programs. Thus Unsuitable
for Parole. ............................... 10

      D.
Board Considers Crime to be Especially Grave,
Heinous, Atrocious and Inexplicable for a
Second Degree Murder without Stateing any
Facts nor Evidence to Support Their Boiler
Plate Catch Phrases. ..................... 11

      E.
The Board Ignores or Missuses Evidence and
Facts that Tend to Show Suitability for
Parole in Order to Deny Parole. ........... 13

F.
The Board is Required by Law to Follow
the Same Laws, Rules and Regulations as
the Sentencing Court Does. .................. 15

Issue III:
Ineffective Assistance of Counsel Before,
During and After the BPH Board Hearing. ...... 20

Issue IV:
Petitioner has a Constitutionally Protected
Liberty Interest in Parole. ................. 24

Issue V: The State has Violated the Plea Bargain at
All Parole Hearings by Claiming 'Facts' not
Adjudicated in Court in Support of Finding
Petitioner Unsuitable for Parole. ........... 28

Conclusion ......................................... 30

## TABLE OF EXHIBITS

A .... Petitioner's Requests for Discovery and Evidentary
Hearings in State Courts. .......................

B .... State Habeas Court Denials and Opinions.

C .... Board Hearing Transcripts.

D .... Parole Plans, Job Offers, Property, etc..

E .... In re Criscione, Santa Clara Superior Court.

F .... Documents Sent to Board Appointed Attorney.

G .... Prisoner Evaluation Dated 04/05.

H .... BPT Lifer Prisoner Decision Face Sheet, 11/01/05.

I .... In re Rutherford/In re Lugo Court Orders of 02/15/06
and Stipulation of 03/23/06.

## TABLE OF AUTHORITIES

United States Constitution 4th, 5th, 6th, 8th, and 11th
Amendments. ............. Though Out

United States Code Title 8 Sections 1362, ................. 22

Model Penal Code Section 4.01. ......................... 13

Opinions of the California Attorney General
82 Ops.Cal.Att.Gen. 242 ...................... 7

California Criminal Jury Instructions CALJIC 4.02. ........ 13

California Rules of Court
         Rule 421. ..................................... 17
         Rule 423. ..................................... 17

California State Bar's Rules of Professional Conduct.
         Rule 3-110(c). ............................... 22
         Rule 3-700. .................................. 22
         Rule 3-700(D)(1). ............................ 22
         Rule 7-105. .................................. 29

California Penal Code
        Sections
            187 ..................................... 7
            211 ..................................... 7
            245(a). ................................. 7
            1170(b) ................................. 17
            1192.2 .................................. 16,28
            1204 ................................... 17
            3041(a) ................................. 15,18,
                                                 27,28
            3041.5 .................................. 20,22
            3041.7 .................................. 20,22
            12022.5 ................................. 5

California Code of Regulations, Title 15
        Sections
            2256 .................................... 20,22
            2402(c)(1) .............................. 12
            2402(c)(3) .............................. 13
            2402(d)(2) .............................. 14
            2402(d)(4) .............................. 14
            2402(d)(9) .............................. 10

Case Laws

Almendarez-Torres v. United States (1998) 523 US 224, 251 . 17
Apprendi v. New Jersey (2000) 530 US 466,484, 489 ........ 16,17,
                                              27,28
Blakely v. Washington (2004) 542 US 296 ................... 18,27,
                                              30.
Boykin v. Alabama (1969) 395 US 238, 242 ................. 17
Briggs v. Terhune (CA 9th.Cir. 2003) 334 F.3d 910, 914 .... 29
Davis v. State Bar (1983) 33 Cal.3d 213, 239-240 .......... 29
Evens v. Chavis (2006) __ US UU, 126 S.Ct. 846 ............ 6
In re Criscione, Case No: 71614, Exhibit B ............... 11,25
In re DeLuna (CA 6th 2005) 126 Cal.App.4th 585, 591 ....... 26
In re Lawerence (CA 2d 2007) 2007 D.J.DAR. 7363, 7372-74 .. 7,8,27
In re Lee (2006) 143 Cal.App.4th 1400,1412 ............... 27
In re Lowe (CA 6th 2005) 130 Cal.App.4th 1405, 1421 ....... 26
In re Marquez (1992) 1 Cal.4th 584, 596 .................. 22
In re Rosenkrantz (2002) 29 Cal.4th 616, 654 ............. 26
In re Rutherford/In re Lugo Case No: SC135399A ........... 26
  (Exhibit I )
In re Scott (2004) 119 Cal.App.4th 871, ................. 17,25,
                                              29,30.

TABLE OF AUTHORITIES
(Continued)

Case Law Continued.

In Re Smith (CA6th 2003) 114 Cal.App.4th 343, 366, 369 .... 11,27
In re Snyder (1985) 472 US 634, 644-45 ..................... 29
Jones v. United States (1999) 526 US 227, 243 ............. 16,29
Jones v. United States (    ) 530 US ___, 489 ............. 23
Martin V. Marshall (N.D.Cal. 2006) 431 F.Supp.2d 1038, 1043,
                                    1046-1047 ........ 7,9,31
Mullaney v. Wilbur (1975) 421 US 684, 697-98 .............. 17
Olguin v. State Bar (    ) 28 Cal.3d 195, 199-200 ......... 29
People v. Arbuckle (1978) 22 Cal.3d 749, 754 ............. 17
People v. Bunyard (1988) 45 Cal.3d 1189, 1215 ............ 23
People v. Calloway (1974) 37 Cal.App.3d 905, 908 ......... 17
People v. Drew (1978) 22 Cal.3d 333 ...................... 13
People v. Harvey (1979) 25 Cal.3d 754, 758 .............. 17
People v. Kilpatrick (CA3d 1980) 105 Cal.App.3d 401, 413 .. 17,28
People v. Ledesma (1987) 43 Cal.4th 171, .................. 23
People v. Lewis (1991) 229 Cal.App.3d 259 ................ 18
People v. Valdivia (1960) 182 Cal.App.2d 145 ............. 17
People v. Wallace (2004) 33 Cal.4th 738 .................. 17
People v. Warren (1959) 175 Cal.App.2d 233 ............... 17
Reno v. Flores (1993) 507 US 292, 306 ................... 22
Rind v. Arizona (2002) 536 US 584, 602 .................. 18
Rosenkrantz v. Marshall (C.D.Cal. 2006) 444 F.Supp.2d 1063, 11,12,
                                    1082,1083,1085 ............ 14,15
Saakian v. INS (CA1st 2001) 252 F.3d 21,25 ............... 23
Santobello v. New York (1971) 404 US 257,262 ............ 23
Sochor v. Florida (1992) 504 US 527, 540 ................ 13
Strickland v. Washington (1984) 466 US 668,688,693 ....... 23
Taylor v. Maddox (CA9th 2004) 366 F.3d 992, 1001 ......... 6
Theard v. United States (1957) 354 US 278, 281 .......... 29
Thompson v. Davis (CA9th 2002) 282 F.3d 780, 786 ......... 10
United States v. Booker (2005) 543 US 220, 125 S.Ct. 738,
                                    749, 760 ....... 18
United States v. Johnson (CA9th 1999) 187 F.3d 1129, 1134 . 17,28

///
///

## MEMORANDUM OF FACTS

Petitioner Jose Ramirez-Salgado was born in rural Mexico on April 24, 1960. At the age of Four (4) Petitioner fell out of a tree and landed on his head. This trauma caused brain tissue damage that has caused life long epilepsy and other problems. In 1967 Petitioner's Father passed away after a long illness of the lungs.

In 1970, Petitioner's Mother left him with his Faternal Grandfather while she came to the United States on a Work Visa. For the next two (2) years, Petitioner lived and worked on his Granfather's ranch/Farm, which was located near San Jose, a small village about sixty (60) miles from Guadalajara, Mexico. While his Mother relocated to San Diego California . Petitioner' Mother became a U.S. Citizen several years later after Petitioner's incarceration.

In late 1972, Petitioner ran away from his Grandfather's Farm to find his Mother and be with her since her job would not allow her to visit and his Grandfather could not afford to leave the farm to visit her. Petitioner hicked rides and other modes of transportation, when his funds would allow all the way to Tijuana at the age of twelve (12), alone. In Tijuana, Petitioner learned how to survive on the streets - getting involved with thriving drug culture there, among other things to survive. Petitioner soon learned how to cross the boarder with out getting caught, and did so to find his Mother in San Diego. But the damage was already done, and it would effect Petitioner's judgements and actions for many years to come. The use of drugs and alcohol to cope with problems, and the use of violence as the rule instead of being the last resort, to establish and protect one's self.

When Petitioner did cross the boarder and finally found his Mother, he was greeted by his Mother and her Boyfriend. A situation he was not prepared for nor expecting. His Grandfather had already informed his Mother of his running away. Like any Parent, She was glad that he was alive, happy to see him, and angry that he had run away, and caused so many people so many sleepless nights of worry. Petitioner's Mother was also upset that Petitioner's illegal entry could cause her to lose her visa and chance to make new life in the U.S. for her family. All of these emotions came

out and confused the Petitioner even more. His Mother's boyfriend
did not help matters any by expressing 'Fatherly' concerns and
personal concerns of the possibility of Petitioner's Mother
suffering deportation due to her son's stupidity. These actions
just re-enforced the first impression of anamosity of the Petitioner
due to his Mother replacing his Father and him with another man.

Over the next seven (7) years, tensions increased between
Petitioner, Petitioner's Mother, Petitioner's Mother's Boyfriend.
Every time Petitioner would get to the point that he wanted to hurt
his Mother for siding with her boyfriend and not with him, Petitioner
would stop a Police Officer and tell him that he was illegally in
the country. The Officer would then take him to the boarder, and
send him accross. Petitioner would then get back into the strret
life to keep alive. Until he would calm down and start missing his
Mother enough to cross the boarder once again. Thus a vicious
circle developed.

One day Petitioner found a .22 cal. pistol in a paper bag.
He decied to keep it and that the next time he returned to Mexico
he could show it to a few people, establishing the word that he
was packing and could better protect himself. And he could also
sell it down there if needed. Life on the strrets is dangerous for
a child at any time, but in the 70's Tijuana was a very dangerous
place for a child. Petitioner's Mother found the gun and took it.

Petitioner used drugs and alcohol since shortly after arriving
in Tijuana the first time. There and in San Diego. This lead of
course to more confilicts between Petitioner, His Mother and Her
Boyfriend. Causing more retreats to Mexico by Petitioner. On one
of these periods of time, Petitioner met a girl and they fell into
love and lust. A child was conceived and born from that relation-
ship by the time Petitioner turned eighteen (18). Shortly after his
ninteenth (19th) birthday, his girlfriend's parents, convinced her
to return to their home in Tijuana, taking Petitioner's and Her
child with her.

Petitioner felt the world closing in on him, and turned to
heavy drug and alcohol use to cope with it. One day, he remembered
the .22 that his Mother had taken from him. While waiting for her
to leave the house, Petitioner drank and smoked pot and once his

2

Mother left for work, Petitioner returned to her house and retrieved
the gun from where she had put it. Petitioner then returned to his
friend's place and drank some more and did more drugs, trying to
passout. This was June 16, 1979, the day that Petitioner ended up
committing his commitment offenses. The stress and substance abuse
of nearly seven (7) years came to a head, and Petitioner snapped.

After his arrest, the District Attorney's Office conducted
indepth interviews and due to the facts that they had, offered the
Petitioner a plea bargain for second degree murder with gun use
enhancements, with a sentence of nineteen (19) years to life. The
minimum ineligibility for parole would expire some where between
April and June 17, 1998. And the Petitioner would then be elegible
for parole. Petitioner plead guilty to Second Degree Murder and
use of a firearm in the commission. The Court accepted the plea
and sentenced him 15 to life plus 4 year for the firearm.

<u>PAROLE HEARINGS.</u>

In each of the Parole Board Hearings (BPH), the commissioners
have used most of the following reasons at one time or another to
deny parole: The number of victums; the victums were vulnerable;
callous disregard for human life; drug and alcohol abuse; unstable
family life; unstable relationships - with girlfriend and their
child; crossing the boarder several times; High custody score;
number of CDC-128's and CDC-115's; Failure to learn a vocation;
failure to learn better english; Petitioner's parole plans in
Mexico are inadequate.

Each Board has refused to take into account the stressors of
Petitioner's life that lead unto the crimes; his young age; the
situation at the time; Petitioner's epilepsy that precludes him
from participating in Vocational Instruction Courses per Prison
Policy. That after Petitioner's debriefing and coming to the SNY
Program, he had a long period without any write-ups/diciplinary
actions; That through out his incarceration, Petitioner has
matured - which lead him to debrief; That the Situation with his
Mother and Her Boyfriend, had changed, They got married, and Petitioner
accepted the relationship and even became friends with his Step-
Father; Petitioner's Grandfather passed away, and left part of the
farm to Petitioner, upon his release from prison; That Petitioner's

Mother passed away while on her way to visit him. That after her Death, Petitioner got into truble for drinking. Petitioner's Mother left him a sizable trust available upon his release from prison and his return to Mexico. That Petitioner has established very close ties with his Family while in prison. That Petitioner has viable and adequate Parole plans for work, living arraingements, and support in Mexico. That Petitioner has the needed skills and experiences for employment and running a farm in Maxico.

The Board also ignors the Psychological report that placed Petitioner as no greater threat to society than anyone else, as long as he avoided gangs, drug use and alcohol use. In San Jose Mexico Drugs and Gangs are not a problem, and that Petitioner has friends and family there to help him stay away from adcohol.

The Boards have told Petitioner that he would have better jobs in Mexico if he learned English better, while ignoring the facts that Petitioner obtained his GED in prison, showing a High School level of English mastery, et al.. That in Mexico, Spanish is the National Langaage not English. The Board also Clearly ignores the fact the Petitioner has Epilepsy, thus placing him squarly under the protection of ADA. Prison Policy bars Petitioner from taking Vocational Classes due to safety and security of the Institution and such concerns would effect his future employement opportunitied in Mexico.

The various Boards have raised concerns about his crossing the boarder as a child. That he would do so again as an adult. They ignore the fact that Petitioner has matured and clearly knows that such action would lead to his incarceration for the rest of his life. Petitioner has spent approximately twenty-nine (29) years in prison, and is not in anyway eager to spend the rest of it in prison.

The Board uses the Crime to justify inegibility, even nine (9) years after the Maximum Inegibility Period for Parole established by the Legislature of California, for that crime.

Even though Petitioner was and has been willing to discuss the crime with the Board, the Board has used the current D.A.'s version of the crime and the probation report that contradicts the Plea Agreement and Accepted Plea of Petitioner in Court.

4

## STATE HABEAS COURTS

Petitioner sought review of the Parole Board's decisions in the State Courts. In each Court, Petitioner asked for discovery of BPH documents and Attorney's 'Lifer Packet" wich under California laws, belong to the Client. Petitioner also asked for an evidentary hearing in each court. All three state courts refused to grant discovery or an evidenatry hearing. Petitioner also sought the transcripts of the Plea Hearing and Sentenceing Court Hearings to support issues raised. But the Courts refused to do their duty.

Each State Habeas Court denied Petition and the Superior Court of San Diego County was the only expressed opion issued.
/F*/

It should be noted that Petitioner received a one year sentence for possession of a weapon by a prisoner while incarcerated and as an participant in prisons' gangs culture.

According to the Minimum Eligible Parole Date setforth by CDCR, See Exhibit H, Petitioner became eligible on May 30, 1992 for parole under the laws of California. Petitioner does not know if this is completely accurate, but will so stipulate at this time that it most likely is. It also includes the one year sentence for the above mentioned offense.
////
////

ISSUES

I

STATE COURTS DEPRIVED PETITIONER OF DUE PROCESS
AND EQUAL PROTECTION OF LAW BY REFUSING TO
HOLD AN EVIDENTIARY HEARING AND DENYING DISCOVERY

- FACTS -

Petitioner requested evidentiary hearings and discovery of
State Prison 'Central File' Documents; BPH appointed attorney's
'Lifer Packet' - documents that BPH issues to counsel for preparation
for Parole Hearing; Court's Transcripts of Plea agreement hearing
and sentencing; et al.. at each and every level of review. Exhibit
'A', which were ignored by the State Courts. Exhibit 'B'.

The documents requested in the discovery motions setforth facts
that prove several of the Habeas Corpus Issues raised before the
Court: 1) Ineffective Assistance of Counsel at hearing; 2) the
Pre-determination of denial by the Board; 3) that the Board's
determinations were not based upon any reliable evidence - nor on
any evidence at all; 4) Facts that clearly contradict the holdings/
findings of the Board; 5) Five Year postponment for next hearing
was retailitory for refusing to sign waiver of hearing; et al..

An evidentary hearing combinded with the discovery materials
would have proven the issues that the Board has ignored facts and
their own Regulations, State and Federal Laws, Constitutions, and
Court Rulings.

- LAWS -

"(A)s the Supreme Court noted in Miller-el, the state
court fact-finding process is undermined where the
state court has before it, yet apparently ignores,
evidence that supports petitioner's claim. Miller-el
537 US at 346, 123 S.Ct. 1029." Taylor v. Maddox (9th
Cir. 2004) 366 F.3d 992, 1001. "Obviously, where the
state court's legal error infects the fact-finding
process, the resulting factual determination will be
unreasonable and no presumption of correctness can
attach to it." Taylor, supra, 366 F.3d at 1001.

The Court went on to hold that an evidentiary hearing is required
in most cases in the state courts for their decisions to be held
"reasonable" under the AEDPA. This view was later adnoted and published
by the Supreme Court in Evens v. Chavis (2006) ___ U.S. ____, 126
S.Ct. 346.

II

STATE PAROLE BOARD HAVE VIOLATED PETITIONER'S
DUE PROCESS AND EQUAL PROTECTION OF LAW, AND
CONSTITUTIONALLY PROTECTED LIBERTY INTEREST IN PAROLE.

A

BOARD HAS CONTINUED TO USE THE UNCHANGING FACTS
OF THE COMMITMENT OFFENSE TO DENY PAROLE AFTER
PETITIONER HAS SERVED THE MINIMUM TERM SET BY LAW.

- FACTS -

Petitioner was sentenced under California Penal Code Sections
187 - Second degree murder, 15 to life; 211 - robbery; 245(a) -
assault with a deadly weapon; and 12022.5 - Firearm use enhancement
for 4 years. Yeilding a 19 to life sentence issued on November 28,
1979. Even without pre-sentence credits, the maxium minumum for
parole ineligiblity expired on November 28, 1999. With the pre-
sentence credits, Petitioner became legally eligible for parole
in June of 1998, nearly nine years ago.

Yet, the Board continues to rely upon the crime to deny parole,
at the November 1, 2005 Parole Hearing, 7 years after the State
Legislature's MAX. inelgibility period ended. Exhibit C, pp. 27-30.

- LAWS -

On December 22, 1999 the California Attorney General issued Opinion
No: 99-322 (82 Ops.Cal.Atty.Gen. 242) concerning life top sentences
in California. It clearly states that Legislature set the minium
ineligibility period for parole at 15 to life or 25 to life, etc.,
at the set term of 15 or 25 years, after which the prisoner is
considered eligible for parole. Martin v. Marshall ((N.D.Cal. 2006)
431 F.Supp.2d 1038, 1046-47) and In re Lawrence ((C.A.2d 2007) 2007
D.J.DAR. 7363, 7372-74 (Exhibit D)) the courts have held that once a
prisoner has served the full minimum term, reliance upon commitment
offense to deny parole impinges on the Prisoner's Constitutional
Liberty Interest in parole and violates Due Process of both the State's
and Federal Constitutions.

In Lawrence, the commitment offense "does not provide "some
evidence" () present release would represent an "unreasonable risk"
of danger to the community." (at pp 7374.) The Lawrence Court
compared numerous commitment offenses of other cases challenging
BPH denials to Lawrence's. Their final anylasis is clear- EXCEPT for
those rare cases like Charles Manson's - after serving the minium

7

term set by law, the commitment offense(s) is no longer "some
evidence" of future threat to society. Neither the Board, Governor,
nor the Courts may utilize such to deny parole suitability.

> "Other than rehabilitation, imprisonment of those who are
> convicted of committing crimes generally serves and is
> justified by one or more of three societal goals:
> (1) Retribution - that is, punishment of the offender
> commensurate with the seriousness of the crime;
> (2) Deterrence of future offenses by the offender and other
> potential offenders;
> (3) Incapacitation of the offender so she is not free to
> commit other offenses.
> When the Legislature sets an indeterminate maximum term
> with a fixed minimum term, the latter can be viewed as
> setting the period of imprisonment deemed necessary to
> satisfy the first two purposes, while the justification
> for continued imprisonment beyond that fixed minimum
> depends on the need for continued incapacitation of the
> offender." Lawrence, supra, 2007 D.J.DAR. at pp. 7374-75.

## - CONCLUSION -

Since the State Court and even the Attorney General conclude
that after the minimum term has been served, relying on the commit-
ment offense to justify denying parole in the majority of parole
hearings, violates the letter and intent of the law as well as
clearly violates Due Process and Liberty Interests of the Prisoner.
It is improper for the Board to deny Petitioner parole based upon
his commitment offenses after he has completed the MINIMUM term
set by law - 20 years, which expired on or about June 1998. Twenty
years after his arrest, since Petitioner did not bail out of jail
during the court procedings, and thus earned per-sentence credits.

## - B -

THE BPH VIOLATED PETITIONER'S DUE PROCESS RIGHTS
BY ARBITRAILY DETERMINING THAT HIS PAROLE PLANS
IN MEXICO WHERE NOT VIABLE NOR REALISTIC - THUS
NOT SUITABLE FOR PAROLE.

## - FACTS -

At the hearing, Petitioner has presented to the Board letters
offering housing, jobs, and support by family and friends. Petitioner
also provided legal documents showing the his Grandfather left him
property (farm) in San Jose Mexico, and that his Mother left him
a trust fund that would provide a substantial capital and support
upon Petitioner's release and return to Mexico. Exhibit D.

The Board Stated the offers and plans are unrealistict with-
out stating why they are unrealistic. Exhibit C, pp. 27-30., Or how
they determined such. The job offers are from businesses in Mexico.
The Property documents are official Mexico Government Documents.
The Inheritances from Petitioner's Grandfather and Mother are
certified. There is absolutely no evidence to the contrary. Yet,
the Board quotes 'boiler plate' verbage of 'unrealistic parole
plans' without any facts to support it.

### - LAW -

15 CCR Section 2402 'Determination of Suitability' subsection
(d) 'circumstances tending to show suitability' (8) 'understanding
and plans for future':"The prisoner has made realistic plans for
release or has developed marketable skills that can be put to use
upon release."

> "The subsection does not require that a prisoner have
> viable parole plans in the United States. Petitioner,
> ..., has realistic parole plans in Mexico. He has at
> least two job offers and a place to live." Martin v.
> Marshall (N.D.Cal. 2006) 431 F.Supp.2d 1038, 1046.

Like Martin, Petitioner has realistic plans in Mexico. Unlike
Martin, Petitioner has both land and money in Mexico upon release.
Outside of 'boiler-plate" verbage, the Board has no fact that
Petitioner's plans are not viable and realistic, what so ever.

The Board stated that the parole plans were unrealistic
"in that he does not have acceptable employment plans..." What?
A job offer to do painting is unacceptable? Do they think that
Mexicans live in un-painted hovals? Owning and operating a farm
in Mexico is not possible or feasable? Are they racist or just
ignorant???? Do they beleive that over fifty-thousand U.S. dollars
is worth over a half-million pesos, will not provide adequate
to support the Petitioner until he can get the farm running at
a profit?
No evidence that Petitioner's plans are unfeasable nor unrealistic
were presented to the Board. None of the Board have any professional
knowledge of economic of Mexico, that they could refer to.
Their 'boiler-plate" response is not based upon any evidence or
factual information presented at the hearing. Thus, clearly
violates Due Process and the laws governing parole hearings.

- C -

### THE BOARD VIOLATED PETITIONER'S CIVIL RIGHTS
### UNDER THE ADA AND CONSTITUTIONS
### BY HOLDING PETITIONER RESPONSABLE FOR
### CDCR POLICIES THAT KEEP PRISONERS WITH SEIZURES
### FROM ATTENDING VOCATIONAL TRAINING PROGRAMS.
### THUS UNSUITABLE FOR PAROLE.

- FACT -

At each Board hearing the fact that Petitioner suffers from
epilepsy is admitted by the Board. Yet, at each hearing, the Board
states that Petitioner has failed to obtain Vocational Training,
thus unacceptable for parole. At each hearing, Petitioner has
tried to have Board appointed Counsel introduce the CDCR and Prison's
policies that exclude from vocational classes, those with any
types of seizure disorders. Board appointed Counsel has refused
each time, claiming that the Board already knows this.

- LAWS -

"Concluding that Congress did in fact liken disability
discrmination to racial discrimination, we held that
the ADA applies to State Correctional Systems. Id.
The same holds true in the parole context: since a
parole board may not deny African Americans consideration
for parole because of their race, and since Congress
thinks that discriminating against a disabled person
is like Discriminating against an African American,
the parole board may not deny a disabled person
consideration for parole because of his disability."
Thompson v. Davis (9th Cal. 2002) 282 F.3d 730, 786.

The Thompson Court went on to quote Supreme Court case law that
clearly authorizes and supports their findings.

15 CCR Sect. 2402(d)(8) States: "The prisoner has made
realistic plans for release or has developed marketable skills
...." And as shown in "B" Petitioner has realistic plans for
release, even if the Board cites 'boiler-plate' nonsense to say
that he doesn't. It is Clear by the physical evidence that the
Prison has a legitamit reason to keep inmates with seizures from
Vocational Training in many incidencs, to redue the chances for
sever injury to the inmate as well as others. It is also clearly
shown that the Board relies on "boiler-plate" verbage that is
not supported by evidence or law.

To tell the prisoner to get a vocation while knowing that the
policies forbid that prisoner from getting such is 'catch-22'
situation. It cannot be done and violates ADA and Due Process.

<u>D</u>

## BOARD CONSIDERS CRIME TO BE ESPECIALLY GRAVE, HEINOUS, ATROCIOUS AND INEXPLICTABLE FOR A SECOND DEGREE MURDER WITHOUT STATING ANY FACTS NOR EVIDENCE TO SUPPORT THEIR BOILER PLATE CATCH PHRASES.

As shown in the transcripts of the Board Hearing, the Board clearly makes use of boiler plate catch phrases through out the hearing without ever pointing to any sufficient evidence nor any comparison to other second degree murders as required by regulations. Exhibit C, espc. pp. 27-30.

### - LAWS -

The California Court of Appeal for the Sixth District found in the case of <u>In re Smith</u> ((CA6th. 2003) 114 Cal.App.4th 343, 7 Cal.Rptr.3d 655) the following:

> "Second degree murder requires express or implied
> malice.... For this reason, it can reasonably be
> said that all second degree murders by definition
> involve some callousness.... As noted, however, parole
> is the rule, rather than the exception, and a conviction
> for second degree murder does not automatically render
> one unsuitable." 114 C.A.4th at. pp. 366.

In a very detailed evidentary hearing by the Superior Court of California, for the County of Santa Clara, in the case of <u>In re Criscione</u>, Exhibit E - Findings and Order, Case No: 71614, dated August 30, 2007. Shows that the Board, in 100% of the hearings reviewed found the crimes to be especially atrocious, heinous, or callous. At pp. 9. On pages 12-13, the Court pointed out that the term "especially" can not possibly apply in 100% of cases, "yet that is precisely how it has been applied by the Board." The Court goes on to point out that there is something definately wrong where the board forces every crime into their catch phrases for denial. See pp. 26-30. Under the ADEPA the findings are binding on the court.

<u>Rosenkrantz v. Marshall</u> (C.D.Cal. 2006) 444 F.Supp.2d 1063:

> "As the California Courts have concluded, an "inexplicable"
> motice" is "one that is unexplained or unintelligible, as
> where the commitment offense does not appear to be related
> to the conduct of the victim and has no other discernable
> purpose." (Citation.) To call Petitioner's crime "inexplicable,"
> as the BPT has, contradicts all of the evidence in the
> record. In fact,...., Petitioner's crime was the result of
> significant emotional stress in his life, a factor that
> actually weighs in favor of ... parole suitablility." at pp. 1082.

11

"Second, in this case, the circumstances of Petitioner's crime do not amount to some evidence supporting the conclusion that Petitioner poses an unreasonable risk of danger if released. As discussed, "(i)n the parole context, the requirements of Due Process are met if some evidence supports the decision." Significantly, the evidence underlying the decision must be supported by "some indicia of reliability." (Citations.) Otherwise, it does not constitute "some evidence."" Rosenkrantz, supra, at pp. 1083.

As it will be discussed in Subsection 'E', next, Petitioner was under a great deal of emmotional stress at the time of the crime. He had just turned 19, lost his Girlfriend and their Child, to her Parents, and had had seven years of termole in his family life as well as heavy drug and alcohol abuse for over six years. This is what caused the rampage. Clearly explaining the grounds for the crimes. A child strikes out without regard to whom it hurts.

The victim that died, exited his home, turning on the poarch light and slamming the door, while yelling. This startaled an emmotionally upset child, who responded by firing a single shot towards the supprising noise, and inadvertantly killing an innocent person.

Yet, the Board, ignores this clear evidence with each of its standard 'boiler plate" verbage it uses to justify it's denial of parole suitablity. Just claiming that there is no explination for a crime, does not actuall proves that there is no reason for it. And YES, the loss of life is exceptionally bad and cruel to his family. And deserves strong condemnation. But, as the evidence shows to be true, Petitioner did not inflict this pain and suffering intentionally. He did not seek out the victim to kill. Had the victim, not exited his home in such a loud and startaling way, Petitioner would not have reacted in the manner that he did.

15 CCR sect. 2402(c)(1) Commitment Offense:

"The prisoner committed the offense in an especially heinous, atrocious or cruel mammer. The factors to be considered include: (A) Multiple victims were attacked, injured or killed in the same or separate incidents. (B) The offense was carried out in a dispassionate and calculated manner, such as an excution-style murder. (C) The victim was abused, defiled or mutilated during or after the offense. (D) The offense was carried out in a manner which demonstrates an exceptionally calous disregard for human suffering. (E) The motive for the crime is inexplicable or very trivial in relation to the offense."

As held by the Criscione Court, it is very easy for the Board to twist the facts of every case before it to fit these criteria, even when it clearly does not apply. The Smith Court stated that ALL second degree murders involve some callousness. And Rosenkrantz Court explained that "an inexplicable motive" is one that is not explained and is not related to the actions of the victim.

Here, contrary to the State's wishes and the Victims Family, the evidence that was before the San Diego's D.A. back in 1979 shows that if the victim had not made the ruckus that he did, the Petitioner would not have fired that fatal shot. Yes, the petitioner was acting recklessly and indifferent to the feelings of others. But, He had reached the breaking point and had snapped. The D.A. knew this and knew under the laws at the time, that the Petitioner would have had a good chance at trial to prove mental incompetence and unconciousness due to voluntary intoxication that would have negated malice under then Penal Code Sections 22 and 25; CALJIC 4.02 Insanity instructions based at the time on Model Penal Code Sect. 4.01, according to People v. Drew ((1978) 22 Cal.3d 333, 149 Cal.Rptr. 275, 583 P.2d 1318) where the California High Court abolished the M'Naghten test in favor of M.P.C.'s test. Which with Petitioner's epilepsy caused by head trauma, would have clearly negated expressed and implied malice required for second degree murder.

All of these facts were previously acknowledged in open court during plea bargain hearing and sentencing. Which is why the State Courts refused to grant discovery of the transcripts.

## E

### THE BOARD IGNORS OR MISSUSES EVIDENCE AND FACTS THAT TEND TO SHOW SUITABILITY FOR PAROLE IN ORDER TO DENY PAROLE.

#### - FACTS -

The Board has repeatedly pointed to Petitioner's past unstable relationships with family and his ex-girlfriend prior to the commission of the offense as reason for the finding of unsuit-ability for parole. Exhibit C, pp. 27-30. 15 CCR Section 2402(c)(3). Without stating how such old news and very outdated actions of an adolescent has any bearing twenty plus years later.

13

Petitioner from the early age of ten was a product of a broken home. His Father passed away after a long illness and then his Mother leaves him to go to another country. At twelve, he left his Grandfather's farm to find his Mother. He lived on the streets of Tijuana until he could find a way across the boarder. He finds his Mother only to find her dating another man. This unstable situation caused emmotional stress, confusion, anger, resentment, etc.. Drugs and Alcohol became a daily escape. At nineteen, his girlfriend and their child returned to her parents home, at the urgings of her parents.

For the Board to hold such information as grounds of Petitioner's present unsuitability instead of evidence of extream emmotional stress that likely will not re-occure (15 CCR Sect. 2402(d)(4)), flies in the face of reality. They clearly ignore the fact that since his incarceration, Petitioner has changed his relationship with his Mother, her Husband, and his family. The changes have brought stability (15 CCR Sect. 2402(d)(2)) to this relationship. The Board insinuated that Petitioner should try to find his Ex-Girlfriend and Child, and disrupte their lives to prove to the Board that he has MATURED. That really sounds mature and adultlike.

## - LAWS -

"The susceptability of juveniles to immature and irresponsible behavior means "their irresposible conduct is not as morally reprehensable as that of an adult." Thompson (v. Oklahoma (1988) 487 US 815, 835). Their own vulnerability and comparative lack of control over their immediate surroundings means juveniles have a greater claim that adults to be forgiven for failing to escape negative influences in their whole environment. See Standford (v. Kentucky (1989) 492 US 361, 395) .... The reality that juveniles still struggle to define their identity means it is less suportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievable deprived character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, "(t)he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." Johnson (v. Texas (1993) 509 US 350, 368)." Rosenkrantz v. Marshall, Supra, 444 F.Supp. 2d at pp 1085.

14

In footnote 17 of Rosenkrantz, on pp. 1085, refers to a publication of materials on adolescent behavor that explains that "the conventional view is that "adolescence is roughly synonymous with teenager, or ages 13-19,"[16] but that "many scholars argue that adolescence begins at approximately age 10 and does not end until early 20's.""

Petitioner was just barily 19 at the commission of his crimes. He had spent over nine years in child hell. Losing his father, his Mother leaving him behind, etc.. Yes an ADULT would have had a better chance of understanding it all. An adult mostlikely would have not done what he did. For the Board to expect an adolescent to act like an adult and to hold Petitioner to such a misguided and improper standard in order to deny him parole, violates Petitioner's Due Process Rights and Liberty interrest in Parole.

The Parole Board refered to a 2002 Psyc. Report which states that Petitioner is no more of a risk to society as anyone already on the streets. All he has to do is refrain from drugs and alcohol as well as gangs. Yet, the Board ingoners this professional's report in favor of it's own twisted views of the facts, to deny parole. BOILER PLATE VERBAGE not supported by the evidence.

F

## THE BOARD IS REQUIRED BY LAW TO FOLLOW THE SAME LAWS, RULES AND REGULATIONS AS THE SENTENCING COURT DOES.

### - FACTS -

Penal Code Section 3041(a) clearly states that the Parole Board is to abideby the same laws, rules, guidelines and regulations that the Sentencing Court MUST abide by. Yet, it does not do so. It repeatedly relys upon allged facts and evidence (other than prison conduct) that has never been before the jury nor admitted as true by the Prisoner in court. In Petitioner's case they used claims made by the state for grounds to deny parole (Exhibit C, pp. 27-30) and set the next hearing date five years when the last parole hearing was only set for two years. The D.A.'S Office issued a Plea Bargain for Second Degree Murder, et al., yet, at each and every hearing claimed facts never admitted to by Petitioner in the agreement mor

15

proven to the Trial Court and/or the Sentencing Court as required
by law.

The Board uses a probation report that is permitted to contain
hearsay, dismissed charges, facts not proven to a jury nor admitted
as true by the Defendant. It has conclusions of an over-worked
State employee based upon their limited investigation and hand-
written notes. Many Courts have raised concern over the inherant
problems of probation reports containing materials normally not
permitted into court by law and it's inherant misuse of false
information.

### - LAWS -

Penal Code section 1192.2 states that a defendant cannot be
punished for a crime not sepecified in a plea agreement. Jones v.
United States ((1999) 526 US. 227, 243) the High Court held the
limit on the State's authority to reallocate the traditional
burdens of proof:

> "The Constitution safeguards that figure in our analysis
> concern not the identity of the elements defining
> criminal liability but only the required procedures for
> finding facts that determine the maximum possible
> punishment; these are the safeguards going to the
> formality of notice, the identity of the factfinders, and
> the burden of proof." Jones, supra, 526 US at pp. 243, n6.

In Apprendi v. New Jersey ((2000) 530 US 466) the High Court stated:

> "Since Winship, we have made clear ... that Winship's
> due process and associated jury protections extend, to
> some degree, "to the determinations that (go) not to a
> defendant's guilt or innocence, but simply to the
> length of his sentence." 530 US at pp. 484. "Our rule
> ensures that a state is obliged "to make its choices
> concerning the substantive context of its criminal laws
> with full awareness of the consequences, unable to mask
> substantive policy choices" of exposing all who are
> convicted to the maximum sentence it provides." 530 US
> at 489, n.16. "Other than the fact of a prior conviction,
> any fact that increases the penalty for a crime beyond
> the statutory maximun must be submitted to a jury and
> proved beyond a reasonable doubt. ..."(I)t is unconstitutional
> for a legislature to remove from the jury the assessment
> of facts that increases the prescribed range of penalities
> to which a criminal defendant is exposed. It is equally
> clear that such facts must be established by proof beyond
> a reasonable doubt." (Citaitions.)" 530 US at pp. 489.

In Issue II(A), pp. 7 herein, The state has determinied that
the maximum ineligibility period for a indeterminate life sentence
is the fixed term set by legislature.

16

"A plea of guilty is more than a confession which admits
that the accused did various acts; it is itself a conviction;
nothing remains but to give judgement and determine
punishment." Boykin v. Alabama ((1969) 395 US 238, 242.).
"(A) statement in which the defendant 'disclos(es) his
guilt of the charged offense(s) and which exclud(es) the
possibility of reasonable inference to the contrary.'
(Citations.)." People v. Kilpatrick (CA3d 1980) 105 Cal.
App.3d 401, 413, 164 Cal.Rptr. 249, 356. "It is impossible
to imagine prosecuting authorities would have made such an
offer if they believed that they could show (defendant)
acted (as now claimed at the BPH hearing). More importantly,
the Board's finding that (defendant) acted in such a manner
files in the face of the findings ...." In re Scott (2004)
119 Cal.App.4th 871, 15 Cal.Rptr.3d 32, 45. "A guilty
plea "admits every element of the crime charged" (citation)
and is a legal equivalent of a verdict (cite) and is
tantamount to a finding (by a jury). (Citation.)." People
v. Wallace (2004) 33 Cal.4th 738, 93 P.3d 1037, 16 Cal.
Rptr.3d 96, 104. "A plea agreement is a contract; the
government is held to the literal terms of the agreement."
United States v. Johnson (CA 9th Cir. 1999) 187 F.3d
1129, 1134.
"Since Winship, we have made clear ... that Winship"s due
process and associated jury protections extend, to some
degree, "to determinations that (go) not only to a defendant's
guilt or innocence, but simply to the length of his
sentence." Almendarez-Torres v. United States (1998) 523
US 224, 251. Apprendi v. New Jersey (2000) 530 US 466, 484.
"(W)e acknowledged that criminal law "is concerned not
only with guilt or innocence in the abstract, but also
with the degree of criminal culpablity" assessed." Mullaney
v. Wilbur (1975) 421 US 684, 697-98. Apprendi, supra,
530 US 466, 485.

Before the pronouncement of judgement in felony cases, the

parties are entitled to a hearing to present evidence on factors

in agrivation and mitigation affecting the sentence, before the

court. Penal Code Sections 1170(b) & 1204; Calf. Rules of Court

Rules 421, 423. Information included in the probation report must

have some substantial basis for believing the information is

accurate and reliable. People v. Calloway ((1974) 37 Cal.App.3d

905, 908). The defendant does not have the right to cross-examine

the probation officer who made the report. People v. Arbuckle

(1978) 22 Cal.3d 749, 754. Hearsay is admissible in the probation

report. People v. Valdivia (1960) 182 Cal.App.2d 145; CA R of Ct.

R 411.5. Witnesses's conclusory statements are also admissible.

People v. Warren (1959) 175 Cal.App.2d 233. It may also include

dismissed counts and cases. People v. Harvey (1979) 25 Cal.3d

754, 758. Also, counts that the defendant was acquitted of may be encluded. People v. Lewis (1991) 229 Cal.App.3d 259.

The High Court vacated a death penalty due to the court using a factor in agiravation that was not found true by the jury in Sochor v. Florida ((1992) 504 US 527, 540. If the state makes an increase in a defendant's sentence contingent on the finding of a fact, that fact must be found true by the jury beyond a reasonable doubt. United States v. Booker (2005) 543 US 220, 125 S.Ct. 738, 749. Ring v. Arizona (2002) 536 US 584, 602, The Sixth Amendment is very clear, any sentencing scheme that allows a finding of fact that is essential to a defendant's sentence to be found by anyone other than a jury violates the defendant's rights to have the jury find the facts beyond a reasonable doubt. Booker, supra, 125 S.Ct. at pp. 2537. Judges have long looked to the report complied by a probation officer, who the judge thinks more likely to have gotten the facts right than a jury, to determine the sentence. Booker, supra, 125 S.Ct. at 760. Blakely v. Washington (2004) 542 U.S. 296, 124 SCT ____ at 2542. Every defendant has the right to insist that the State prove to a jury all the facts legally essential to the punishment. Blakely, supra, 124 S.Ct. at 2543.

Since the High Courts of both the United States and California have held that a plea of guilt, such as given in a plea agreement, is more than just an admission — it is a conviction that excludes the possiblity of inferences to the contrary, which admits all of the facts listed in the agreement, IT IS ONLY those facts that can be used to determine the defendant's sentence, per the Sixth Amendment. The probation report can have any facts not proven to a jury, encluding those facts found not true by the jury(See Lewis, supra.), the probation report fails the standard set by Winship, and its prodigy. The use by the Board, clearly violates Petitioner's Constitutional Rights to have ALL of the factors proven in court - either by jury or his own admission of guilt, since the Law requires the Board to obey the same Laws, Rules, and Regulations that are binding on the Sentencing Court. Penal Code Section 3041(a). And the State cannot do a run'around the Constitution and it's own laws by masking policy choices to allow the Board to do so.

18

## - CONCLUSION -

It is clear that the Board does not follow the laws of the State, let alone the laws of the Country, in conducting parole hearings. They ignore Court Orders on a regular basis, as if they never were issued. And in the case of the Petitioner, They have used the facts of the crime past the time permited by Legislature. Petitioner's crime carries a 15 to life, plus the gun use enhancement that brings the minium ineligibility for parole based on the crime to 20 years. Which expired in 1998, at the latest.

The Board refuses to accept Reasonalble Parole Plans in Mexico. Facts that Petitioner has or will have upon release, land, money, friends and family support, and work, is ignored without any evidence to the contrary by the Board. The Board ignores the facts that Petitioner was an adolescence under an enormus amount of streess at the time of the crime. That since his incarceration Petitioner has matured and given up those childhood recklessness and attitudes. They point to his RVR"s while incarcerated. Yet, ignore the fact, that Petitioner gave up the life style of gangs and since that time, has only had a couple of rule violations in eleven (11) years, compared to the numerous ones prior to debriefing.

Then the Board tells Petitioner to get a vocation - while knowing the CDCR will not permit Petitioner to attend Vocational Training due to his Epilepsy. Basically violating the ADA. It also holds Petitioner"s prior drug addiction as grounds for denial even though the ADA forbids the State for holding 'former' drug use as grounds for denial. Since it is considered a disability.

The Board further added insult to injury by setting the next hearing date five (5) years away, because the Petitioner would not sign a waiver for the hearing, in exchange for a two year denial. Even though it was ordered by the Superior Court of California, Marin Count to stop such illegal practices. It clearly shows that the Board was perjudice and had predetermined their decision prior to the hearing, in clear violation of Petitioner"s Due Process Rigths, and the laws governing the Board.

Therefore Petitioner believes that he has Never received a Constitutionally adequate Board Hearing on the Proven Facts of his Case. Thus should be granted parole and allowed to return HOME to Mexico to live as a productive citizen.

19

## III.

### INEFFECTIVE ASSISTANCE OF COUNSEL, BEFORE, DURING AND AFTER THE BPH BOARD HEARING CA.P.C. SECTIONS 3041.5 AND 3041.7; TITLE 15, SECTION 2256. U.S. CONSTITUTION FIFTH AMENDMENT.

#### - FACTS -

Upon being notified by BPH of the name and address of appointed counsel for the hearing, Petitioner wrote and sent the following items to counsel for consideration and introduction to the Board: A) Five page letter giving numerous cases that would support motions to the Board to disregard the unsupported claims made by the D.A. and law enforcement; B) Three page parole plan; C) A seven page statement to the Board; D) A letter to the Board; and E) A hand copied duplication of a CDCR Memorandum. See Exhibit F.

At the attorney - client meeting , Ms. Ludwig stated that she had received an envelope from the Petitioner, but had not opened it. Counsel explained that she had only read the BPT Summery Page of the last Board Hearing just prior to meeting with Petitioner. Ms. Ludwig did not want to review any of the facts and any other issues for the hearing. Ms. Ludwig stated that the Board wanted her to have Petitioner sign a waiver of unsuitability in exchange for a Board Hearing set in TWO YEARS. This waiver would allow the Board not to hold an actual hearing with the Petitioner. Counsel stated that the Board had already determined that Petitioner was not eligable for a parole date, and did not want to waist time on his hearing.

Counsel explained that if Petitioner refused to sign the waiver, the Board would set his next hearing date five years away. Which is the maximum time permitted by law.

Petitioner stated that he didnot believe that he was unsuitable for parole and would not sign a waiver saying so. That He wanted to present his case for parole to the Board. Ms. Ludwig stated that it was already decied that if he didnot sign the waiver, the Board would set his next hearing five years away instead of two years offered if he signed the waiver.

Petitioner asked counsel to prepare for the hearing and have motions ready to challenge the claims made by the D.A. and law enforcement. Petitioner also requested Counsel to Move that CDCR conduct a "pre-Board audit" as required by CDCR D.O.M. Section 7404.3.2. Counsel refused these requests, stating that it would

a waste of her time since the Board had already decieded not to grant suitability.

The 'pre-Board audit' would require up-dated materials on Psych-Reports, In Custody behavior, et al.. Without such up-dated materials, it has been determined that the Board cannot conduct a proper hearing. Thus is required before each hearing. Counsel is suppose to make sure that CDCR does this audit. As it was, the Board relied on information that was clearly out-dated, and on incomplete/inaccurate information on Rule Violation Reports. Some of which had been adjudicated in Petitioner's favor and dismissed. But, due to the lack of a Pre-Hearing audit, were left in the file and not clarified as being adjudicated in any manner. See Exhibit C, Board Transcripts, where these were repeatedly mentioned.

At the Hearing, Counsel asked Petitioner to reconsider the waiver, stating that the Board didnot want to see him at all. That they would deny parole and set a date five years away, if he refused to waive his rights. At the hearing, Petitioner raised the issue of Counsel trying to pressure him into waiving his rights. Exhibit C, pp. 24:24-25:10. Counsel did not deny it, but stated that Petitioner did have the right to be present and present his case for parole.

The Board found that nothing had been updated from the 2002 and eariler hearings. Per Board policies, this should have stopped the hearing with the orders from the Board to CDCR to do a 'Pre-Hearing audit' as required by regulations and Due Process. But, the Board forged ahead with out-dated information, ignoring their own policies and numerous Court Orders regarding this issue.

Counsel did not object to this nor to the use of out-dated data. Counsel had refused to prepare for the hearing by reviewing the Central File, as required to do to properly perpare for the hearing and to have inaccracies corrected prior to the hearing. Counsel did not move the Board to postpone the hearing until Prison could do the Pre-hearing audit. Division 2 of the Title 15 CCR, claerly state the duties of parole hearing counsel. Counsel did not abid by these rules and regulations. To be on the Boards" approved counsel list for appointments, Counsel must show knowledge of the rules and regulations. Thus knows her duties to Petitioner.

After the hearing, Petitioner asked Counsel for the Parole Packet that the BPT had issued to her to prepare for the hearing and all documents sent to her on the behalf of and by Petitioner. She refused. Petitioner then made a formal written request under the State Bar's Rules of Professional Conduct, Rule 3-700(D)(1). Which state that the material is the property of Petitioner and must be turned over tho client upon request. No response from counsel. The State Bar was sent a complaint and failed to act upon it. At each level of State Habeas Court Proceedings, Petitioner asked the Court for discovery orders for these documents. The Courts denied each request and stated that the Petitioner had failed to make a prema facia case.

Ms. Ludwig represented many inmates before the board on November 01, 2005, along with Petitioner, Those that signed the waivers received a two year postponement to the next hearing. Those that did not sign the waivers, received a five year post-ponement. Petitioner asked the State Habeas Courts for discovery of such Board documents, and was denied. Petitioner asked Counsel for this information, and was ignored. Such a request would not violate any attorney-client confidentaility since no names would have been given. Just the numbers.

                          - LAWS -
Under CA.P.C. Sections 3041.5 and 3041.7; Title 15, CCR Section 2256, Petitioner has the statutory right to counsel at all parole hearings. The U.S. Constitution Fifth Amendment requires the effective assistance of counsel, when the right to counsel attaches. Title 8 U.S.C. Section 1362, grants aliens the statutory right to counsel in deportation hearings and the Court has held that such statutory right to counsel is governed by the Fifth Amendment. Reno v. Flores (1993) 507 US 292, 306, 123 L.Ed.2d 1.

California State Bar's Rules of Professional Conduct, Rule 3-110(C) requires counsel to have the necessary learning and skill to take a client's case. Rule 3-700 requires counsel to protect the future rights by turning over the client files to the client upon the request of the client.

Counsel is required to adequately investigate the case. In re Marquez ((1992) 1 Cal.4th 584, 596, 3 Cal.Rptr.2d 727. Failure to

challenge evidence. People v. Ledesma (1987) 43 Cal.4d 171, 233
Cal.Rptr. 404. Failure to investigate and/or object to the use of
unproven facts/evidence presented by the State. Jones v. United
States, supra, 530 US at 489; Et alli.

> "Ineffective assistance of counsel exists where, as a
> result of counsel's actions (or the lack thereof), 'the
> proceedings was so fundamentally unfair that the (inmate)
> was prevented from reasonably presenting his case.'"
> Saakian v. INS (CA 1st Cir. 2001) 252 F.3d 21, 25.

See also, People v. Bunyard (1988) 45 Cal.3d 1189, 1215, 249
Cal.Rptr. 71; Strickland v. Washington (1984) 466 US 668, 688, 693,
104 SCt 2052, 80 LEd2d 674.

Counsel refused/failed to have CDCR update Petitioner's files
as required for and by the BHP for the proper hearing of an inmates
eligibility for parole suitability. While it could be argued that
counsel knew that no matter what she did to prepare for the Board
Hearing, the Board had already predetermined the outcome of the
hearing in advance. Yet, that is clear grounds for counsel to make
a solid record at the hearing for the future review by the Courts.
Since the predetermination of the outcome of a hearing by the Board
is forbidden by regulations and statutes, as well as Petitioner's
Due Process rights to a fair and impartial hearing.

The only thing that Counsel did do at the Board Hearing was to
assure her own continued appointments to inmates as counsel by the
Board. Thus securing her paycheck from them.

## - CONCLUSION -

Petitioner did not receive effective assistance of counsel,
before, at, and afterwards. Counsel knew she was ineffective and
was not obeying her legal duties to the clients she was appointed
to provide adequate counsel for. Thus, she refused to obey law
that requires her to turn over client files to the client. The Board
knows that this counsel will not be a advocate for the inmates she
represents, thus keeps appointing her. And worst of all, the State
Habeas Courts, have choosen to turn a blind eye to these facts -
allowing the Board to appoint counsel whos only intentions is to
get reappointed to other Hearings and make more money. Even to the
point of trying to strip away the Due Process and Fair Hearing
Rights of the Prisoner, with the Board.

I V.

## PETITIONER HAS A CONSTITUTIONALLY
## PROTECTED LIBERTY INTEREST IN PAROLE.

Petitioner has exceeded the Statutory maximum ineligibility
period set by law for second degree murder and weapon use determinate
sentence that gave a total of 20 to life by June 1998. At that point,
by California Laws, Petitioner became eligable for parole. Unless,
the Board could point to facts admitted to by Petitioner at the
plea agreement Hearing, that proves that the offense(s) were
especially heinous, attrocious or cruel. In comparision to other
Second degree murders.

The Board did not do this, and unless they can specify the
actual factors and evidence relied upon to support this findings,
of especially ..., the Board cannot parot the words and justify
denial. The Board is also required to weigh all evidence in both
tending to show unsuitability as well as suitability. But in the
case of the Petitioner, the Board ignored evidence of suitability,
and at times, used the evidence of suitability to find unsuitability.

Like, that Petitioner was having family problems, See Memorandum
of Facts, pp. 1-4, herein. These problems of an adolescent lead to
the commission of the crimes. Since the Petitioner has reconciled
wiht his Mother (before her death) and Her Husband, which shows
that the termole of childhood has passed, and that Petitioner has
grown up emmotionally. That such emmotional stress is unlikely
to reoccure.

Likewise, the Board uses his choice to not contact his
ex-girlfriend and their child, as grounds for denial. Do they want
Petitioner to disrupt these peoples lives in order to prove that
he is eligible for parole?

The Board also points to the numerous CDCR-115's and 128's
Petitioner received while associated with prison gangs. While
ignoring facts that since his debriefing, he has only had a couple
of write-ups, which occured after his Mother's death while coming
to visit him at Calipatria State Prison. Very few prisoners can
get through their terms without some kind of write-ups. They are the
exception, not the rule. Prior to 1934 Petitioner had 19 CDCR-115's.
After that he had 7 CDCR-115's. For nearly 10 years, Petitioner had
NO CDCR-115's. And some of the CDCR-115's in 2004, were dismissed
or adjudicated in his favor, but not excised from the file.

24

See Exhibit G, section D of the Life Prisoner Evaluation.
For the complete run-down of disciplinary history.

The Board also held that Petitioner needs more therapy to
become eligable for parole. Even though the Psychirist Report
says the opposite. That Petitioner is no more of a risk to society
as anyone already out there. As long as he stays away from gangs,
drugs and alcohol. He has both Family and Friends to assist and
support him in this requirement.

The Board held that he needs more education and training to
be eligable. Ignoring the fact that Petitioner has a GED and has
repeatedly tested with a 12.6 GPL. Exhibit G, section B. That per
CDCR and Prison Policy, Petitioner cannot particapate in Vocational
training classes due to his epilepsy.

ETC. ETC. ETC....

## - LAWS -

In the case of <u>In re Scott</u> ((CA 1st Dist. 2004) 119 Cal.App.4th
871, 15 Cal.Rptr.3d 32) the court held the following to be true:

1. Parole is the rule, not the exception;
2. Conviction for second degree murder does not render one
   unsuitable;
3. To demonstrate "an exceptionally callous disregard for
   human suffering" the commission must have been more violent
   than ordinarily shown for second degree murder;
4. An "inexplicable motive" is one that is unexplained or
   unintelligible;
5. While the Board holds broad discretion over parole
   suitability, it is not complete, IT MUST ABIDE by the laws;
6. Facts relied upon by the Board cannot differ from those
   established in the Court Room - about the circumstances of
   crime(s) and the situations surrounding the commission;
7. ET ALII....

In the Case of <u>In re Criscione</u> (Exhibit E) the Court held that:

"As noted supra, a reason the proof in this case
irrefutably establishes constitutional violations is
because the Board does not, in actual fact, operate
within the limiting construction of the regulations."
at pp. 26.
"This practice results in violence to the requirements
of due process and individualized consideration which
are paramount to the proper exercise of its broad
discretion." at pp. 27.
"The PC Section 3041(b) exception to the rule can only
be invoked when the "gravity of the current convicted
offense or offenses, or the timing and gravity of current
or past offense or offenses, is such that consideration
of public safety requires a more lengthy period of
incarceration for this individual." The word "gravity"
is a directive for comparison just as "more lengthy"
indicates a deviation from the norm." at pp. 28.

"By simple definition the term "especially" as contained
in section 2402(c)(1) cannot possibly apply in 100% of
cases, yet that is precisely how it has been applied by
the Board. As pointed out by the Second District Court
of Appeal, not every murder can be found to be "atrocious,
heinous, or callous" or the equivalent without "doing
violence" to the requirements of due process. (In re
Lawrence (2007) 150 Cal.App.4th 1511, 1557.) This is
precisely what has occured here, where the evidence
shows that the determinations of the Board in this
regard are made not on the basis of detailed guidelines
and individualized consideration, but rather through the
use of all encompassing catch phrases gleaned from the
regulations." at pp. 12-13.

In the In re Rutherford/now Lugo case before the Superior
Court of California for Marin County (Case No: SC 135399A) a Class
Action suit against the Board, Honorable Judge Verna A. Adams,
has found that the Board not only overdue in having hearings for
lifers, but had instigated an illegal method to reduce the back-
log by having Lifers sign Waivers in exchange for a two year
postponement, and for those Lifers that refused to sign such
waivers, they were given up to five years before the next hearing
even when nothing had occured since the prior hearing to justify
such a drastic delay.

At the August 31, 2004 hearing, the Respondents stated:

"(T)hey will comply with the mandate of PC Section 3041.5
only if and when an inmate seeks and obtains relief in
habeas corpus; otherwise, Respondents conceded that they
will continue to do what they have done in the past,..."
Court Order Dated February 15, 2006, pp.4, Exhibit I.

In March 23, 2006 the Board agreed to stipulated Procedures to
correct their 'procedures'. Yet to this dated, have done everything
but follow them. It is now on appeal. But the findings of the
Superior Court is not being challenged, just the policy to correct
the problems.

As shown in Exhibit H, BPT Life Prisoner Decision Face Sheet,
The Board fully expected Petitioner to sign the "unsuitability"
waiver form 1001A, prior to the hearing. They had already marked
the box for it, and had to change it. This shows that it pre-
determined to deny parole and that they punished Petitioner for
excercising his legal rights to present his case to the Board.

Prisoners have the Liberty interest in Parole and the Due
Process rights to a fair and impartial Parole Hearing. In re Lowe
(CA 6th Dist. 2005) 130 Cal.App.4th 1405, 1421; In re DeLuna
(CA 6th Dist. 2005) 126 Cal.App.4th 585, 591; In re Rosenkrantz

(2002) 29 Cal.4th 616, 654; et al..

The board had no reasonable grounds to reject the findings of the psychologist, and by law are required to accept the findings. In re Smith (2003) 114 Cal.App.4th 343, 369. Even with an old report compiled for the previous Board Hearing. The report clearly states that the Petitioner is not anymore of a danger than any other citizen on the streets is.

> "(C)rimes have little, if any, predictive value for future criminality. Simply from the passing of time, crimes almost 20 years ago have lost much of their usefulness in foreseeing the likelihood of future offenses than if he had commited them five of ten years ago." (In re Lee (2006) 143 Cal.App.4th 1400, 1412.)" Exhibit E, In re Criscione, pp 16.

The United States Supreme Court stated that the only evidence that has indicia of reliability can be used by the sentencing court to determine that persons lenth of sentence. Evidence found true by the Jury or admitted to be true by the Defendant at court.. Blakely v. Washington, supra; Apprendi v. New Jersey, supra; In re Winship, supra; et al.. And since the P.C. Section 3041(a) specific- aily state that the Board must follow the same rules and regulations that the Sentencing Court must follow, these Case Laws protecting Due Process Rights in the determination of length of sentences, MUST be followed by the Board. Especially since the Petitioner has exceeded the maxium minium of parole ineligibility set by law for his crimes. The Board Must point to actual facts supported by reliable evidence to support their findings of unsuitability, or set a parole date. P.C. section 3041; In re Lawrence, supra; et al..

There is no Factual reliable evidence for the Board to hold that Petitioner was a danger to public safety above the danger that any citizen on the streets present. There is not one piece of evidence that Petitioner's parole plans are unreasonable. He has job offers, housing, land and money, as well as the emmotional, physical and materials support of family and friends. Petitioner has a GED and a 12.6 GPL. He has a stable relationship with his Family. He has matured since the crime. He was under a great deal of stress at the time that caused an adolesent to strike out. That stress no long exists.

The Board's denial is clearly Boiler Plate verbage.

27

## V.

## THE STATE HAS VIOLATED THE PLEA BARGAIN AT ALL PAROLE HEARINGS BY CLAIMING 'FACTS' NOT ADJUDICATED IN COURT IN SUPPORT OF FINDING PETITIONER UNSUITABLE FOR PAROLE.

### - FACT -

In the plea agreement, the District Attorney's Office specified each and every fact that they wanted Petitioner to admit to in exchange for Second Degree murder sentence of 19 to life (Petitioner picked up an additional one year sentence while incarcerated).

Petitioner, in open Court admitted to all facts stipulated by the Plea Bargain and the Court accepted the plea and the agreement.

At each and every hearing of parole suitability, the State - ii.e., the D.A.'s Office, has introduced a written statement of their current views of the crime, which differs extreamly from the Plea Agreement facts. They have claimed repeatedly, that it was not acctually a second degree murder, but an execution style pre-meditated murderous rampage. And so on. (Court will have to issue a discovery order to obtain the written statements, since Board Appointed Counsel has refused to turn over the documents and the State Habeas Courts have refused to issue discovery orders and an evidentary hearing on the matter.)

### - LAWS -

A Plea Bargain is a contract between the state and the charged individual that certain specified facts are true in exchange for a plea of guilt to the specified charge(s), etc.. The State must abide by the agreement it makes as long as the individual does. If either party violates the agreement, the plea is void. Santobello v. New York (1971) 404 US 257, 262; et al.. The State is held to the literal terms of the agreement. United States v. Johnson (CA 9th 1999) 187 F.3d 1129, 1134; et alli.. The plea excludes the possibility of reasonable inferences to the contrary, bind the parties to the agreed upon facts of the case. People v. Kilpatrick (CA 3d 1980) 105 Cal.App.3d 401, 413, 164 Cal.Rptr. 349. Under Cal.P.C. section 1192.2 a person cannot be punished for facts and acts not specified in the plea agreement. PC. section 3041(a) binds the Board to the facts adjudicated in court - not the later claims by the state.

"It is impossible to imagine prosecuting authorities would have made such an offer if they believed that they could show (defendant) acted (as now claimed at the BPH hearing). More importantly, the Board's finding that (defendant) acted in (such a ) manner flies in the face of the findings ...." In re Scott (2004) 119 Cal.App.4th 871, 15 Cal.Rptr.3d 32, 45.

In the parole context, the requirements of due process must be met by the reliance on evidence that has been adjudicated in court, on the crime itself. Briggs v. Terhune (CA 9th Cir. 2003) 334 F.3d 910, 914; Jones v. United States (1999) 526 US 227, 243; Apprendi v. New York (2000) 530 US 466, 484, 489, n.16, 499; et al....

The D.A. is an Officer of the Court and the Representative of the State. As such, they are required to obey the Rules of Professional conduct. Filing false and/or misleading documents presumes an intent to secure a determination based upon them and is a clear violation of law. Davis v. State Bar (1983) 33 Cal.3d 213, 239-240, 188 Cal.Rptr. 441, 445, 655 P.2d 1276; Olguin v. State Bar ( )28 Cal.3d 195, 199-200, 167 Cal.Rptr. 876, 616 P.2d 858; Rule 7-105, State Bar Rules of Professional Conduct; et al.. Conduct unbecoming is conduct contrary to Professional Standards that show an unfitness to discharge obligations to the Court, the State and the Law. In re Snyder (1985) 472 US 634, 644-45; Theard v. United States (1957) 354 US 278, 281; et al..

Dispite repeated rulings by the courts on parole boards relying on the claims of the D.A.'s that donot correspond to the facts adjudicated in court regarding the commitment offense(s), the D.A.'s and the Board continue to rely on facts not adjudicated in accordance to due process to determine unsuitability.

How many defendants would accept a plea agreement in exchange for a life max sentence, if the D.A. stated in court that they were not bound to the agreed upon facts and would present un-adjudicated 'facts' at the parole hearings to keep defendant incarcerated for the max term of life????

The fact that the Board accepts and clearly supports such actions of the DA., raises the question of legallity of the whole parole hearing process. The fact that numerous courts have found that the facts relied upon by the Board presented by the State, were not the ones found by the jury or admitted to by the Defendant,

should raise some red flags that something is wrong. Especially, since they continue to do so, even after the courts specifically state that the facts are not supported by the evidence properly adjudicated at trial, or plea hearing. The Board has repeatedly, reused the facts in the rehearings ordered by the courts. Showing total disregard for the courts and the laws.

The Defendant has the constitutional right to have the State prove to a jury all the facts legally essential to the punishment. This includes plea agreement facts - in as much as that the defendant admitts to those facts stated in the agreement as true, just as if a jury found them. Any fact not expressily admitted to by the Defendant can not be used to determine his sentence. Blakely supra, 124 S.Ct. at 2543. To allow the State to use facts not subjected to the regors of jury and/or not agreed as true by the state and defendant in a plea agreement, clearly violates the Petitioner's Constitutional Rights, and Liberty Interest in Parole.

Since Parole is the rule, In re Scott, supra, et al., and not the exception to the rule. Allowing the State to introduce un-proven allegations in an attempt to support unsuitablity allows the rule to be ignored for the exception.

## CONCLUSION

The State has intentionally deprived the Petitioner of his Liberty Interest in Parole through the introduction of un-proven allegations; Ignoring facts and findings without out any evidence to the contrary; Ignoring any fact that shows eiligibility for parole; Denying effective assistance of counsel; and so on.

Petitioner has suitable parole plans; he is not a threat to society according to the Pscy reports; he has matured and developed stable relationships with family and friends, an so on.... AND has completed the statutory maximum of parole ineligibility set by the state for his crime.

Thus the actions of the Board violates Petitioner's rights and the Laws of the State and Country, requiring reversal and court ordered release.

"However, the diferential "some evidence" standard has
outer limits. (Citation.) If it is established that a
particular judgment was predetermined, then a prisoner's
due process rights will have been violated even if there
is "some evidence" to support the decision. (See Bakalis
v. Golembeski, 35 F.3d 318, 326 (7th Cir.1994) (a
decision-making "body that has prejudged the outcome
cannot render a decision that comports with due process.'");
see also, In re Rosenkrantz, 29 Cal.4th at 677, ... (a
parole decision "must reflect an individualized consider-
ation of the specified criteria and cannot be arbitrary
and capricious.") The California Supreme Court has
explicitly stated that a blanket no-parole policy as
to certain catagory of prisoners is illegal. (Citation.)"
Martin v. Marshall, supra, 431 F.Supp.2d at 1043.

In what little of the evidence Petitioner does have, a strong
showing is made for discovery of the materials denied by Board
Appointed Counsel in clear violation of State Laws; The Sentencing
and Plea Hearing Transcripts; et al., as shown in Exhibit H,
the Board had already determined before the hearing not to grant
parole suitability and had encouraged Appointed Counsel to secure
a waiver of Suitability, which counsel did. Instead of preparing
for the hearing as required by Professional Conduct Rules and
the Constitution, and statutes. Counsel chose not to since she
knew that the Board had already made it's decision in advance of
the hearing.

It is also shown, that the Board did not have any evidence
to contradict nor challenge Parole Plans, Psych. Report, et al.,
that suppoorts suitability. The use of the crime, unless they can
and do point to specific evidence that was adjudicated in accordance
with Due Process Requirments, can not be used past the Statutory
maxium eneligibility period of 19 years (15 for the Second degree
murder, and 4 for the weapon use enhancement). As even the CDCR
and the Board documents show, in Exhibits G and H, the Petitioner
became eligible for parole, including the one year sentence, on
or about May 30, 1992. Petitioner calculates that from his arrest
on June 17, 1979 started the clock since he did not bailout of
jail prior to incarceration in the State Prison. Twenty years
ended on June 17, 1999. This encludes the determinaté sentences
of 4 years and 1 year, with the 15 years of the life sentence.
Either number shows that the base ineligibility period set by law
expiried. The Board ignored laws and case laws prohibiting the use

the facts of the crime after the base ineligibility period had passed, unless the proven evidence of the case shows it to be of a greater or especially grave, heinous, atrocious incomparison to other Second degree murders. But, instead of relying on the evidence adjudicated in court, the Board relied on the claims of the State and the report of an over worked probation officer, that under California Laws can contain unadjudicated 'facts', suppositions, conjecture, hearsay, etc., that have not withstood the rigors of Due Process.

The Board told Petitioner to get a vocational training, while knowing that due to his epilepsy, the prison system willnot permit him to obtain. This is a 'Catch-22' situation and a clear violation of their regulations. (15 CCR sect. 2402(d)(8)) That uses the word 'OR' in it, stating: "..has made realistic plans for release or has developed marketable skills...". It does not use the word 'and'. Petitioner has Realistic Plans for Release. He has the support of family and friends as well as job offers and housing. On top of which his Grandfather and Mother has left him with a farm and money upon his release and return to Mexico. And the Board had before it, the evidence of such. Yet it declared that the Petitioner did not have realistic plans for parole, with no evidence to support such a decision. Thus shows that their decision was arbitrary and capricious, and not based on the evidence.

The Board violated their own regulations, Court Orders and Rulings, State Laws that govern their actions, and Petitioner's Legal Rights in denying parole suitability. The 'some evidence' standard was not even met since that standard requires that the evidence itself must meet the Due Process standards first, before the Board can rely upon it, and they have not used any evidence that meets this standard.

Petitioner was deprived of Liberty Interest in Parole by the Board and the Board had already determined the out-come prior to the hearing in direct violation of Constitutional Rights of Petitioner. Thus, their decision doesnot meet the standards of law, and cannot stand. The Board has shown numerous times to the courts, that even if returned to them for a new hearing, they are going to do business as usual and deny parole. Petitioner therefore asks that upon showing of good cause that the

Court order his release and return to his native Country of Mexico forthwith, Instead of allowing the Board to delay the release by doing business as normal through a rehearing and having to re-litigate through the state courts.

Petitioner has changed and his prison record does reflect this change. Petitioner is no longer the adolesent that went on a temper-tantrum that ended up taking a life of an innocent by-stander. Petitioner can not change the past, no one can, but this Court can assist him in changing his present and give him a better future as a productive citizen. And is that not the main goal of punishment? To correct patterns that lead to illegal acts.

<u>PRAYER</u>

Petitioner prays that the Court grant an evidentary hearing and grant appointment of cousel to conduct discovery to obtain the evidence that will support all of Petibner's issues, since the state courts have refused to hold such a hearing and denied the discovery requests.

Petitioner also requests that the Court, upon finds of the evidence protect Petitioner's future rights to Due Process since the Board has admitted to the Marin Superior Court, and has proven by its actions, that it willnot obey the laws and court orders without being forced to do so. That the Court removes the Parole determination from the Board in this case.

///
///





Name JOSE RAMIREZ-SALGADO

Address D2-233-L P.O. Box 5002

Calipatria State Prison

Calipatria CA 92233-5002

CDC or ID Number C-11124

## SUPERIOR COURT OF CALIFORNIA

## FOR SAN DIEGO COUNTY

*(Court)*

| | |
|---|---|
| JOSE RAMIREZ-SALGADO | **PETITION FOR WRIT OF HABEAS CORPUS** |
| Petitioner | Request for Discovery and Hearing |
| vs. | No. _____ |
| L.E. SCRIBNER, Warden (A) | *(To be supplied by the Clerk of the Court)* |
| Respondent | |

## INSTRUCTIONS — READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. January 1, 1999]
Optional Form

**PETITION FOR WRIT OF HABEAS CORPUS**

WEST GROUP

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rules 56.5, 201(h)

Name  Jose Ramirez- Salgado

Address  D2-233-L  P.O. Box 5002

CALIPATRIA STATE PRISON

CALIPATRIA CA 92233-5002

CDC or ID Number  C-11124

CALIFORNIA COURT OF APPEAL

FOURTH DISTRICT
(Court)

---

| | |
|---|---|
| Jose Ramirez- Salgado | PETITION FOR WRIT OF HABEAS CORPUS |
| Petitioner | |
| vs. | No. D048877 |
| L.E. Scribner, Warden (A) | (To be supplied by the Clerk of the Court) |
| Respondent | EVIDENTIARY HEARING REQUESTED |

## INSTRUCTIONS — READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

---

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Form Approved by the
Judicial Council of California
MC-275 [Rev. January 1, 1999]
Optional Form

PETITION FOR WRIT OF HABEAS CORPUS    WEST GROUP    Penal Code, § 1473 et seq.; Cal. Rules of Court, rules 56.5, 201(h)

Name _Jose Ramirez-Salgado_

Address _D2-233-L   P.O. Box 5002_

_Calipatria State Prison_

_Calipatria CA 92233-5002_

CDC or ID Number _C-26264_

_Supreme Court of California_

_____
(Court)

| | |
|---|---|
| _Jose Ramirez-Salgado_ <br> Petitioner <br><br> vs. <br><br> _L.E. Scribner, Warden (A)_ <br> Respondent | **PETITION FOR WRIT OF HABEAS CORPUS** <br><br> No. _____ <br> (To be supplied by the Clerk of the Court) |

## INSTRUCTIONS — READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Page one of six

**PETITION FOR WRIT OF HABEAS CORPUS**

WEST GROUP

Penal Code, § 1473 et seq.; <br> Cal. Rules of Court, rules 56.5, 201(h)



F I L E D

APR    2006

BY ANY OK EDING A. Deputy

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF: | ) HC 17291 - 2nd Petition |
| | ) |
| | ) CR 47435 |
| JOSE RAMIREZ-SALGADO, | ) |
| | ) ORDER DENYING PETITION FOR |
| | ) WRIT OF HABEAS CORPUS |
| Petitioner. | ) |
| | ) |
| | ) |
| | ) |

AFTER REVIEWING THE PETITION FOR WRIT OF HABEAS CORPUS AND THE COURT FILE IN THE ABOVE-REFERENCED MATTER, THE COURT FINDS AS FOLLOWS:

On November 1, 1979, Petitioner pleaded guilty to second-degree murder (Pen. Code § 187), robbery (Pen. Code § 211), and assault with a deadly weapon (Pen. Code § 245(a)). Petitioner also admitted the allegation that he was personally armed with a firearm during the commission of the above offenses. (Pen. Code § 12022.5). On November 28, 1979, Petitioner was sentenced to an indeterminate term of 20 years to life in state prison.

On February 7, 2003, Petitioner filed his first petition for writ of habeas corpus in this Court, contending he received ineffective assistance of his defense counsel. This petition was denied on February 19, 2003.

Petitioner filed the instant second petition for writ of habeas corpus in this Court on February 22, 2006, challenging the November 1, 2005 decision of the California Board of Parole Hearings

-1-

1  ("BPH" or "Board") finding him unsuitable for parole.  Petitioner argues the Board violated his

2  constitutionally protected liberty interest in parole by not setting a parole release date.  Petitioner

3  also argues he received ineffective assistance of his counsel at the parole hearing, and the BPH used

4  facts to deny parole that were not admitted by Petitioner in his plea agreement.

5       The Petition is denied for the following reasons.

6       Every petitioner must set forth a *prima facie* statement of facts which would entitle him to

7  habeas corpus relief under existing law.  (*In re Bower* (1985) 38 Cal.3d 865, 872.)  Vague or

8  conclusory allegations do not warrant habeas relief.  (*People v. Duvall* (1995) 9 Cal.4th 464, 474.)

9  The petitioner bears the burden of proving the facts upon which he bases his claim for relief.  (*In re*

10  *Riddle* (1962) 57 Cal.2d 848, 852.)  The petition should include copies of reasonably available

11  documentary evidence in support of claims, including pertinent portions of hearing transcripts and

12  affidavits or declarations.    (*People v. Duvall, supra,* 9 Cal.4th at 474.)    A petitioner's

13  unsubstantiated, self-serving statements do not provide a sufficient basis upon which to prove his

14  claims.  (*In re Alvernaz* (1992) 2 Cal.4th 924, 945.)

15       Petitioner has not met this burden.

16  **Overview Of Parole Suitability Standards:**

17       By statute, when determining suitability for parole, the parole board "shall normally set a

18  parole release date" (Pen. Code § 3041(a)) "unless it determines that the gravity of the current

19  convicted offense or offenses, or the timing and gravity of a current or past convicted offense or

20  offenses, is such that consideration of the public safety requires a more lengthy period of

21  incarceration for this individual" (Pen. Code § 3041(b)).  The state Legislature has given the BPH

22  the power to establish the rules and regulations regarding release on parole. (Pen. Code § 3052.)  The

23  BPH regulations require a panel determining parole suitability for a life prisoner to find the prisoner

24  unsuitable for parole if, in the judgment of the panel, the prisoner will pose an unreasonable risk of

25  danger to society if released from prison.  (California Code of Regulations, Title 15 [hereafter 15

26  C.C.R.] §§ 2281(a), 2402(a).)  The BPH should consider all relevant, reliable information available

27  to it, including the prisoner's social history, past and present mental state, criminal history,

28  commitment offenses, behavior before, during and after the crime, attitudes toward the crime, and

any other information that bears on the prisoner's suitability for release. (15 C.C.R. §§ 2281(b), 2402(b).)

The BPH has also set forth general factors that tend to show suitability and unsuitability for parole. (15 C.C.R. §§ 2281(c)-(d), 2402(c)-(d).) The following are the factors tending to show *unsuitability* for parole that the parole board should consider:

> (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
> (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
> (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
> (C) The victim was abused, defiled or mutilated during or after the offense.
> (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
> (E) The motive for the crime is inexplicable or very trivial in relation to the offense.
> (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
> (3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.
> (4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.
> (5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.
> (6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

(15 C.C.R. § 2402(c).) The following are the factors tending to show *suitability* for parole that the parole board should consider:

> (1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.
> (2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.
> (3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.
> (4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.
> (5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.
> (6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.
> (7) Age. The prisoner's present age reduces the probability of recidivism.
> (8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

1      (9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

2  (15 C.C.R. § 2402(d)).

3      The precise manner in which these specified factors are considered and balanced lies within

4  the broad discretion of the BPH, but any decision to deny parole cannot be arbitrary or capricious.

5  (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 656-657, 677 (*Rosenkrantz*).) Thus, the standard is that a

6  life prisoner such as Petitioner should be granted parole unless the BPH finds, in the exercise of its

7  broad discretion, the prisoner is unsuitable for parole in light of the circumstances specified by

8  statute and by regulation. (See *Rosenkrantz, supra,* 29 Cal.4th at 654-655.) The overriding factor in

9  determining whether a prisoner is suitable for parole is public safety. (Pen. Code § 3041; 15 C.C.R.

10  § 2402(a); *In re Dannenberg* (2005) 34 Cal.4th 1061, 1084 (*Dannenberg*); *In re Scott* (2005) 133

11  Cal.App.4th 573, 591 (*Scott*).)

12      Judicial review of the BPH's decision whether a prisoner is suitable for parole is limited to a

13  determination of whether the factual basis for the decision is supported by some evidence in the

14  record presented to the parole board that has some indicia of reliability. (*Rosenkrantz, supra,* 29

15  Cal.4th at 667; *Scott, supra,* 133 Cal.App.4th at 590-591.) This standard of review requires only a

16  "modicum of evidence." (*Rosenkrantz, supra,* 29 Cal.4th at 677.) It is within the BPH's discretion

17  to decide how to resolve conflicts in the evidence and to decide how much weight to give each

18  factor. (*Id.* at 656, 677.) "It is irrelevant that a court might determine that evidence in the record

19  tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for

20  parole." (*Id.* at 677.) As long as the BPH's decision reflects individualized consideration of the

21  specified criteria and legal standards, and is not arbitrary or capricious, the court's review is limited

22  to ascertaining whether there is some evidence in the record that supports the decision. (*Id.*)

23  **Petitioner's Claims On Habeas Corpus:**

24      **"Some Evidence" to Support Denial of Parole:**

25      Petitioner argues he was deprived of his constitutionally protected liberty interest in parole

26  because there is no evidence to support the Board's decision denying him parole. However, this

27  claim is without merit.

28

The federal courts indeed have found the language of Penal Code § 3041 creates a liberty interest in release on parole, which is protected by the procedural safeguards of the due process clause. (*Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 610, 614; *McQuillion v. Duncan* (9th Cir. 2002) 306 F.3d. 895, 902-903; see also, *Rosenkrantz, supra,* 29 Cal.4th at 653.) However, the California Supreme Court has recently found that whether a prisoner is suitable for parole trumps the prisoner's expectancy of a set parole date. (*Dannenberg, supra,* 34 Cal.4th at 1070-1071 ["The statutory scheme, viewed as a whole, thus clearly elevates a life prisoner's individual suitability for parole above the inmate's expectancy in early setting of a fixed and "uniform" parole date."]) Thus, there is no violation of a prisoner's liberty interest if the parole board properly denied parole.

A decision to deny parole can be based on the nature of the prisoner's underlying offense alone, as long as the parole board has given due consideration to all applicable factors regarding suitability for parole. (*Rosenkrantz, supra,* 29 Cal.4th at 677, 682-683; see also, *Scott, supra,* 133 Cal.App.4th at 594-595), and the circumstances of the commitment offense reasonably could be considered more aggravated or more violent than the minimum necessary to sustain a conviction for that offense (*Rosenkrantz, supra,* at 678, 683; see also, *Dannenberg, supra,* 34 Cal.4th at 1098.)

The parole board in this case did not rely solely on Petitioner's commitment offense in denying him parole. The BPH gave due consideration to all the applicable factors regarding suitability for parole as set forth in 15 C.C.R. §2402(c), (d). First, the BPH considered the underlying commitment offense. Petitioner robbed two victims at gunpoint. He took cigarettes and six dollars from the victims and told them to start running down an alley. They did, and Petitioner fired shots at them, striking one of them in the neck. Petitioner continued running down the alley, firing several more shots at the victims. Petitioner then ran up to a vehicle that had entered the alley, and fired three shots at the occupants. The shots missed the occupants of the vehicle, and Petitioner continued to run down the alley. At that point, a resident who had heard the shots came out of his residence to investigate. Petitioner shot the man three times in the chest and back, fatally wounding him. Petitioner continued running down the alley and approached another victim and demanded his wallet at gunpoint. Petitioner found no wallet, and told the victim to run. As the victim was running, he heard a gunshot. The victim looked back and saw Petitioner run toward him and fire

another shot. (Petition, Exh. A at 11:9-12:10). The Board found that the offense was committed in an especially cruel and callous manner (15 C.C.R. §2402(c)(1); Petition, Exh. A at 27:8-11). Multiple victims were attacked. (15 C.C.R. §2402(c)(1)(A); Exh. A at 28:8-11). The offense was carried out in a dispassionate and calculated manner. (15 C.C.R. §2402(c)(1)(B); Exh. A at 27:11-15). The motive for the crime was very trivial in relation to the offense in that Petitioner shot two people, killing one of them. (15 C.C.R. §2402(c)(1)(E); Exh. A at 27:15-18).

The Board also considered Petitioner's previous criminal record and social history. (15 C.C.R. §2402(c)(2), (3)). Petitioner has a history of unstable relationships with others, and a record of an escalating pattern of criminal conduct and violence. (Petition, Exh. A at 27:18-23).

The Board also considered Petitioner's institutional behavior. (15 C.C.R. §2402(c)(6)). The Board noted Petitioner has programmed in a limited manner while incarcerated. (Petition, Exh. A at 27:24-25). Petitioner has failed to develop a marketable skill that he can put to use when released, has not upgraded vocationally, and has not sufficiently participated in self-help or therapy programs. (Exh. A at 27:26-28:3). In addition, Petitioner has received five 128's and twenty-five 115's while incarcerated. (Exh. A at 28:3-6). He received two of those 115's since his last parole hearing. (Exh. A at 14:17-19).

The Board next considered Petitioner's parole plans. (15 C.C.R. §2402(d)(8)). The BPH noted Petitioner's parole plans were not realistic in that he does not have acceptable employment plans or a marketable skill. (Petition, Exh. A at 28:7-10).

The Board also considered psychological factors. (15 C.C.R. §2402(c)(5)). The BPH reviewed Petitioner's psychological report from 2002, which states Petitioner has a high classification score of 230, but that his behavior has been improving. (Petition, Exh. A at 15:16-23).

The Board also reviewed the 3042 Notice responses, which indicate an opposition to a finding of parole suitability, specifically from the San Diego District Attorney's Office and the victim's wife. (Petition, Exh. A at 16:15-19). The Board also reviewed letters submitted in support of Petitioner's release from several of Petitioner's family members. (Exh. A at 16:19-22).

After weighing the above factors, the BPH determined the positive aspects did not outweigh the unsuitability for parole, and denied parole for five years. The Board concluded:

The prisoner needs therapy in order to face, discuss, understand and cope with stress in a nondestructive manner until progress is made the prisoner continues to be unpredictable and a threat to others. Therapy in a controlled setting but motivation is questionable. In view of the prisoner's assaultive history, continued negative behavior and lack of program participation there is no indication that the prisoner would behave differently if paroled.
(Petition, Exh. A at 28:11-19).

Based on the above, there is "some evidence" in the record to support the Board's finding that Petitioner is unsuitable for parole. This Court finds no abuse of the Board's discretion is apparent in this case.

**Ineffective Assistance of Counsel:**

Petitioner next argues he received ineffective assistance of his counsel at the suitability hearing in that his counsel attempted to prevent him from appearing at the parole hearing. However, Petitioner has presented no evidence he was prejudiced by his counsel's alleged deficiencies.

To show that counsel was ineffective, Petitioner must show (1) counsel's representation was deficient in that it "fell below an objective standard of reasonableness . . . under prevailing professional norms," and (2) counsel's deficient performance prejudiced his defense. (*Strickland v. Washington* (1984) 466 U.S. 668, 688; *People v. Ledesma* (1987) 43 Cal.3d 171.)

The first prong is reviewed under a standard of deferential scrutiny. (*Strickland, supra*, at 689; *Ledesma, supra*, at 216.) Counsel is given the benefit of a strong presumption that his or her conduct fell within the "wide range of reasonable professional assistance." (*Id.*) "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (*In re Marquez* (1992) 1 Cal.4th 584, 603, citing *Strickland, supra*, at 689.)

"To establish ineffective assistance of counsel under either the federal or state guarantee, a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that counsel's deficient performance was prejudicial, i.e., that a reasonable probability exists that, but for counsel's failings, the result would have been more favorable to the defendant. (*Ledesma, supra*, at 239, citing *Strickland, supra*, at 687-688; *People v. Waidla* (2000) 22 Cal. 4th 690, 718)."

The *Strickland* court advised, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland, supra*, at 697).

Here, Petitioner has not shown he suffered prejudice as a result of his counsel's alleged attempt to persuade Petitioner to waive his presence at his parole hearing. Petitioner did personally appear at the hearing, and thus, his counsel's alleged actions were not prejudicial. Accordingly, this Court need not reach the issue of whether his counsels' assistance fell outside the range of reasonable professional assistance.

**Decision Based on Facts Not Admitted in Plea:**

Petitioner also argues the BPH used facts to deny parole that were not admitted by Petitioner in his plea agreement, determined by the court at the plea hearing, or relied upon by the prosecution in offering the plea bargain. This claim is also denied.

A prisoner may refuse to discuss the facts of the crime, in which instance a decision shall be made based on the other information available. The Board takes as true the appellate court's factual findings, or, if there are none, the statement of facts in the probation officer's report. (15 C.C.R. §2236; CEB, Criminal Law Procedure and Practice (2005), § 47.40, p. 1456). Petitioner has cited no law to support his contention that the Board acted improperly in considering facts of the commitment offense that were taken from the 2002 Board report.

Moreover, Petitioner has submitted no evidence in support of his contention. Petitioner fails to state which facts on which the Board improperly relied, and why those facts were erroneous. Petitioner's unsubstantiated, self-serving statements do not provide a sufficient basis upon which to prove his claims. (*In re Alvernaz* (1992) 2 Cal.4th 924, 945.)

**Request for Assignment of Counsel:**

Petitioner's request for assignment of counsel is also denied. Counsel must be provided to an indigent petitioner who makes "adequately detailed factual allegations stating a prima facie case for relief." (*People v. Barton* (1978) 21 Cal.3d 513, 519, fn. 3; *People v. Shipman* (1965) 62 Cal.2d

226, 232). As discussed above, Petitioner here has failed to state a *prima facie* case for relief on habeas corpus. Petitioner has also provided no evidence he is indigent.

Therefore, the petition for writ of habeas corpus is DENIED, in its entirety.

A copy of this order shall be served upon 1) Petitioner; and 2) the Office of the San Diego County District Attorney (Appellate Division).

IT IS SO ORDERED.

DATED: 4·11·06

_____
LISA FOSTER
JUDGE OF THE SUPERIOR COURT

I hereby certify that the foregoing instrument is a full, true & correct copy of the original on file in this office, that said document has not been revoked, annulled or set aside, and it is in full force and effect.

Attest: APR 11 2006 @ 4PM

Clerk of the Superior Court of the State of California, in and for the County of San Diego

By_____ Deputy

COURT OF APPEAL - FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

F I L E D
Stephen M. Kelly Clerk
SEP 1 5 2006
Court of Appeal Fourth District

| | |
|---|---|
| In re JOSE RAMIREZ-SALGADO | D048877 |
| on | (San Diego County Super. Ct. No. CR47435) |
| Habeas Corpus. | |

THE COURT:

The petition for writ of habeas corpus has been read and considered by Justices Nares, McDonald and Irion.

Jose Ramirez-Salgado is serving a prison sentence of 20 years to life after pleading guilty in 1979 to second degree murder, robbery and assault with a deadly weapon, and admitting he was personally armed with a firearm when he committed the offenses. On November 1, 2005, the Board of Parole Hearings (Board) held a hearing and declined to set a parole date, finding Ramirez-Salgado would pose an unreasonable risk to society or public safety if released. The Board based its decision on the cruel and callous nature of the offense, finding multiple victims were attacked or killed and the motive for the crime was inexplicable or trivial compared to the offense. The Board further found Ramirez-Salgado has a record of violence, an escalating pattern of criminal conduct and a history of unstable relationships with others. He has limited prison programming, failed to develop a marketable skill to use when released, failed to upgrade his vocational skills and has not sufficiently participated in beneficial self-help or therapy programs. Further, Ramirez-Salgado failed to show positive changes in that he received 30 disciplinary reports while incarcerated, including two since his last parole hearing.

Ramirez-Salgado claims: (1) the Board relied on facts of the crime which were not admitted by him in his plea agreement, not found by the court at the change of plea hearing and not relied on by the prosecution in offering the plea bargain; (2) he received ineffective assistance of counsel before, during and after the suitability hearing because counsel advised him to waive his right to be present at that hearing; (3) the Board's findings he was unsuitable for parole were contrary to the facts, unreasonable and violated his due process rights; and (4) the Board violated his due process rights by

exercising his legal right to personally appear at the parole suitability hearing and predetermined the outcome of that hearing.  (*In re Alvernaz* (1992) 2 Cal.4th 924, 945.)

     The petition is denied.

                                                            NARES, Acting P. J.

Copies to:  All parties

S148454

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re JOSE RAMIREZ-SALGADO on Habeas Corpus

---

The petition for writ of habeas corpus is denied.

SUPREME COURT
FILED

MAY 2 3 2007

Frederick K. Ohlrich Clerk

DEPUTY

GEORGE
_____
Chief Justice



SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )          CDC Number C-11124
)
JOSE RAMIREZSALGADO )
_____)

**INMATE COPY**

CALIPATRIA STATE PRISON

CALIPATRIA, CALIFORNIA

NOVEMBER 1, 2005

PANEL PRESENT:

Mr. Stephen Lee, Presiding Commissioner
Mr. George Saldamando, Commissioner
Mr. Alejandro Armenta, Deputy Commissioner

OTHERS PRESENT:
Mr. Jose Ramirezsalgado, Inmate
Ms. Linda Ludwig, Attorney for Inmate
Mr. A. Rodriguez, District Attorney
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No          See Review of Hearing
_____    Yes         Transcript Memorandum

**Jennyfer Osecheck, Peters Shorthand Reporting**

ii

# INDEX

                                                              PAGE

Proceedings........................................... 1

Case Factors......................................... 10

Pre Conviction Factors............................... 5

Post Conviction Factors.............................. 13

Parole Plans......................................... 16

Closing Statements................................... 22

Recess............................................... 26

Decision............................................. 27

Transcriber Certification............................ 31

--oOo--

1

1        **P R O C E E D I N G S**

2        **PRESIDING COMMISSIONER LEE:**  This is a

3    Subsequent Parole Consideration Hearing for Jose

4    Ramirezsalgado, CDC Number C-11124.  We are

5    currently located at Calipatria State Prison

6    date of hearing is November 1, 2005.  The inmate

7    was received on December 5, 1979 excuse me, that

8    doesn't sound right.  Out of the county of San

9    Diego, in CR47435 the offense was murder in the

10    second degree pursuant to Penal Code Section

11    187.  The term was set at 15 years to life plus

12    four years for the gun enhancement with a

13    minimum eligibility for parole in May 30, 1982.

14    At this time we will make our appearances my

15    name is Stephen Lee, L-E-E, Commissioner

16    presiding.  We will go to the other

17    Commissioner.

18        **COMMISSIONER SALDAMANDO:**  George

19    Saldamando, S-A-L-D-A-M-A-N-D-O, Commissioner.

20        **DEPUTY COMMISSIONER ARMENTA:**  And I am

21    Alejandro Armenta, A-R-M-E-N-T-A, Deputy

22    Commissioner.

23        **INMATE RAMIREZSALGADO:**  Jose

24    Ramirezsalgado, R-A-M-I-R-E-Z-S-A-L-G-A-D-O.

25        **PRESIDING COMMISSIONER LEE:**  Your CDC

26    number sir?

27        **INMATE RAMIREZSALGADO:**  C-11124.

2

1    **ATTORNEY LUDWIG:**  Linda Ludwig, L-U-D-W-I-
2    G, attorney for Mr. Ramirezsalgado.

3    **PRESIDING COMMISSIONER LEE:**  Go ahead
4    counsel.

5    **DEPUTY DISTRICT ATTORNEY RODRIGUEZ:**  A.
6    Rodriguez from the District Attorneys officer,
7    R-O-D-R-I-G-U-E-Z.

8    **PRESIDING COMMISSIONER LEE:**  Thank you at
9    this time counsels I have an exhibit one.  Take
10   a look at it please to see if you have the
11   documents listed in exhibit one.  It has a date
12   on the bottom right hand corner September 16,
13   2005.

14   **ATTORNEY LUDWIG:**  I have the documents but
15   I am going to note for the record that there was
16   an addendum to the board report, which Mr.
17   Ramirez had that I did not receive.  Since it
18   was one page or less it is not going to effect
19   whether or not we have a hearing.

20   **PRESIDING COMMISSIONER LEE:**  Very good
21   thank you.

22   **PRESIDING COMMISSIONER LEE:**  Counsel do you
23   have the documents listed in exhibit one?

24   **DEPUTY DISTRICT ATTORNEY RODRIGUEZ:**  Yes I
25   do thank you.

26   **PRESIDING COMMISSIONER LEE:**  Very good.  At
27   this time I also have another document that is

3

1  going to be marked exhibit two it is a document

2  which explains the ADA rights of the inmate as

3  well as his hearing rights.  There are two

4  signatures in the back counsel did you sign this

5  document?

6       **ATTORNEY LUDWIG:**  Yes.

7       **PRESIDING COMMISSIONER LEE:**  Did you go

8  over this document with your client?

9       **ATTORNEY LUDWIG:**  Yes.

10       **PRESIDING COMMISSIONER LEE:**  Alright Mr.

11  Ramirezsalgado did you go over this document?

12       **INMATE RAMIREZSALGADO:**  Yes.

13       **PRESIDING COMMISSIONER LEE:**  All right, at

14  this point and time do you wish for me to go

15  over your ADA rights your outline of procedures

16  or your inmate rights?

17       **INMATE RAMIREZSALGADO:**  Yes.

18       **PRESIDING COMMISSIONER LEE:**  Yes or no.

19       **INMATE RAMIREZSALGADO:**  Yes.

20       **PRESIDING COMMISSIONER LEE:**  You want me to

21  go through it over again?

22       **INMATE RAMIREZSALGADO:**  Oh no you don't

23  have to read that again, she already read it to

24  me.

25       **PRESIDING COMMISSIONER LEE:**  That is what

26  ok, are you having any problems with your

27  hearing?

4

1      **INMATE RAMIREZSALGADO:**  No, I just have

2  some problems sometimes comprehending.

3      **PRESIDING COMMISSIONER LEE:**  Is that

4  comprehension because of the language or of

5  something else?

6      **INMATE RAMIREZSALGADO:**  Sometimes when I

7  hear things I think in Spanish before I can

8  think in English.

9      **PRESIDING COMMISSIONER LEE:**  Ok, you don't

10  want an interpreter though?

11      **INMATE RAMIREZSALGADO:**  No.

12      **ATTORNEY LUDWIG:**  We did have a discussion,

13  Mr. Ramirez and I over the use of his

14  eyeglasses.  And he does need eyeglasses to read

15  but he has told me that he does not need the

16  glasses for the hearing.  Is that correct Mr.

17  Ramirez?

18      **INMATE RAMIREZSALGADO:**  Yes.

19      **PRESIDING COMMISSIONER LEE:**  So you wish to

20  continue without your glasses at this time?

21      **INMATE RAMIREZSALGADO:**  Yes.

22      **PRESIDING COMMISSIONER LEE:**  All right at

23  this point and time we will incorporate exhibit

24  two into the file with exhibit one as well.  At

25  this time counsel is your client going to be

26  discussing the facts of the case?

27      **ATTORNEY LUDWIG:**  My client has elected not

5

1    to discuss and facts and circumstances of the

2    case but will address the issue of remorse.

3         PRESIDING COMMISSIONER LEE:  All right, sir

4    would you raise your right hand.  Do you

5    solemnly swear to tell the truth the whole truth

6    and nothing but the truth?

7         INMATE RAMIREZSALGADO:  I do.

8         PRESIDING COMMISSIONER LEE:  Alright, I

9    will indicate to you, you have the right to be

10   heard by an impartial panel, it is my

11   understanding that excuse me Commissioner did

12   you want to indicate something on the record?

13        COMMISSIONER SALDAMANDO:  Yes Mr. Ramirez

14   this is a San Diego case, I spent 34 years on

15   the San Diego police department, 14 as the

16   assistant chief is that going to influence you

17   having me on the board?

18        INMATE RAMIREZSALGADO:  No as long as you

19   are fair?

20        COMMISSIONER SALDAMANDO:  Ok.

21        PRESIDING COMMISSIONER LEE:  At this point

22   and time the inmate has been informed about the

23   previous activities of the commissioner, he has

24   waived it at this time so we are going to

25   continue on.  Inmate was born on April 24, 1960.

26   Inmate was the second child born to a 17-year-

27   old farmers wife.  He knows nothing of his

6

1  mother's condition during pregnancy.  Indicates

2  that at the age of nine or ten he attended

3  school in Mexico for about a year and a half.

4  He learned the alphabet and was able to

5  recognize a few words.  After entering prison he

6  taught himself to read in write in Spanish as

7  well as later on in English.  Inmate's parents

8  were farmers in rural Mexico.  He had one older

9  sister and four younger ones.  Two sisters have

10  died, or died of pneumonia I should say, he has

11  a brother one year his junior.  His mother had

12  some schooling as was able to read and write.

13  Inmates mother died four months ago in a car

14  accident while coming to visit him.  This is

15  troublesome.  One of his sisters accompanied her

16  but has recovered from her injuries, the inmate

17  did not know his maternal grandparents they were

18  killed in a uprising in 1968.  Father and his

19  parents had no education the paternal

20  grandfather worked as a farmer and a butcher.

21  His father died in 1967 of a lung disorder, his

22  mother lived with a man in 1974 and later

23  married him in 1980.  Diabetes is reported on

24  the mother's side of the family.  Sir do you

25  have any problems with diabetes?

26          **INMATE RAMIREZSALGADO:**  Not yet.

27          **PRESIDING COMMISSIONER LEE:**  Not yet so you

1    are thinking about it huh.

2         INMATE RAMIREZSALGADO:  There is a lot of

3    people in my family that have diabetes so.

4         PRESIDING COMMISSIONER LEE:  You have to

5    watch what you eat bottom line.  Sir I am sorry

6    to hear about your mother, what happened?

7         INMATE RAMIREZSALGADO:  She had a roll over

8    in the car when she was coming to visit me here.

9         PRESIDING COMMISSIONER LEE:  Here?

10        INMATE RAMIREZSALGADO:  Yes.

11        PRESIDING COMMISSIONER LEE:  Where was she

12   coming from?

13        INMATE RAMIREZSALGADO:  San Diego.

14        PRESIDING COMMISSIONER LEE:  And that was

15   four months ago?

16        INMATE RAMIREZSALGADO:  That was in 2001.

17        PRESIDING COMMISSIONER LEE:  2001

18   fortunately you have an old psychiatric report

19   so how did you handle that.

20        INMATE RAMIREZSALGADO:  It was kind of hard

21   being in and not being able to attend to her, to

22   see my mother in the funeral.

23        PRESIDING COMMISSIONER LEE:  Have you been

24   able to keep in touch with your sister?

25        INMATE RAMIREZSALGADO:  Yes.

26        PRESIDING COMMISSIONER LEE:  Ok, how about

27   your other family members?

8

1     **INMATE RAMIREZSALGADO:** They come and visit
2 me whenever they have time.

3     **PRESIDING COMMISSIONER LEE:** Inmate has had
4 three live in relationships the duration was
5 approximately two years. When he was 17 he
6 fathered a son, his father however came and took
7 their daughter, her father excuse me her parents
8 however came and took their daughter and the
9 last contact with them was the at the time of
10 the court hearing. So you haven't been in
11 contact with your child or your child's mother?

12     **INMATE RAMIREZSALGADO:** Not since 1979.

13     **PRESIDING COMMISSIONER LEE:** Substance
14 abuse at the age of 12, the inmate began using
15 marijuana, alcohol and heroine. All three?

16     **INMATE RAMIREZSALGADO:** Yes.

17     **PRESIDING COMMISSIONER LEE:** At the age of
18 12?

19     **INMATE RAMIREZSALGADO:** Yes.

20     **PRESIDING COMMISSIONER LEE:** Where did you
21 get it?

22     **INMATE RAMIREZSALGADO:** From everybody on
23 the streets in Tijuana.

24     **PRESIDING COMMISSIONER LEE:** You were just
25 hanging out.

26     **INMATE RAMIREZSALGADO:** When I first got to
27 Tijuana I was living on the streets.

9

1       **PRESIDING COMMISSIONER LEE:**  Away from your

2  family.

3       **INMATE RAMIREZSALGADO:**  In 1972 I got a, I

4  gathered all the money I could together and to

5  come to San Diego because I wanted to come and

6  find my mother.  Because my mother come to San

7  Diego in 1971.

8       **PRESIDING COMMISSIONER LEE:**  Who were you

9  staying with when you were in Mexico?

10      **INMATE RAMIREZSALGADO:**  With my

11  grandfather.

12      **PRESIDING COMMISSIONER LEE:**  And you

13  decided to go find your mother in San Diego?

14      **INMATE RAMIREZSALGADO:**  Yes.

15      **PRESIDING COMMISSIONER LEE:**  So when you

16  were 12 years old you took everything you had

17  and moved to Tijuana?

18      **INMATE RAMIREZSALGADO:**  Moved to Tijuana

19  yes.

20      **PRESIDING COMMISSIONER LEE:**  Ok, but then

21  you didn't go to San Diego?

22      **INMATE RAMIREZSALGADO:**  No I stayed in

23  Tijuana for a while until I find a way to come

24  over and find my mother.

25      **PRESIDING COMMISSIONER LEE:**  Ok so what

26  were you doing in Tijuana at that time besides

27  getting high?

10

1          **INMATE RAMIREZSALGADO:**  Asking questions

2     trying to find a way to get over here.

3          **PRESIDING COMMISSIONER LEE:**  How did you

4     pay for your drugs?

5          **INMATE RAMIREZSALGADO:**  I was with some

6     people that had drugs then I sell it and I would

7     get a profit.

8          **PRESIDING COMMISSIONER LEE:**  At age 16 the

9     inmate was using alcohol and heroin regularly.

10    So for four years you were drinking and taking

11    heroin?

12         **INMATE RAMIREZSALGADO:**  Yes.

13         **PRESIDING COMMISSIONER LEE:**  All right, his

14    pattern continued until the time of his arrest.

15    It said that he had been clean from illegal

16    substances since 1979.  At this time we will go

17    into the facts of the case.  The inmate does not

18    have any prior record juvenile or adult other

19    than the case before us at this time.  Your

20    mother did have an live in relationship however

21    did you ever know this person this stepfather or

22    whoever he was?

23         **INMATE RAMIREZSALGADO:**  Yes, I know him.

24         **PRESIDING COMMISSIONER LEE:**  How did you

25    know him?

26         **INMATE RAMIREZSALGADO:**  Huh?

27         **PRESIDING COMMISSIONER LEE:**  How did you

11

1  come to know him?

2  **INMATE RAMIREZSALGADO:**  When I come over

3  when I got home he was there.

4  **PRESIDING COMMISSIONER LEE:**  You were 16?

5  **INMATE RAMIREZSALGADO:**  Yes.

6  **PRESIDING COMMISSIONER LEE:**  The facts of

7  the case are being taken from the 2002 board

8  report.  Or I take that back the 2005 board

9  report.  On June 16, 1979 the inmate at gunpoint

10 robbed the victim Sidney Pierce and Matthew

11 Foster while they were walking on Wilson Avenue.

12 The inmate appeared to be high or on something

13 at the time.  He took cigarettes and six dollars

14 from the victims and told them to start running.

15 They did and the inmate fired a couple of shots

16 and one of them striking Pierce in the neck.  So

17 (indiscernible) ran down an alley firing several

18 more shots.  Salgado ran up to and started

19 banging on a vehicle which had entered the

20 alley.  The vehicle was occupied by Mr. Holley

21 and his son.  He then fired three shots missing

22 them and fled down the alleyway.  Subsequently

23 victim Lang came out of his residence to

24 investigate.  The gunshots and was shot three

25 times in the chest and back fatally wounding

26 him.  He was dead on arrival at the hospital.

27 There after the inmate continued his running in

12

1    the alley and approached another victim by the

2    name of McCloud and demanded his wallet at

3    gunpoint. McCloud told him he had no wallet and

4    had only five one-dollar bills with him. Upon

5    searching McCloud Salgado found no wallet and

6    ordered McCloud to run. McCloud heard a shot

7    turned and headed back toward the inmate. The

8    inmate saw McCloud coming toward him and then he

9    proceeded to run down the street and fire

10   another shot. The following morning on June 17

11   the inmate was taken into custody a 22-semi

12   caliber pistol was recovered. At this point and

13   time the inmate has indicated to not discuss the

14   facts of the case so at this point and time I

15   will merely ask the inmate sir how do you feel

16   about this offense?

17        **INMATE RAMIREZSALGADO:** I feel it was a

18   tragedy that one life was taken, it was a

19   mistake that I make, and I take full

20   responsibility for that persons (indiscernible).

21   I wished it never happened but it did.

22        **PRESIDING COMMISSIONER LEE:** Ok anything

23   further?

24        **INMATE RAMIREZSALGADO:** Go ahead. I feel

25   for this time in order I did commit a crime

26   (indiscernible) because there was several crimes

27   I committed that day. And keeping me in prison

13

1   any longer don't benefit nobody.  They just

2   harming more people.  And I feel that I already

3   paid my debt to society and I should be aloud to

4   have another chance and go back into society.

5       PRESIDING COMMISSIONER LEE:  Ok at this

6   point and time I will turn it over to Deputy

7   Commissioner, Deputy Commissioner will discuss

8   with you your programming as well as your

9   psychological.

10      DEPUTY COMMISSIONER ARMENTA:  Ok, sir what

11  we are going to do at this point is go over what

12  you have been doing since your last hearing.

13  You were denied for three years at that time,

14  the last hearing was on April 16, 2002.  It was

15  held here in Calipatria.  What I have done is I

16  have gone over your Central File and over the

17  reports prepared by correctional counselor

18  Kellerman.  And lets see what else.  Let me have

19  that one.  I also went over the psychological

20  report which I believe is from the year 2002

21  prepared by Doctor Dallenger.  At the present

22  time your current scores are 226.  226 points

23  that is extremely high.

24      INMATE RAMIREZSALGADO:  Yes.

25      DEPUTY COMMISSIONER ARMENTA:  Ok, you have

26  received a number of 115's you have 27 however

27  they dismissed one in 2002.  So you have 26

14

1  115's.  Your last 115's there was three of them

2  last year.  Since your last hearing you have

3  received three.  Possession of dangerous

4  contraband, battery of an inmate, and the other

5  that the inmate was refusing to submit to a

6  urine sample.

7      **INMATE RAMIREZSALGADO:**  That battery on a

8  inmate was dismissed.

9      **DEPUTY COMMISSIONER ARMENTA:**  Ok, I didn't

10  see that there.

11      **INMATE RAMIREZSALGADO:**  I have a copy of it

12  right here.

13      **DEPUTY COMMISSIONER ARMENTA:**  Can I see it?

14      **INMATE RAMIREZSALGADO:**  Yes.

15      **DEPUTY COMMISSIONER ARMENTA:**  What happens

16  is it is on the list this information is not in

17  here because it is out.  Yah.  Ok so we will say

18  you have received 25.  And only two since your

19  last hearing.  While in prison apparently you

20  did receive your GED.  Back in 1991 you

21  participated in the literacy lab you have worked

22  in the kitchen, had been participating in AA and

23  NA.  You participated for a number of years in

24  life skills, I saw a number of certificates in

25  parenting and anger management and life without

26  a crutch.  You have been taking part in that.

27  One thing sir I will tell you right now that

15

1    concerns me and you mentioned that you have done

2    a long time in prison.  But one of the purposes

3    of these hearings is to determine whether you

4    are would be safe for the community.  And one of

5    the factors we look at is your behavior.  And

6    when I see all these 115's it doesn't speak well

7    for you.  And 25 is a lot of 115's.  And I see

8    we have a number of them for fighting and pruno.

9    Ok so we got that out of the way lets get into

10   the psychological.  Doctor Derringers diagnosis

11   he states that under AXIS I which is the drug

12   area that it is in remission, AXIS II he says

13   you have antisocial personality disorder

14   improving, AXIS III says you have epilepsy and

15   AXIS IV average prisoner stress and gives you a

16   functional score between 70 and 80.  As to

17   whether he considers you a risk, he says his

18   acting out in earlier years (indiscernible) he

19   still has a classification score of 230, this is

20   back in 2002, and he sites your 115's he says

21   however your behavior has been improving.  And

22   prior to that he had not been involved into the

23   fight in quite a few years is what he is saying.

24   His risk factors for violence seem to have been

25   situationally produced in prison.  Certainly if

26   you were released to the community begin to

27   fraternize with former gang members and resume

16

1  drugs and alcohol his violence potential would
2  increase.   Basically he is saying that if you
3  were to have, you could keep your gains that you
4  are earning in AA and NA and you went out to the
5  community and you did not participate with gangs
6  or get yourself into drugs and alcohol that you
7  would be, your risk for dangerousness in the
8  community would be average.   Ok, is there
9  anything else I haven't covered?
10     **INMATE RAMIREZSALGADO:**   No you covered
11  everything.
12     **DEPUTY COMMISSIONER ARMENTA:**   Ok, thank
13  you.
14     **COMMISSIONER SALDAMANDO:**   Ok future plans.
15  Pursuant to 3042 letters were sent out in
16  reference to this hearing and we received two
17  letters of opposition one from the San Diego
18  Police Department and one from the victims wife
19  Felicia Lang.   We also received a letter of
20  support from your niece Margarita.   I guess a
21  niece Malina, your sister Felipa, your niece
22  Artaselle, and your sister Christina.   Ok, --
23     **INMATE RAMIREZSALGADO:**   I have other
24  letters.
25     **ATTORNEY LUDWIG:**   I do have one additional
26  letter from his sister Felipe that was faxed
27  over to me on the 26th of this month.

17

1        **COMMISSIONER SALDAMANDO:**  State?

2        **ATTORNEY LUDWIG:**  His plans to live with

3    her.

4        **COMMISSIONER SALDAMANDO:**  Can I see it?

5    Thank you.  Ok, Mr. Ramirezsalgado what are your

6    plans?  Your parole plans what plans have you

7    made?

8        **INMATE RAMIREZSALGADO:**  My first plans if I

9    was to get out and start a business in Tijuana

10   right.  Cause I have ten acres of land that my

11   grandfather left to me when he passed away.

12   Then my family was trying to talk him into

13   selling the ranch and start a business in

14   Tijuana.  The board had a lot of concerns about

15   me being paroled in Tijuana the last time.  So I

16   talked to my family and recommend my family if I

17   get out that my grandfather wishes and go do

18   some farm workers.  Far away from the borderline

19   because if I stay on the borderline more likely

20   you know I am going to sooner or later going to

21   be identified as a Mexican mafia dropout and

22   probably marking myself for death.  So I will be

23   better off and be better for me and my family if

24   I go back to the ranch and do some farming.

25       **COMMISSIONER SALDAMANDO:**  And where would

26   you live?

27       **INMATE RAMIREZSALGADO:**  In Jalisco.

18

1        **COMMISSIONER SALDAMANDO:** In the state of

2    Jalisco in Mexico?

3        **INMATE RAMIREZSALGADO:** Yes.

4        **COMMISSIONER SALDAMANDO:** With whom?

5        **INMATE RAMIREZSALGADO:** Probably living out

6    there in the beginning I will be staying there

7    with my brothers law father and then I will be

8    in my own house.  There is a house on there but

9    the house is not that good so I will have to

10   rebuild the house.  I have 50,000 dollars to

11   restart my ranch, and get it back in order and

12   working.

13       **COMMISSIONER SALDAMANDO:** And what city in

14   Jalisco was it?

15       **INMATE RAMIREZSALGADO:** It is in

16   (indiscernible).

17       **COMMISSIONER SALDAMANDO:** Ok, thank you.

18   Commissioner.

19       **PRESIDING COMMISSIONER LEE:** At this point

20   and time we have discussed with the inmate his

21   previous history, his parole plans as well as

22   his programming while incarcerated.  Sir you

23   said that you hope someday to be a Mexican mafia

24   dropout is that what you said?

25       **INMATE RAMIREZSALGADO:** No I am a dropout?

26       **PRESIDING COMMISSIONER LEE:** When did you

27   debrief?

19

1        **INMATE RAMIREZSALGADO:**  I did it, I was a

2    victim in 1997 and I was, I started the

3    debriefing when I was in San Quentin in 1982.

4        **PRESIDING COMMISSIONER LEE:**  We have no

5    record of you debriefing.

6        **INMATE RAMIREZSALGADO:**  Lieutenant Robinson

7    goes by the name of (indiscernible).

8        **PRESIDING COMMISSIONER LEE:**  So you are not

9    in general population now?

10        **INMATE RAMIREZSALGADO:**  No sir.

11        **PRESIDING COMMISSIONER LEE:**  Ok, Deputy

12    Commissioner do we have anything in the file?

13        **DEPUTY COMMISSIONER ARMENTA:**  I am looking

14    for it.

15        **PRESIDING COMMISSIONER LEE:**  It appears

16    that he did debrief not as a validated member

17    but as an affiliate in 1993.  This is based in

18    the psychological report in 1996.  That is the

19    reason why it didn't come up.  At this point and

20    time counsel for the people do you have any

21    questions of the inmate? Can you hear me?

22        **DEPUTY DISTRICT ATTORNEY RODRIGUEZ:** Yes I

23    can, thank you.  Because I couldn't see what the

24    prisoner presented to the board with respect to

25    the latest 115 about the battery my file

26    indicates it was under review as least as of

27    April of this year, is that been resolved?

20

1      **INMATE RAMIREZSALGADO:**  The 115 was

2  resolved in December of last year.

3      **PRESIDING COMMISSIONER LEE:**  Ok, how has it

4  been resolved?

5      **INMATE RAMIREZSALGADO:**  The 115 hearing and

6  that the officer that attended the hearing they

7  finded me not guilty.

8      **PRESIDING COMMISSIONER LEE:**  You have

9  another one pending right?

10      **INMATE RAMIREZSALGADO:**  No sir.

11      **PRESIDING COMMISSIONER LEE:**  So you have

12  nothing--

13      **INMATE RAMIREZSALGADO:**  There is nothing

14  pending at the moment.

15      **DEPUTY DISTRICT ATTORNEY RODRIGUEZ:**  I am

16  looking at the April 2005 board report under

17  custody history and it indicates the RDR was

18  judicated in December in 2004 and dismissed for

19  insufficient evidence but is being reviewed by

20  the CDO.  I am wondering the status of the

21  review?

22      **PRESIDING COMMISSIONER LEE:**  Does the

23  inmate know?

24      **INMATE RAMIREZSALGADO:**  No.

25      **PRESIDING COMMISSIONER LEE:**  At this point

26  and time that is the status of that 115.  Next

27  question?

21

1      **DEPUTY DISTRICT ATTORNEY RODRIGUEZ:**  Would

2  the board please ask the prisoner if the

3  prisoner believes he has a alcohol problem?

4      **PRESIDING COMMISSIONER LEE:**  Sir.

5      **INMATE RAMIREZSALGADO:**  No sir I don't not.

6      **DEPUTY DISTRICT ATTORNEY RODRIGUEZ:**  Is it

7  reportably that the prisoner believes he has a

8  problem with drugs?

9      **INMATE RAMIREZSALGADO:**  Not anymore.

10     **DEPUTY DISTRICT ATTORNEY RODRIGUEZ:**  Would

11  the board please ask the prisoner if he has a

12  problem with violence?

13     **INMATE RAMIREZSALGADO:**  No I don't have a

14  problem with violence.  Every time I get

15  involved in violence is most of the time I have

16  been put in a situation where I cannot avoid

17  them.  Most of the times I try to avoid them.

18  And in the beginning I was a real aggressive

19  person I did a lot of stabbings, but now my last

20  stabbing was in 1983, since 1983 I try to avoid

21  violence as much as possible.  If nobody attacks

22  me I don't attack nobody.

23     **DEPUTY DISTRICT ATTORNEY RODRIGUEZ:**  The

24  prisoner has chosen not to discuss the events I

25  have no further questions.  Thank you.

26     **PRESIDING COMMISSIONER LEE:**  Counsel do you

27  have any questions?

1       **ATTORNEY LUDWIG:**  I have no questions.

2       **PRESIDING COMMISSIONER LEE:**  At this time

3    we will go to statements.  Hold on just a

4    second.  Do you have any questions?  All right

5    at this point and time we will go to statements,

6    counsel you may be heard.

7       **DEPUTY DISTRICT ATTORNEY RODRIGUEZ:**  Thank

8    you.  I (indiscernible) the board am very aware

9    of the underlying offense and the severity of

10   the underlying offense the complete random act

11   of violence that occurred that day and the

12   absolutely pointless reason given for doing so.

13   It is very troubling to the people that despite

14   what the prisoner described is an extensive

15   period of time in prison it seems that very

16   little has changed.  Because the excuse for the

17   violence on the day of the offense was being

18   high and drinking and yet the prisoner who has

19   been in trouble several times for alcohol and

20   contraband in prison seems, continues to deny

21   having a problem with either alcohol or drugs.

22   It was a sure violent act yet the prisoner had a

23   lot of problems since being in prison denies

24   having a problem with violence.  Why that

25   problem arises from the fact that there has been

26   virtually no self-help and no treatment, he has

27   just been doing time.  And given that he is

23

1  going to get out someday if he gets his wish, he

2  may end up in a situation where he is surrounded

3  by an environment that produced him in the first

4  place there really is no reason to believe he is

5  not going to be violent once he gets out of a

6  controlled environment of prison.  In fact even

7  in the controlled environment of prison he has

8  trouble controlling himself.  He gets out and he

9  is going to start a business from scratch, he

10  has to deal with other people.  And maybe some

11  of his old cohorts come looking for him, it is

12  almost guarantee that there is going to be

13  violence.  There really has been no change in

14  the prisoner all these years.  It just has been

15  watching time.  It is unfortunate because he has

16  been given and opportunity to resolve some of

17  these issues and maybe someday get out and

18  become a productive member of society.  And who

19  knows maybe someday he would return to the

20  United States lawfully but he has chosen not to

21  do that, he has chosen to just sort of stand on

22  his head and mark his time and eventually he is

23  going to earn up enough years and the board is

24  going to let him go.  I don't think that is

25  reasonable.  He may have had an unresolved

26  (indiscernible) in CDC but he has had two or

27  three since his last hearing just a couple of

1  years ago.  He seems incapable of staying out of

2  trouble, trouble in this controlled setting.

3  Trouble when he gets out is going to be trouble

4  for everybody.  I don't think anything has

5  changed since his last hearing and I don't think

6  he is suitable for release.  Thank you.

7      **PRESIDING COMMISSIONER LEE:**  Thank you

8  counsel.  Counsel you may be heard.

9      **ATTORNEY LUDWIG:**  Well Mr. Ramirez has made

10  excellent parole plans for when he is released,

11  I think he has a family that is supportive of

12  him, financially and emotionally.  He has plans

13  to stay away from trouble in Mexico as well as

14  California.  The psychological report says if he

15  refrains from drug and alcohol and gang

16  lifestyles he would be an average risk in the

17  community.  And I am going to submit that he has

18  his GED, he has done AA and NA.  He doesn't have

19  a vocational certificate because he has epilepsy

20  apparently.  But I think that he has shown that

21  he can positive programming and he will be a

22  success if he is released on parole.  Thank you.

23      **PRESIDING COMMISSIONER LEE:**  Sir?

24      **INMATE RAMIREZSALGADO:**  My self I really

25  don't know what to tell you I don't know because

26  my attorney already told me it doesn't matter

27  what I say right here because I will be denied a

25

1    few years.

2        **ATTORNEY LUDWIG:**  I did not tell you it

3    doesn't matter what you say I said you have the

4    right to address the board on why you are

5    suitable Mr. Ramirez, so please do that.

6        **INMATE RAMIREZSALGADO:**  And try to get me

7    to sign a paper for that I don't come in front

8    of you members.  No I feel that I have the right

9    to come here and you know if you know if I get

10   denied unless we should get a fair chance.  Like

11   I told you before it is a tragedy that I

12   committed the crime.  I wish it never happened

13   but it did.  And there is nothing I can do to

14   change that, nobody can change it cause it is

15   already done.  (indiscernible) compassion and

16   find it in your hearts to give me a chance to go

17   back up there and start anew with my family.

18   You know I know that when I commit this crime,

19   they was I think a one or two year old child

20   that, that man had or that family had he grow up

21   without a father, I grow up without a father so

22   I understand that he grow up with a lot of pain.

23   A lot of sadness not being able to see his

24   father, hug his father, or (indiscernible)

25   football game or baseball game.  I really wish

26   you can find the kindness in your heart and give

27   me a parole date.

26

1      **PRESIDING COMMISSIONER LEE:**  Thank you at

2   this time we will recess, we will clear the

3   room, we will deliberate, and we will call

4   everybody back once we have decided thank you.

5                     R E C E S S

6                      --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

27

1       **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                   **D E C I S I O N**

3       **COMMISSIONER SALDAMANDO:**  The panel has reviewed

4       the information received from the public and relied on

5       the following circumstances in concluding prisoner

6       is not suitable for parole, and would pose an

7       unreasonable risk to society and threat to

8       public safety if released from prison.  The

9       offense was carried out in a cruel and callous

10      manner there were multiple victims that were

11      attacked and killed.  The offense was carried

12      out in a dispassionate and calculated manner the

13      offense was carried out in a manner which

14      demonstrates exceptionally callous disregard for

15      human suffering.  The motive for the crime was

16      inexplicable.  You shot and killed one person,

17      you shot another person during this one series

18      of attacks.  The prisoner has previous occasions

19      inflicted or tempted to inflict serious injuries

20      on victims.  The prisoner has a record of

21      violence the prisoner has an escalating pattern

22      of criminal conduct and violence.  He also has a

23      history of unstable relationships with others.

24      The prisoner has programmed in a limited manner

25      while incarcerated.  He failed to develop a

26      marketable skill that he can put to use when

27      **JOSE RAMIREZSALGADO C-11124 DECISION PAGE 1 11/01/05**

28

1   released.  He has failed to upgrade his vocational

2   skills.  He has not sufficiently participated in

3   beneficial self-help or therapy programs.  He has

4   failed to develop evidence of positive change in that

5   he has received five 128's and 27 115's the latest as

6   of April 6, 2004.  And he continues to display

7   negative behavior while incarcerated.  The prisoner

8   lacks realistic parole plans in the he does not have

9   acceptable employment plans and he does not have a

10  marketable skill.  The panel makes the following

11  findings.  The prisoner needs therapy in order to

12  face, discuss, understand and cope with stress in a

13  nondestructive manner until progress is made the

14  prisoner continues to be unpredictable and a threat to

15  others.  Therapy in a controlled setting but

16  motivation is questionable.  In view of the prisoner's

17  assultive history, continued negative behavior and

18  lack of program participation there is no indication

19  that the prisoner would behave differently if paroled.

20  In a separate decision the hearing panel finds that

21  the prisoner has been convicted of murder and it is

22  not reasonable to expect that the parolee would be

23  granted at a hearing during the next five years.

24  Multiple victims were attacked and killed in

25  separate incidents.  The offense was carried out

26  in a dispassionate calculated manner again the

27  **JOSE RAMIREZSALGADO C-11124 DECISION PAGE 2 11/01/05**

29

1   offense was carried out in a manner which

2   demonstrates exceptional callous disregard for

3   human suffering.  The motive for the crime was

4   inexplicable.  The prisoner has a record of

5   violent behavior in that the prisoner again has

6   27 115's and five 128's.  The prisoner has a

7   history of unstable relationships with others a

8   recent psychiatric report dated January 23, 2002

9   authored by John R. Bellinger PhD.  Indicates a

10  need for a longer period of observation and

11  evaluation and treatment.  The panel recommends

12  that the prisoner become and remain disciplinary

13  free, work toward reducing his custody level, so

14  that program opportunities will become more

15  available.  If available upgrade his vocational

16  skills if available participate in self-help and

17  therapy programs.  And cooperate with clinicians

18  in a complete clinical evaluation.  Commissioner

19  do you have anything to say?

20      **PRESIDING COMMISSIONER LEE:**  Well sir you

21  have a very, very high classification score.

22  Until you get your classification score you

23  cannot expect getting a date.  So you are going

24  to have to work at it.

25      **COMMISSIONER SALDAMANDO:**  Deputy

26  Commissioner?

27  **JOSE RAMIREZSALGADO C-11124 DECISION PAGE 3 11/01/05**

30

1

2      **DEPUTY COMMISSIONER ARMENTA:** From 1980 to

3 1983 you got 19 115's. You dug your hole very

4 deep and it is going to take a while to get out

5 of it. And every year that you don't get a 115

6 you at least earn eight points and that's what

7 you get.

8      **COMMISSIONER SALDAMANDO:** Ok, the time is

9 12:40 and this completes our hearing.

10                    --oOo--

11

12

13

14

15

16

17

18

19

20

21

22

23 **PAROLE DENIED FIVE YEARS**        MAR 0 1 2006

24 **THIS DECISION WILL BE FINAL ON:**_____

25 **YOU WILL BE PROMPLTY NOTIFIED IF, PRIOR TO THAT**

26 **DATE, THE DECISION IS MODIFIED**

27 **JOSE RAMIREZSALGADO C-11124 DECISION PAGE 4 11/01/05**

31

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, JENNYFER OSECHECK, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 -30, and which recording was duly recorded at CALIPATRIA STATE PRISON, CALIPATRIA, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF JOSE RAMIREZSALGADO, CDC NO. C-11124, ON NOVEMBER 1, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated  December 4, 2005, at Sacramento, California.

JENNYFER OSECHECK
TRANSCRIBER
**PETERS SHORTHAND REPORTING**



Luis Ramirez Salgado
5442 Lenox Dr.
San Diego CA 92114

Re: Jose Ramirez-Salgado

I am asking this panel to please find leniency in their hearts for my brother Jose

Ramirez-Salgado C-11124. He has been incarcerated now for over twenty-five years

going on close to thirty years. Our family has suffered a lot of pain since his

incarceration. Jose even missed our mother's funeral. Jose loved our mother beyond any

measure! As well as she loved him!! I asked God day and night for his freedom everyday.

" I now ask you". Since the death of my father, my brother and I lived alone for a while.

We did everything together to get food and work to be able to survive. The day that he

was incarcerated I knew that he didn't acted like himself that night. Now that he is older I

know that he has change and he isn't the same, he has matured and knows what he did

was wrong. Without my brother I am just not myself he is the only brother I have and

wish to have him back by my side like we where when we where kids. He has a support

plan from people that love him. I will take full responsibility of my brother. I already

built a house for my brother in Tijuana Mexico. Also my sister Felipa Martinez has a

bank account in Union Bank under her name where she deposits money that is only for

my brother. Which is intended to be use when he gets out, so you can see that he has all

the family support! His future could be bright if given the chance, if continue having him

incarcerated any longer by no means benefits no one any longer. He is just getting older

and has been expressing his remorse on numerous occasions. Our hearts cry out everyday

for our party involved. There has to be a time for punishment and forgiveness when has

completed his time. I fell in my heart that he has fulfilled that part of this tragedy. Now is

the time for healing and togetherness, "I beg you" please give my plea considerable

consideration. And may God bless your hearts with the right decision.

Sincerely,

*Luis Ramirez Salgado*

Luis Ramirez Salgado

Jose Luis Ramirez
5442 Lenox Dr.
San Diego CA 92114

January 15, 2005

Calipatria State Prison Board of Prison Terms

Re: Jose Ramirez Salgado C-11124. Board Hearing

To whom it may concern in the B.P.T. hearing,

      My name is Jose Luis Ramirez , I am the nefu of Jose Ramirez Salgado. I am writing this letter just to let you know that my uncle has change throughout these years. He is not the same nineteen year old that committed the ugly crime back in 1979. To today date my uncle is a different person. Some people do change and I truly believe that my uncle has change. He doesn't do and will not do the things he use to do when he was nineteen or twenty-three years of age. He wants his freedom and be sent back to Mexico, so that he can start a new life in his own country. I am supplicating to you to please see deep in to your heart and find that compassion that God has giving you, to give my uncle a parole date so I can have my uncle back with all of the family t. My father who is my uncle 's brother purchase two lots in Tijuana were he already built a house for my uncle to live in. My uncle has always had the family support and when he get his parole date he will have family support and financial support. Since 1993 all of the family has been preparing to help my uncle to start a new life when out of prison. All of our family loves him very much and misses his companionship.

                                        Sincerely,

                                        Jose Luis Ramirez

Ramon Ramirez
5442 Lenox Dr.
San Diego CA 92114

January 22, 2005

Calipatria State Prison Board of Prison Terms

Re: Jose Ramirez Salgado C-11124 Board Hearing

To whom it may concern in the B.P.T hearing,

My name is Ramon Ramirez and I am the nephew of Jose Ramirez Salgado, and that is why I am writing this letter just to let you know that my uncle has change he is not the same nineteen year old that committed the ugly crime back in 1979. Till today's date my uncle has been a different person.

You know some people do change and I really believe that my uncle has change. He does not do things that he did when he was nineteen or twenty-three. He wants to be free and sent back to Mexico so that he can start a new life in his own country. I am asking and supplicating to you to please see deep into your hearts and find that compassion that God has giving you to please give my uncle a parole date so I can have my uncle back with all of the family. Also my father has purchase two lots in Tijuana were he built a house for my uncle to live in when he comes out. He also has all the family support and financially support.

Since 1993 all of the family has been preparing to help my uncle to start a new life with his family that loves him and misses him. Thank you for your time and may god bless you .

Sincerely,

Ramon Ramirez

Ramon Ramirez

Maricela Ramirez
5442 Lenox Dr.
San Diego CA 92114

January 20, 2005

Re: Jose Ramirez Salgado, C-1114

To whom it may concern in the B.P.T. hearing,

When I turn five my father started taking me to visit my uncle Jose Ramirez-Salgado it was

the first time that I meet him. He is the only uncle I have and he looks like my dad and I would

sometimes mistake him as my dad. From what I could remember my uncle always will tell me to

be good and don't chose the wrong friends. He wouldn't only give me advice he would do the same

with my older brother and my younger ones. When I got older I asked my uncle "why he had to

stay and he couldn't leave with us" he got sad and he told me that he had to stay in there for the

wrong mistakes he made when he was nineteen. Then I asked what he did, he just turn away and

said that he did something bad that he wishes he had never had done and told me to not make the

same mistakes he did. He would comfort me by telling me that he would one day be out when he

finish serving his time and would be able to teach me how to make belts and wooded clocks. He

also warn me about gangs and told me that having those types of friends won't get me no where but

in trouble. Every advice he gave me and my brothers where very helpful because thanks to God that

none of our family is involve in gangs or in drugs. Every time we went to visit him was exciting but

when it came the time to say goodbye to him sadden me so much to see my grandma cry and my

dad cry because I never would see my dad cry because he has always been a strong man that really

doesn't like to show his feelings. I know for a fact that my dad has always need his older brother

by his side. When my uncle was incarcerated my dad's family hasn't been the same because he says

how is it going to be a family with out there brother. My grandma loved my uncle so much that she

had money saved for him to get him out, her wish was to see her boy out of prison and to start a new life all over again. My grandma always wanted to go visit him, if visitation where all week she would of been there. She started to save money to buy herself a car to be able to go visit him more often. My grandma was born on June 12, 1941 and died on June 22, 2001. The day of the accident was when my grandma and her older daughter where going to visit my uncle, when they where half way there my grandma lost control of the car and flip over. I was at work when my brother went to tell my the news that my grandma had pass away and that my aunt luckily had lived. My uncle suffered so much to find out that his mother had died and he couldn't say goodbye to her or even see her. I strongly believe that my uncle has change and that he isn't a little boy he is a grown man that needs to have a chance to start all over again. I know that if my grandmother was a live she would of been the first one to try to do anything for her son. Now it is all of his family doing anything possible just to see the whole family together the way my grandmother has always wanted it to be. My uncle disservice a chance and he should get it because he has completed his time. He wouldn't be alone he has all of the family support and he has somewhere to live at and he will be financially supported by all of use when he gets his parole date. I am sorry if my letter is long and I personally don't think is long enough to say what I want to say but I am going to make it short. All I want is that for you to see deep down into your hearts and give him a chance, so that he could finally be a family again. Thank you for your time.

Sincerely,

Maricela Ramirez

# TALLER "JUNIORS"

## MANTENIMIENTO Y MAS

LUCIA ANDRADE RAMIREZ R.F.C.AARL681213D31

CURP: AARL681213MBCNMC04

BRONCE Y HERMOSILLO #133 COL. REVOLUCION ENSENADA.B.C 22830

TEL: 172-10-78

Ensenada, B.C. del 2005

Regarding: Jose Ramirez Salgado

Throughout this letter I testified that I know Jose Ramirez Salgado, to whom I am requesting his presence and services in my business as a painter. Thanking you for you attention.

Lucia Anrade Ramirez

Further Questions Tel: 172-10-78/ 0446461579259

Thank you

January 31, 2005


Felipa Martinez
3139 Shelby Dr
National City, CA  91950
Re: Jose Ramirez Salgado C-11124

To Whom It May Concern:

Once again I testified that my brother Jose Ramirez Salgado has never been alone I have been by his side since day one taking full responsibility of him and his needs such as food, clothing, medical issues and economical.  I have been with him trying to help him in everything I can since we have faith in GOD that he will be out of prison one day.

My brother Luis Ramirez has also helped Jose Ramirez Salgado by purchasing a property in Tijuana Baja California Mexico, where he has build a house for Jose.  Even though my brother Jose Ramirez Salgado owns a property in Atotonilco Mexico, we are planning on selling that property so we can use that money to purchase a restaurant in Tijuana Baja California Mexico witch will be a business that the family will be operating including my husband Pedro Martinez, so the family can have Jose Ramirez Salgado close to us since my brother and I have properties here in San Diego we can't afford to travel a lot.

I have also kept a bank account separated for my brother in Union Bank of California, money that mother Teresa Ashley that past away left for her son Jose Ramirez Salgado under my name, but that money is only for my brother for when he gets out.  As you all can see my brother Jose Ramirez Salgado has fully support from his family.  I thank you dearly for you time.

Sincerely,

*Felipa Martinez*

Felipa Martinez

January 31, 2005


Marielena Martinez
3139 Shelby Dr
National City, CA  91950

To Whom It May Concern:

The purpose of this letter is to testify that I am the knee of Jose Ramirez Salgado C-11124. I meet him six years ago. I know that every single one of us makes mistakes during our life's, but I also believe that we learn from our errors and our mistakes makes us reflect on what we did wrong and makes us mature and it brings us to redemption were we try to be a better person each day of our life's to try to live better and better ourselves to try to bring us to perfection in what we did wrong in the past.

I do believe that my uncle Jose Ramirez Salgado C-11124 has learned from his mistakes for the time I have meet him he has shown maturity and redemption to his sins committed on the past. I know that God gives each one of us chances to better our self's and who are we to take that opportunity from someone who wants to be better person. Since I was seventeen years old I started visiting my uncle and giving him all my support, because from my point of view I believe that twenty four years in prison are plenty years to pay for a crime done in his youth years. I have a two year old daughter and many other family that would love to share family blessing with our siblings Jose Ramirez he has missed single event that has happened in our family from marriage to giving birth to a new family member. I have given him my support morally and economically I know that my mother Felipa Martinez and my Uncle Luis Ramirez have property for Jose Ramirez Salgado waiting for him in Mexico. He has all the support from our family all we want to see is that my uncle can form part of the family he has really never meet since he has been in prison half of his life.

I appreciate you time and I hope that you can see the need and love we have for my uncle Jose Ramirez to have him with us. I think everyone deserves a second change in life don't you think so? God Bless

Sincerely,

Marielena Martinez

# PRESIDENCIA MUNICIPAL
## D E
## ATOTONILCO EL ALTO, JAL.
#### 47750   MEXICO

| DEPENDENCIA | |
|---|---|
| PRESIDENCIA MUNICIPAL | |
| NUM. DE OFICIO | |
| EXPEDIENTE | |

**Asunto:** *El que se indica.*

EL QUE SUSCRIBE SR. JORGE LUIS SERRANO SOLORIO, PRESIDENTE MUNICIPAL DEL H. AYUNTAMIENTO CONSTITUCIONAL DE ESTA CIUDAD-------------------
-------------------------C E R T I F I C A---------------------------

*Que ante mí, comparecieron los C.C. JOSE IÑIGUEZ RAMIREZ Y CELIA OCE GUEDA DE IÑIGUEZ, para manifestar que:*

*EL C. JOSE RAMIREZ SALGADO, es sucesor UNICO, de su abuelo paterno - Sr. Ramón Ramirez García, finado, del Ejido San José del Valle de esta Comprensión Municipal, con dotación de 10 Hectareas de tierra y- 1 casa.*

*Se extiende la presente CERTIFICACION, a petición del inte resado para los fines legales que correspondan.*

A t e n t a m e n t e .
" SUFRAGIO EFECTIVO. NO REELECCION
Atotonilco el Alto, Jal. Febrero 21 de 1992
POR UN ATOTONILCO MEJOR "

JORGE LUIS SERRANO SOLORIO
PRESIDENTE MUNICIPAL

**INSTITUTO FEDERAL ELECTORAL**
**REGISTRO FEDERAL DE ELECTORES**
**CREDENCIAL PARA VOTAR**

NOMBRE
INIGUES
ALBA
JOSE EUGENIO

EDAD 54
SEXO H

DOMICILIO
C LAZARO CARDENAS S/N -
LOC SAN JOSE DEL VALLE 47775
ATOTONILCO EL ALTO ,JAL.

FOLIO 0000020960973    AÑO DE REGISTRO    1991 01
CLAVE DE ELECTOR    IGALEG49031914H000
ESTADO   14    DISTRITO
MUNICIPIO 013    LOCALIDAD 0086    SECCION 0187



ESTE DOCUMENTO ES INTRANSFERIBLE,
NO ES VALIDO SI PRESENTA TACHA-
DURAS O ENMENDADURAS

EL TITULAR ESTA OBLIGADO A NOTI-
FICAR EL CAMBIO DE DOMICILIO EN
LOS 30 DIAS SIGUIENTES A QUE ESTE
OCURRA.

FERNANDO ZERTUCHE MUÑOZ
SECRETARIO EJECUTIVO DEL
INSTITUTO FEDERAL ELECTORAL



LIC. OSCAR JAIME SANCHEZ      Notario Público

Titular encargado de la Notaría Pública No. 4 hago

constar que la presente copia fotostática es fiel repro

ducción del original que tuve a la vista en ____1____

– – – – UNA – – – – – – – –

fojas útiles doy fe._____

Atotonilco el Alto, Jal._____    2 de Mayo del 2,005



A QUIEN CORRESPONDA:

JOSE EUGENIO IÑIGUES ALBA, mexicano
por nacimiento, mayor de edad, casado, Agricultor, y con domi
cilio en la calle Lázaro Cárdenas Sin número, San Jose del --
Valle, Municipio de esta Ciudad y de transito, con respeto:

Bajo Formal Protesta de Decir Ver---
dad manifiesto conocer al señor JOSE RAMIREZ SALGADO, persona--
a quien identifico debidamente en Razón de conocerlo desde hace
aproximadamente 33 años y que es originario de Portezuelo, Muni
cipio de la Barca, Jalisco, que fuimos vecinos y me consta que-
es una persona honesta y trabajadora y de buenas costumbres.

- - - - - - - - - - - - - - - - - - - -

Misma que se encuentra en calidad de-
detenido en la Ciudad de Calipatria, California Estados Unidos-
de Norteamerica, y pro ser mi conocido en cuanto sea liberado -
vó le reasignare nuevamente su puesto que anteriormente desempe
ñaba en este Pais.

En fé de lo anterior otorgo la presen
te para todos los efectos legales correspondientes en la Ciudad
de Atotonilco el Alto, Jalisco a los 2 de Mayo del 2,005
JOSE EUGENIO IÑIGUES ALBA

*J. Eugenio Iñigeya.*

--- En la Ciudad de Atotonilco el Alto, Jalisco a los días del-
mes de Mayo del 2,005 dos mil cinco, Ante mí, LICENCIADO OSCAR-
JAIME SANCHEZ, Notario Público Número 4 cuatro de está Municipa
lidad, compareció el señor JOSE EUGENIO IÑIGUES ALBA, quien ra-
tifica sus generales expuestas y quien por no ser de mi conoci-
miento se identifica con su Credencial para Votar con fotogra-

fia expedida por el Instituto Federal Electoral con núme-

ro de folio 20960973 dos, cero, nueve, seis, cero, nueve,

siete, tres, a quien conceptuo con plena capacidad legal

de ejercicio habiendome manifestado estar al corriente en

el Pago del Impuesto Sobre la Renta, sin habermelo acredi

tado por lo que le hice las advertencias de Ley y me dice

Que reconoce como suya la firma que calza el ocurso que -

antecede fechado al día de hoy relativo a una Constancia-

de Identidad, Ratificando en todas y cada una de sus par-

tes el contenido de dicho documento, por lo que YO, el --

Notario Certifico la autenticidad de las firmas por haber

sido puesta en mi presencia y para constancia de lo anterior

firma nuevamente Ante mí, a las 12.00 doce horas del día-

de su fecha. Doy Fe. - - - - - - - - - - - - - - - - - -



**County of Santa Clara**
**Superior Court of California**
191 North First Street
San Jose, California 95113
(408) 882-2700

**HALL OF JUSTICE**



**Re: CRISCIONE, ARTHUR**                **D.O.B. : XXXXXXXXX**
**Case#: 71614**

- [ ] There was not enough information
  - [ ] Not a full name, alias, or D.O.B. to match.
  - [ ] The case number that was given was incomplete or incorrect

- [ ] Our records do not reflect any complaint(s) filed for the year(s)       to       within the County of Santa Clara.

- [ ] The files requested are located at another Court Facility, your request and check has been forwarded:

- [ ] The file was purged due to applicable time statutes.

- [x] Other: ENCLOSED FIND 1(ONE) TIME COURTESY COPY OF ORDER DATED 08/30/07. SAME ORDER ISSUED FOR DEF. JAMEISON CASE NUMBER 71194.

- [ ] Payment was not included or is insufficient:
  GC 70627(a)          Copies          $ 0.50 per page(single sided) (two sided=2 pages)
  GC 70626(a)(4)      Certifications $15.00 per certification per document
  GC 70627(c)          Any search for records or files which takes longer than 10 minutes $15.00
                Fees due for this Request:

     <u>0</u> X copies @ $ 0.50 per page =          <u>$0</u>

     <u>0</u> X certification @ $15.00 each =          $<u>0</u>

     <u>0</u> Excess time Fee@ $15.00=          $<u>0</u>

     TOTAL AMOUNT DUE =          $<u>0</u>

     AMOUNT SUBMITTED:          $_____

     BALANCE DUE:          $<u>COURTESY COPY ONE TIME ONLY</u>

DATE: 10/17/2007

By: _____
     Andrina R. Roman-Castillo, LPCIII
     HOJ PUBLIC SERVICE DIVISION

COPY   (ENDORSED) FILED

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SANTA CLARA

AUG 3 0 2007

Kiri Torre
Chief Executive Officer/Clerk
Superior Court of CA, County of Santa Clara
BY BRET MORROW, DEPUTY

In re                              )        No.: 71614
                                   )
      ARTHUR CRISCIONE,            )
                                   )        ORDER
On Habeas Corpus                   )
_____)

## INTRODUCTION

Petitioner alleges that he has been denied due process of law because the Board has used standards and criteria which are unconstitutionally vague in order to find him unsuitable for parole. Alternatively, he argues that those standards, even if constitutionally sound, are nonetheless being applied in an arbitrary and meaningless fashion by the Board. He relies upon evidence that in one hundred percent of 2690 randomly chosen cases, the Board found the commitment offense to be "especially heinous, atrocious or cruel", a factor tending to show unsuitability under Title 15 §2402(c)(1).

## Are the Board Criteria Unconstitutionally Vague?

Our courts have long recognized that both state and federal due process requirements dictate that the Board must apply detailed standards when evaluating whether an individual inmate is unsuitable for parole on public safety grounds.   (See *In re Dannenberg* (2005) 34

**1357**

1

1  Cal. 4th 1061 at p. 1096, footnote 16.) Those standards are found in

2  15 CCR §2402(c). (*Dannenberg, supra*, 34 Cal.4th at p. 1080,) and do

3  include detailed criteria to be applied by the Board when considering

4  the commitment offense:

   (c) Circumstances Tending to Show Unsuitability. The following
5  circumstances each tend to indicate unsuitability for release.
   These circumstances are set forth as general guidelines; the
6  importance attached to any circumstance or combination of
   circumstances in a particular case is left to the judgment of
7  the panel. Circumstances tending to indicate unsuitability
   include:
8

   (1) Commitment Offense. The prisoner committed the offense in an
9  especially heinous, atrocious or cruel manner. The factors to be
   considered include:
10

       (A) Multiple victims were attacked, injured or killed in
11      the same or separate incidents.

12      (B) The offense was carried out in a dispassionate and
        calculated manner, such as an execution-style murder.
13

        (C) The victim was abused, defiled or mutilated during or
14      after the offense.

15      (D) The offense was carried out in a manner which
        demonstrates an exceptionally callous disregard for human
16      suffering.

17      (E) The motive for the crime is inexplicable or very
        trivial in relation to the offense.
18

19     In response to Petitioners claim that the regulations are

20 impermissibly vague, Respondent argues that while "especially

21 heinous, atrocious or cruel" might be vague in the abstract it is

22 limited by factors (A)-(E) of §2402(c)(1), and thus provides a

23 'principled basis' for distinguishing between those cases which are

24 contemplated in that section and those which are not.  An examination

25 of cases involving vagueness challenges to death penalty statutes is

26 instructive here and shows that Respondent's position has merit:

27     "Our precedents make clear that a State's capital sentencing

28                                                      **1358**

2

scheme also must genuinely narrow the class of persons eligible for the death penalty. When the purpose of a statutory aggravating circumstance is to enable the sentencer to distinguish those who deserve capital punishment from those who do not, the circumstance must provide a principled basis for doing so. If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm. (*Arave v. Creech* (1993) 507 U.S. 463, 474, citing *Maynard v. Cartwright* (1988) 486 U.S. 356, 364 [invalidating aggravating circumstance that any criterion person could honestly believe described every murder] and, *Godfrey v. Georgia* (1980) 446 U.S. 420, 428-429. A person of ordinary sensibility could fairly characterize almost every murder as "outrageously or wantonly vile, horrible and inhuman.")

It cannot fairly be said that 'every murder' could be categorized as "especially heinous, atrocious or cruel" under the Board regulations, since the defining factors contained in subdivisions (A)-(E) clearly narrow the group of cases to which it applies. Although Petitioner also argues that the "vague statutory language is not rendered more precise by defining it in terms or synonyms of equal or greater uncertainty". (*People v. Superior Court (Engert)* (1982) 31 Cal.3d 797, 803, *Pryor v. Municipal Court* (1979) 25 Cal.3d 238, 249. *See also Walton v. Arizona* (1990) 497 U.S. 639, 654), the factors in those subdivisions are not themselves vague or uncertain. The mere fact that there may be some subjective component (such as "exceptionally callous" disregard for human suffering) does not render that factor unconstitutionally vague. The proper degree of definition of such factors is not susceptible of mathematical precision, but will be constitutionally sufficient if it gives meaningful guidance to the Board.

A law is void for vagueness if it "fails to provide adequate notice to those who must observe its strictures and impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and

**1359**

discriminatory application." (People v. Rubalcava (2000) 23
Cal.4th 322, 332, quoting People ex rel. Gallo v. Acuna (1997)
14 Cal.4th 1090, 1116, quoting Grayned v. City of Rockford
(1972) 408 U.S. 104, 108-109.)

A review of cases expressing approval of definitions to limit the
application of otherwise vague terms in death penalty statutes leads
inextricably to the conclusion that the limiting factors in §2402(c)
easily pass constitutional muster.  An Arizona statute was upheld
that provided a crime is committed in an 'especially cruel manner'
when the perpetrator inflicts mental anguish or physical abuse before
the victim's death," and that "mental anguish includes a victim's
uncertainty as to his ultimate fate."  (Walton v. Arizona (1990) 497
U.S. 639, 654.)  Similarly, the court in *Maynard v. Cartwright*, 486
U.S. at 364-365, approved a definition that would limit Oklahoma's
"especially heinous, atrocious, or cruel" aggravating circumstance to
murders involving "some kind of torture or physical abuse.  In
Florida, the statute authorizing the death penalty if the crime is
"especially heinous, atrocious, or cruel," satisfied due process
concerns where it was further defined as "the conscienceless or
pitiless crime which is unnecessarily torturous to the victim."
*State v. Dixon* (1973) 283 So. 2d 1 at p. 9.

Here, the factors in subdivisions (A)-(E) provide equally clear
limiting construction to the term "especially heinous, atrocious, or
cruel" in §2402(c).

**Has the Board Engaged in a Pattern of Arbitrary Application of the
Criteria?**

As previously noted, 15 CCR §2402 provides detailed criteria for
determining whether a crime is "exceptionally heinous, atrocious or
cruel" such that it tends to indicate unsuitability for parole.  Our

4

1  courts have held that to fall within those criteria and thus serve as

2  a basis for a finding of unsuitability the circumstances of the

3  crime must be more aggravated or violent than the minimum necessary

4  to sustain a conviction for that offense. *(In re Dannenberg (2005)*

5  *29 Cal.4th 616, 611-614.)* Where that is the case, the nature of the

6  prisoner's offense, *alone,* can constitute a sufficient basis for

7  denying parole. (*In re Dannenberg, supra,* 34 Cal.4th at p. 1095.)

8      Petitioner claims that those criteria, even if constitutionally

9  sound, have been applied by the Board in an arbitrary and capricious

10  manner rendering them devoid of any meaning whatever. The role of

11  the reviewing court under these circumstances has been addressed

12  previously in the specific context of Parole Board actions:

13      "[Courts have] an obligation, however, to look beyond the facial
       validity of a statute that is subject to possible

14      unconstitutional administration since a law though fair on its
       face and impartial in appearance may be open to serious abuses

15      in administration and courts may be imposed upon if the
       substantial rights of the persons charged are not adequately

16      safeguarded at every stage of the proceedings. We have
       recognized that this courts obligation to oversee the execution

17      of the penal laws of California extends not only to judicial
       proceedings but also to the administration of the Indeterminate

18      Sentence Law." (*In re Rodriguez* (1975) 14 Cal.3d 639, 648,
       quoting *Minnesota v. Probate Court* (1940) 309 U.S. 270, 27...)

19

20      Similarly, in *In re Minnis* (1972) 7 Cal.3d 639, 645, the case

21  closest on point to the present situation, the California Supreme

22  Court stated: "This court has traditionally accepted its

23  responsibility to prevent an authority vested with discretion from

24  implementing a policy which would defeat the legislative motive for

25  enacting a system of laws." Where, as here, the question is whether

26  determinations are being made in a manner that is arbitrary and

27  capricious, judicial oversight "must be extensive enough to protect

28

1  limited right of parole applicants "to be free from an arbitrary

2  parole decision . . . and to something more than mere pro-forma

3  consideration." (In re Rosenkrantz (2000) 94 Cal.App.4th 549 at p. 564,

4  quoting In re Sturm (1974) 11 Cal.3d 258 at p. 268.)

5      This Court, therefore, now examines Petitioner's "as applied"

6  void for vagueness challenge.

7

8              The Evidence Presented

9      A similar claim to those raised here, involving allegations of

10  abuse of discretion by the Board in making parole decisions, was

11  presented to the Court of Appeal in *In re Ramirez, supra*. The court

12  there observed that such a "serious claim of abuse of discretion"

13  must be "adequately supported with evidence" which should be

14  "comprehensive." (*Ramirez, supra*, 94 Cal.App.4th at p. 564, fn. 5.)

15  The claim was rejected in that case because there was not "a

16  sufficient record to evaluate." (*Ibid.*)  In these cases, however,

17  there is comprehensive evidence offered in support of Petitioner's

18  claims.

19      Discovery orders were issued in five different cases involving

20  life term inmates (Petitioners) who all presented identical claims.[1]

21

---

22  [1] This Court takes judicial notice of the several other cases currently
   pending (Lewis #68038, Jameison #71194, Bragg #108543, Ngo #127611.) which
23  raise this same issue and in which proof was presented on this same point.
   (Evidence Code § 452.(d).  See specifically, in the habeas corpus context,
24  *In re Vargus* (2000) 83 Cal.App.4th 1125, 1134-1136, 1143, in which judicial
   notice was taken of the evidence in four other cases and in which the court
   noted "Facts from other cases may assist petitioner in establishing a
25  pattern."  See generally *McKell v. Washington Mutual, Inc.* (2006) 142
   Cal.App.4th 1457, 1491.  "trial and appellate courts . . . may properly take
26  judicial notice of . . . established facts from both the same case and other
   cases.  And see *AB Group v. Wertin* (1997) 59 Cal.App.4th 1022, 1035.
27  Judicial notice taken of other cases when matters are "just as relevant to
   the present [case] as they are to the others.")

28

1362

1   The purpose of the discovery was to bring before the Court a

2   comprehensive compilation and examination of Board decisions in a

3   statistically significant number of cases.  The Board decisions under

4   examination consisted of final decisions of the Board for life term

5   inmates convicted of first or second degree murder and recently

6   eligible for parole.  Included were all such decisions issued in

7   certain months, chosen by virtue of their proximity in time to the

8   parole denials challenged in the pending petitions.  All Board

9   decisions in the months of August, September and October of 2002,

10  July, August, September, October, November, and December of 2003,

11  January and February of 2004, February of 2005, and January of 2006

12  were compiled.  This resulted in a review of 2690 cases decided in a

13  total of 13 months.

14      The purpose of the review was to determine how many inmates had

15  actually been denied parole based in whole or in part on the Board's

16  finding that their commitment offense fits the criteria set forth in

17  Title 15 §2402(c)(1), as "especially heinous, atrocious or cruel."  A

18  member of the research team conducting the review, Karen Rega,

19  testified that in its decisions the Board does not actually cite CCR

20  rule §2402(c), but consistently uses the specific words or phrases

21  ("verbiage from code") contained therein, so that it could easily be

22  determined when that criteria was being applied.  (For example,

23  finding "multiple victims" invokes §2402(c)(1)(A); finding the crime

24  "dispassionate" "calculated" or "execution style" invokes

25  §2402(c)(1)(B); that a victim was "abused" "mutilated" or "defiled"

26  invokes §2402(c)(1)(C);  a crime that is "exceptionally callous" or

27  demonstrated a "disregard for human suffering" fits criteria

28

**1363**

7

1   §2402(c)(1)(D); and finding the motive for the crime "inexplicable"

2   or "trivial" invokes §2402(c)(1)(E).

3        Petitioners provided charts, summaries, declarations, and the

4   raw data establishing the above in the cases of Lewis #68038,

5   Jameison #71194, Bragg #108543, and Ngo #127611.  In this case

6   (Criscione #11614) the evidence was presented somewhat differently.

7   Both to spread the burden of the exhaustive examination, and to

8   provide a check on Petitioners' methods, this Court ordered

9   Respondent to undertake an examination of two randomly chosen months

10  in the same manner as Petitioner had been doing.  Respondent complied

11  and provided periodic updates in which they continued to report that

12  at all "the relevant hearings the Board relied on the commitment

13  offense as a basis for denying parole."  (See "Respondent's Final

14  Discovery Update" filed April 5, 2007.)  At the evidentiary hearing

15  on this matter counsel for Respondents stipulated that "in all of

16  those cases examined [by Respondent pursuant to the Criscione

17  discovery orders] the Board relied on the commitment offense as a

18  basis for denying parole."  (See pages 34-35 of the June 1, 2007,

19  evidentiary hearing transcript.)

20       The result of the initial examination was that in over 90

21  percent of cases the Board had found the commitment offense to be

22  "especially heinous, atrocious or cruel" as set forth in Title 15

23  §2402(c)(1).  In the remaining 10% of cases either parole had been

24  granted, or it was unclear whether §2402(c)(1) was a reason for the

25  parole denial.  For all such cases, the decisions in the prior

26  hearing for the inmate were obtained and examined.  In every case,

27  the Board had determined at some point in time that every inmates

28

1364

1    crime was "especially heinous, atrocious or cruel" under Title 15

2    §2402(c)(1).

3         Thus, it was shown that 100% of commitment offenses reviewed by

4    the Board during the 13 months under examination were found to be

5    "especially heinous, atrocious or cruel" under Title 15 §2402(c)(1).

6         A further statistic of significance in this case is that there

7    are only 9,750 inmates total who are eligible for, and who are

8    currently receiving, parole consideration hearings as life term

9    inmates.   (See "Respondent's Evidentiary Hearing Brief," at p. 4,

10   filed April 16, 2007.)

11

12                         USE OF STATISTICS

13        In *International Brotherhood of Teamsters v. United States*

14   (1977) 431 U.S. 324, 338-340, the United States Supreme Court

15   reaffirmed that statistical evidence, of sufficient "proportions,"

16   can be sound and compelling proof.   As noted by the court in *Everett*

17   *v. Superior Court* (2002) 104 Cal.App.4th 388, 393, and the cases cited

18   therein, "courts regularly have employed statistics to support an

19   inference of intentional discrimination."

20        More recently, the United States Supreme Court, in *Miller-El v.*

21   *Cockrell* (2003) 537 U.S. 322, 154 L.Ed.2d 931, when examining a habeas

22   petitioner's allegations that the prosecutor was illegally using his

23   peremptory challenges to exclude African-Americans from the

24   petitioner's jury, noted that "the statistical evidence alone" was

25   compelling.   The high court analyzed the numbers and concluded:

26   "Happenstance is unlikely to produce this disparity."   (See also

27   *People v. Hofsheier* (2004) 117 Cal.App.4th 438 in which "statistical

28

1  evidence" was noted as possibly being dispositive. And see *People v.*
2  *Flores* (2006) 144 Cal.App.4th 625 in which a statistical survey and
3  analysis, combined into an "actuarial instrument" was substantial
4  proof.)

5  A statistical compilation and examination such as has been
6  presented in these cases is entirely appropriate and sufficient
7  evidence from which to draw sound conclusions about the Board's
8  overall methods and practices.

9

10  **THE EXPERT'S TESTIMONY**

11  Petitioners provided expert testimony from Professor Mohammad
12  Kafai regarding the statistics and the conclusions that necessarily
13  follow from them. Professor Kafai is the director of the statistics
14  program at San Francisco State University, he personally teaches
15  statistics and probabilities, and it was undisputed that he was
16  qualified to give the expert testimony that he did. No evidence was
17  presented that conflicts or contradicts the testimony and conclusions
18  of Professor Kafai. By stipulation of the parties, Professor Kafai's
19  testimony was to be admissible and considered in the cases of all
20  five petitioners. (See page 35 of the June 1, 2007, evidentiary
21  hearing transcript.)

22  Professor Kafai testified that the samples in each case, which
23  consisted of two or three months of Board decisions, are
24  statistically sufficient to draw conclusions about the entire
25  population of life term inmates currently facing parole eligibility
26  hearings. Given that every inmate within the statistically
27  significant samples had his or her crime labeled "'particularly

28

1366

1  egregious" "or especially heinous, atrocious or cruel, under Title

2  15 §2402(c)(1), it can be mathematically concluded that the same

3  finding has been made for every inmate in the entire population of

4  9,750.  Although he testified that statisticians never like to state

5  unequivocally that something is proven to a 100% certainty, (because

6  unforeseen anomalies are always theoretically possible,) he did

7  indicate the evidence he had thus far examined came as close to that

8  conclusion as could be allowed.  Not surprisingly, Professor Kafai

9  also testified that "more than 50% can't by definition constitute an

10  exception."

11       Having found the data provided to the expert to be sound this

12  Court also finds the expert's conclusions to be sound.  In each of

13  the five cases before the Court over 400 inmates were randomly chosen

14  for examination.  That number was statistically significant and was

15  enough for the expert to draw conclusions about the entire population

16  of 9,750 parole eligible inmates.  The fact that the approximately

17  2000 inmates examined in the other cases also had their parole denied

18  based entirely or in part on the crime itself (§2402(c)(1)), both

19  corroborates and validates the expert's conclusion in each individual

20  case and also provides an overwhelming and irrefutable sample size

21  from which even a non expert can confidently draw conclusions.

22

23                          **DISCUSSION**

24       Although the evidence establishes that the Board frequently says

25  parole is denied "first," "foremost," "primarily," or "mainly,"

26  because of the commitment offense, this statement of primacy or

27  weight is not relevant to the question now before the Court.

28
                                                        **1367**

1   Petitioners acknowledge that the Board generally also cites other

2   reasons for its decision. The question before this Court, however,

3   is not whether the commitment offense is the primary or sole reason

4   why parole is denied. The question is whether the commitment

5   offense is labeled "particularly egregious" and thus could be used

6   under *Dannenberg* primarily or exclusively to deny parole.

7       The evidence proves that in a relevant and statistically

8   significant period where the Board has considered life term offenses

9   in the context of a parole suitability determination, every such

10  offense has been found to be "particularly egregious" or "especially

11  heinous, atrocious or cruel."[2]  This evidence conclusively

12  demonstrates that the Board completely disregards the detailed

13  standards and criteria of §2402(c). "Especially" means particularly,

14  or "to a distinctly greater extent or degree than is common."[3]  (EC §

15  451(e).)  By simple definition the term "especially" as contained in

16  section 2402(C)(1) cannot possibly apply in 100% of cases, yet that

17  is precisely how it has been applied by the Board. As pointed out by

18  the Second District Court of Appeal, not every murder can be found to

19  be "atrocious, heinous, or callous" or the equivalent without "doing

20

[2] In a single case out of the 2690 that were examined Petitioner has conceded that
the Board did not invoke §2402(c)(1). This Court finds that concession to be
improvidently made and the result of over caution. When announcing the decision at
the initial hearing of S. Fletcher (H-10330) on 4/6/06, the commissioner did begin
by stating "I don't believe this offense is particularly aggravated..." However
the commissioner proceeds to describe the crime as a drug deal to which Fletcher
brought a gun so "we could say there was some measure of calculation in that." The
commissioner continued by observing that the reason someone would bring a gun to a
drug transaction was to make sure things went according to their plan "so I guess
we can say that that represents calculation and perhaps it's aggravated to that
extent." As is the Board's standard practice, by using the word 'calculated' from
§2402(c)(1)(b) the Board was invoking that regulation. Certainly if Mr. Fletcher
had brought a habeas petition Respondent's position would be that there is 'some
evidence' supporting this. The ambiguity created by the commissioner's initial
statement was cleared up several pages later when he announces that "based upon the
crime coupled with ...." parole was denied for four years. (See *In re Burns* (2006)
136 Cal.App.4th 1318, 1326, holding §2402(c)(1) criteria are necessary for a multi-
year denial.)

28

1368

1   violence" to the requirements of due process.  (In re Lawrence (2007)
2   150 Cal.App.4th 1511, 1557.)  This is precisely what has occurred
3   here, where the evidence shows that the determinations of the Board
4   in this regard are made not on the basis of detailed guidelines and
5   individualized consideration, but rather through the use of all
6   encompassing catch phrases gleaned from the regulations.

8                          __THE BOARD'S METHODS__

9        Because it makes no effort to distinguish the applicability of
10  the criteria between one case and another, the Board is able to force
11  every case of murder into one or more of the categories contained in
12  §2402(c).

13       For example, if the inmate's actions result in an instant death
14  the Board finds that it was done in a "dispassionate and calculated
15  manner, such as an execution-style murder."  At the same time the
16  Board finds that a murder not resulting in near instant death shows a
17  "callous disregard for human suffering" without any further analysis
18  or articulation of facts which justify that conclusion.  If a knife
19  or blunt object was used, the victim was "abused, defiled, or
20  mutilated."  If a gun was used the murder was performed in a
21  "dispassionate and calculated manner, such as an execution-style
22  murder."  If bare hands were used to extinguish another human life
23  then the crime is "particularly heinous and atrocious."

24       Similarly, if several acts, spanning some amount of time, were
25  necessary for the murder the Board may deny parole because the inmate
26  had "opportunities to stop" but did not.  However if the murder was

27  _____
    [3] Princeton University World Net Dictionary (2006).
28

**1369**

1  accomplished quickly parole will be denied because it was done in a

2  dispassionate and calculated manner and the victim never had a chance

3  to defend themselves or flee. If the crime occurred in public, or

4  with other people in the vicinity, it has been said that the inmate

5  "showed a callous disregard" or "lack of respect" for the

6  "community." However if the crime occurs when the victim is found

7  alone it could be said that the inmate's actions were aggravated

8  because the victim was isolated and more vulnerable.

9      In this manner, under the Board's cursory approach, every murder

10  has been found to fit within the unsuitability criteria. What this

11  reduces to is nothing less than a denial of parole for the very

12  reason the inmates are present before the Board – i.e. they committed

13  murder. It is circular reasoning, or in fact no reasoning at all,

14  for the Board to begin each hearing by stating the inmate is before

15  them for parole consideration, having passed the minimum eligible

16  parole date based on a murder conviction, and for the Board to then

17  conclude that parole will be denied because the inmate committed acts

18  that amount to nothing more than the minimum necessary to convict

19  them of that crime. As stated quite plainly by the Sixth District:

20  "A conviction for murder does not automatically render one unsuitable

21  for parole." (Smith, supra, 114 Cal.App.4th at p. 366, citing

22  Rosenkrantz, supra, 29 Cal.4th at p. 683.)

23      In summary, when every single inmate is denied parole because

24  his or her crime qualifies as a §2402(c)(1) exception to the rule

25  that a parole date shall normally be set, then the exception has

26  clearly swallowed the rule and the rule is being illegally

27  interpreted and applied. When every single life crime that the Board

28

1370