1 examines is "particularly egregious" and "especially heinous,

2 atrocious or cruel", it is obvious that the Board is operating without

3 any limits and with unfettered discretion.

4     Other examples of their failure to "connect up" the facts of the

5 individual case with the criteria and the ultimate findings abound in

6 the decisions of the reviewing courts. Some of the state cases to

7 have reversed Parole Board or Governor abuses of discretion in

8 denying parole include *In re Roderick, In re Cooper, In re Lawrence,*

9 *In re Barker, In re Gray, In re Lee, In re Elkins, In re Weider, In*

10 *re Scott, In re Deluna, In re Ernest Smith, In re Mark Smith,* and *In*

11 *re Capistran.*

12     When "the record provides no reasonable grounds to reject, or

13 even challenge, the findings and conclusions of the psychologist and

14 counselor concerning [the inmate's] dangerousness" the Board may not

15 do so. (*In re Smith* (2003) 114 Cal.App.4th 343, 369.)

16     When an inmate, although only convicted of a second degree

17 murder, has been incarcerated for such time that, with custody

18 credits, he would have reached his MEPD if he had been convicted of a

19 first, the Board must point to evidence that his crime was aggravated

20 or exceptional even for a first degree murder if they are going to

21 use the crime as a basis for denying parole. (*In re Weider* (2006)

22 145 Cal.App.4th 570, 582-583.)[4]

23

24    [4]   This rule, rooted in Justice Moreno's concurrence in *Rosenkrantz, supra,* is
particularly applicable in this case. Petitioner was convicted of second degree,
but acquitted of first degree, murder over 25 years ago. (*People v. Criscione*

25 (1981) 125 Cal.App.3d 275.) With his custody credits he is beyond the matrix even
had he been convicted of a first. In a currently pending habeas petition in which

26 he challenges his 2007 parole denial the first reason the Board gave was the crime
itself and the presiding commissioner explained: "His actions go well beyond the

27 minimum necessary for a conviction of murder in the second degree." (Decision page
2 of 4/2/07 transcript.) For the Board to penalize the Petitioner for the fact

28 that he was acquitted of first degree is further proof of their willfulness and

1    A "petitioner's young age at the time of the offense" must be

2 considered.  (In re Elkins (2006) 144 Cal.App.4th 475, 500, quoting

3 Rosenkrantz v. Marshall (C.D.Cal. 2006) 444 F. Supp. 2d 1063, 1085:

4 1085: "The reliability of the facts of the crime as a predictor for

5 his dangerousness was diminished further by his young age of 18, just

6 barely an adult.  The susceptibility of juveniles to immature and

7 irresponsible behavior means their irresponsible conduct is not as

8 morally reprehensible as that of an adult.'")[5]

9    The Board's formulaic practice of stating §2402(c)(1) phrased in

10 a conclusory fashion, and then stating "this is derived from the

11 facts" without ever linking the two together, is insufficient.  (In

12 re Roderick, (2007) ___ Cal.App.4th ___ (A113370): "At minimum, the

13 Board is responsible for articulating the grounds for its findings

14 and for citing to evidence supporting those grounds."  (See also In

15 re Barker (2007) 151 Cal.App.4th 346, 371, disapproving

16 "conclusorily" announced findings.)

17    After two decades, mundane "crimes have little, if any,

18 predictive value for future criminality.  Simply from the passing of

19 time, [an inmate's] crimes almost 20 years ago have lost much of

20 their usefulness in foreseeing the likelihood of future offenses than

21 if he had committed them five or ten years ago."  (In re Lee (2006)

22 143 Cal.App.4th 1400, 1412.)  It should be noted that this rule

23

24 bias.  The jury had a reasonable doubt that Petitioner committed first degree
murder but under the Board's 'reasoning' and 'analysis' this puts him in a worse
position than if they had not.  Had the jury convicted him of the greater offense

25 Petitioner has served so much time that he would already be having subsequent
parole hearings on a first and the Board would not have been able to use the 'some
evidence' of first degree behavior against him.  As observed previously, the

26 Board's position in this regard is "so ridiculous that simply to state it is to
refute it."  (Weider, supra, 145 Cal.App.4th at p. 583.)

27 [6] This point is particularly significant in the case of Mike Ngo.  Mr. Ngo was only
18 at the time of his crime.  The impetus behind the shooting was youth group or

28

1 applies with even more force when the Board is relying on any

2 criminality that occurred before the crime. In that situation, just

3 as with the crime itself, the Board must explain why such old events

4 have any relevance and especially when the inmate has spent a decade

5 as a model prisoner.

6 Murders situationally related to intimate relationships are

7 unfortunately commonplace because emotions are strongest in such

8 domestic settings. When a murder occurs because of "stress unlikely

9 to be reproduced in the future" this is a factor that affirmatively

10 points towards suitability. (*In re Lawrence* (2007) 150 Cal.App.4th

11 1511 and cases cited therein.)

12 "The evidence must substantiate the ultimate conclusion that the

13 prisoner's release currently poses an unreasonable risk of danger to

14 the public. It violates a prisoner's right to due process when the

15 Board or Governor attaches significance to evidence that forewarns no

16 danger to the public." (*In re Tripp* (2007) 150 Cal.App.4th 306,

17 313.)

18 The Board "cannot rely on the fact that the killing could have

19 been avoided to show the killing was especially brutal." (*In re

20 Cooper* (2007) 153 Cal.App.4th 1043, 1064.)

21 The Board's focus must be upon how the inmate "actually

22 committed his crimes" not the "incorporeal realm of legal

23 constructs." (*Lee, supra,* 143 Cal.App.4th at p. 1413.) This is

24 especially significant when the murder conviction is based on the

25 felony murder rule, provocative act doctrine, or accomplice liability

26 such that the inmate did not intend to kill or may not have even been

27

28

gang rivalries, posturing, and threats which mature adults would not have been

**1373**

1 | the actual killer.

2 |     The Board has ample guidance before it in the decisions of the

3 | various reviewing courts to constrain its abuse, but has failed to

4 | avail itself of the opportunity to do so.

5 |

6 |                    SEPARATION OF POWERS DOCTRINE

7 |     The evidence presented, as discussed above, has established a

8 | void for vagueness "as applied" due process violation. That same

9 | evidence also proves a separate but related Constitutional violation

10 | -- an as applied separation of powers violation.

11 |     The separation of powers doctrine provides "that the legislative

12 | power is the power to enact statutes, the executive power is the

13 | power to execute or enforce statutes, and the judicial power is the

14 | power to interpret statutes and to determine their

15 | constitutionality." (*Lockyer v. City and County of San Francisco*

16 | (2004) 33 Cal.4th 1055, 1068.) Because the evidence has proven the

17 | Board is not executing/enforcing the legislature's statutes as

18 | intended it is this Court's duty to intervene. The question here is

19 | whether the Board is violating the separation of powers doctrine by

20 | appropriating to itself absolute power over parole matters and

21 | disregarding the limits and guidelines placed by the statute.[6]

22 |     "Government Code section 11342.2 provides: 'Whenever by the

23 |

24 | caught up in.
[6] "It is settled that Administrative regulations that violate acts of the
Legislature are void and no protestations that they are merely an exercise of

25 | administrative discretion can sanctify them. They must conform to the legislative
will if we are to preserve an orderly system of government. Nor is the motivation

26 | of the agency relevant: It is fundamental that an administrative agency may not
usurp the legislative function, no matter how altruistic its motives are."

27 | (*Agricultural Labor Relations Board v. Superior Court of Tulare County* (1976) 16
Cal.3d 392, 419 quoting *Morris v. Williams* (1967) 67 Cal.2d 733, 737; and *City of*

28 | *San Joaquin v. State Bd. of Equalization* (1970) 9 Cal.App.3d 365, 374.)

1374

1  express or implied terms of any statute a state agency has authority

2  to adopt regulations to implement, interpret, make specific or

3  otherwise carry out the provisions of the statute, no regulation

4  adopted is valid or effective unless consistent and not in conflict

5  with the statute and reasonably necessary to effectuate the purpose

6  of the statute.'  Administrative regulations that alter or amend the

7  statute or enlarge or impair its scope are void and courts not only

8  may, but it is their obligation to strike down such regulations."

9  (*Pulaski v. Occupational Safety & Health Stds. Bd.* (1999) 75

10  Cal.App.4th 1315, 1341, citations omitted.)

11      The vice of overbroad and vague regulations such as are at issue

12  here is that they can be manipulated, or 'interpreted,' by executive

13  agencies as a source of unfettered discretion to apply the law

14  without regard to the intend of the people as expressed by the

15  legislature's enabling statutes.  In short, agencies usurp unlimited

16  authority from vague regulations and become super-legislatures that

17  are unaccountable to the people.  As it has sometimes been framed and

18  addressed in the case law, a vague or all encompassing standard runs

19  the risk of "violat[ing] the separation of powers doctrine by

20  'transforming every [executive decisionmaker] into a "mini-

21  legislature" with the power to determine on an ad hoc basis what

22  types of behavior [satisfy their jurisdiction].'"  (*People v. Ellison*

23  (1998) 68 Cal.App.4th 203, 211, quoting *People v. Superior Court*

24  (*Caswell*) (1988) 46 Cal.3d 381, 402.)

25      "It is concern about 'encroachment and aggrandizement,' the

26  [United States Supreme Court] reiterated, that has animated its

27  separation of powers jurisprudence.  'Accordingly, we have not

28

**1375**

1  hesitated to strike down provisions of law that either accrete to a

2  single Branch power more appropriately diffused among separate

3  Branches or that undermine the authority and independence of one or

4  another coordinate Branch.'" (*Kasler v. Lockyer* (2000) 23 Cal.4th

5  472, 493, quoting *Mistretta v. United States* (1989) 488 U.S. 361,

6  382.)  This articulation of the principle speaks directly to the

7  situation at hand.  The Board, by its enactment and interpretation of

8  Title 15, §2402, has appropriated to itself absolute power over

9  'lifer' matters.  Overreaching beyond the letter and spirit of the

10 Penal Code provisions, Title 15, §2402(c)(1) has been interpreted by

11 the Board to supply the power to declare every crime enough to deny

12 parole forever.  The fact that Title 15, §2402, has been invoked in

13 every case, but then sometime later not invoked, tends to show either

14 completely arbitrary and capricious behavior or that unwritten

15 standards are what really determine outcomes.  In either event, all

16 pretenses of taking guidance from, or being limited by, the

17 legislature's statutes have been abandoned.  "[I]t is an elementary

18 proposition that statutes control administrative interpretations."

19 (*Ohio Casualty Ins. Co. v. Garamendi* (2006) 137 Cal.App.4th 64, 78.)

20 Title 15 §2402 as applied, however, has no controls or limitations.

21      The PC § 3041(b) exception to the rule can only be invoked when

22 the "gravity of the current convicted offense or offenses, or the

23 timing and gravity of current or past convicted offense or offenses,

24 is such that consideration of the public safety requires a more

25 lengthy period of incarceration for this individual."  The word

26 "gravity" is a directive for comparison just as "more lengthy"

27 indicates a deviation from the norm.  While *Dannenberg* held there

28

**1376**

1   does not need to be intra case comparison for the purposes of term

2   uniformity or proportionality, there necessarily has to be some sort

3   of comparison for the purposes of adhering to the legislative mandate

4   that parole is available. The Board employs no meaningful yardstick

5   in measuring parole suitability. This is a violation of the

6   separation of powers doctrine. (*People v. Wright* (1982) 30 Cal.3d

7   705, 712-713. And see *Terhune v. Superior Court* (1998) 65

8   Cal.App.4th 864, 872-873. Compare *Whitman v. Am. Trucking Ass'ns*

9   (2001) 531 U.S. 457, 472, describing a delegation challenge as

10  existing when the legislature fails to lay down "an intelligible

11  principle to which the person or body authorized to act is directed

12  to conform.")

13

14                        **RESPONDENT'S POSITION**

15      The Attorney General has suggested, without pointing to any

16  concrete examples, that it is possible that the Board, when invoking

17  the crime as a reason to deny parole, is not placing it within

18  §2402(c)(1) but instead using is as some sort of 'lesser factor'

19  which, only when combined with other unsuitability criteria, can

20  contribute to a valid parole denial. The two problems with this

21  position are, first, there is no evidentiary support for this

22  assertion, and second, it would have no impact on the constitutional

23  infirmities outlined and proven above.

24      Even if Respondent had produced evidence that the Board was

25  utilizing the crime as a 'lesser factor' which needs others to fully

26  support a parole denial, the Board would then be admitting it was

27  denying parole, in part, for the very reason that the person is

28

**1377**

1  before the panel and eligible for parole in the first place - the

2  commitment offense. Respondent's argument suggests that a crime that

3  only qualified as the *Dannenberg* "minimum necessary" could still be

4  invoked as a reason for denying parole. Respondent argues that when

5  the crime is invoked "not in the *Dannenberg* sense," there must be

6  other reasons for the parole denial and the crime alone would not be

7  enough in this context. This position is inconsistent with the law

8  and fundamental logic.

9      A crime qualifies under *Dannenberg* when it is "particularly

10 egregious," or one where "no circumstances of the offense reasonably

11 could be considered more aggravated or violent than the minimum

12 necessary to sustain a conviction for that offense." (*Dannenberg*,

13 *supra*, 34 Cal.4th at pp. 1094-1095.) These are the only two choices.

14 If a crime consists of only the bare elements then it is not

15 aggravated and it cannot, in and of itself, serve as a basis for

16 parole denials once the inmate becomes eligible for parole. It is

17 the reason an inmate may be incarcerated initially for the equivalent

18 of 15 or 25 years, and then examined to determination rehabilitation

19 efforts when they come before the Board, but a crime that is no more

20 than the bare minimum cannot be factored into the equation pursuant

21 to PC § 3041(b) or any of the case law interpreting it.

22     In oral argument Respondent suggested a second way the

23 commitment offense can be used outside of §2402(c)(1). If for

24 example a crime had its roots in gang allegiances or rivalries and

25 the inmate continued to associate with gangs while incarcerated, then

26 an aspect of the crime, even if the crime otherwise consisted of no

27 more than the minimum elements, could be combined with other behavior

28

1378

1  to support a parole denial.  Similarly, if a crime was rooted in an

2  inmate's then existing drug addiction, and the Board was to point to

3  a recent 115 involving drugs, the evidence that the inmate's drug

4  issues had not been resolved would justify a parole denial even if

5  the crime itself was not aggravated.  A finding that the inmate is

6  not suitable for release under these circumstances, however, is not

7  based on the facts of the commitment offense as tending to show

8  unsuitability.  It is based on the conclusion that can be drawn about

9  Petitioner's lack of rehabilitation or change since the offense, and

10  thus, his present dangerousness.

11      Respondent has not demonstrated any flaws in Petitioner's

12  methodology or analysis, nor provided any actual evidence of the

13  crime being invoked *other* than pursuant to §2402(c)(1).  Drawing

14  conclusions from the Board's direct statements, or its precise

15  recitations of the §2402(c)(1) language, logically indicates an

16  invocation of §2402(c)(1), and Respondent's suggestion otherwise is

17  insupportable.

18

19              **THE QUESTION OF BIAS**

20      Because the issue has been squarely presented, and strenuously

21  argued by Petitioners, this Court is obligated to rule on the charge

22  that the Board's actions prove an overriding bias and deliberate

23  corruption of their lawful duties.

24      In the discrimination and bias case of *USPS Bd. of Governors v.*

25  *Aikens* (1983) 460 U.S. 711, the United States Supreme Court

26  acknowledged "there will seldom be 'eyewitness' testimony as to the

27  [] mental processes" of the allegedly biased decisionmaker.  Instead,

28

23

1379

1   an examination of other cases for trends or patterns can provide the

2   necessary circumstantial evidence.  (See *Aikens, supra*, at footnote

3   2.)  Reaffirming that such circumstantial evidence will be sufficient,

4   the Court stated:  "The law often obliges finders of fact to inquire

5   into a person's state of mind.  As Lord Justice Bowen said in

6   treating this problem in an action for misrepresentation nearly a

7   century ago, 'The state of a man's mind is as much a fact as the

8   state of his digestion.  It is true that it is very difficult to

9   prove what the state of a man's mind at a particular time is, but if

10  it can be ascertained it is as much a fact as anything else.'"

11  (*Aikens*, at pp. 716-717, quoting *Edgington v. Fitzmaurice* (1885) 29

12  Ch. Div. 459, 483.)[7]

13      The discovery in these cases was granted in part due to the

14  Petitioners' prima facie showing of bias and the necessity that it be

15  "adequately supported with evidence" if such evidence is available.

16  (*Ramirez, supra*, 94 Cal.App.4th at p. 564, fn. 5.  See also *Nasha v.*

17  *City of Los Angeles* (2004) 125 Cal.App.4th 470, 483: "A party seeking

18  to show bias or prejudice on the part of an administrative decision

19  maker is required to prove the same 'with concrete facts.'"  And see

20  *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674,

21  841: "The challenge to the fairness of the adjudicator must set forth

22  concrete facts demonstrating bias or prejudice."  See also *Hobson v.*

23

24  [7] As occurred in *Aikens, supra*, and as suggested in prior orders of this Court,
    Respondent should have provided direct evidence from the decisionmakers.  While the
    fact that a *Defendant* does not explain his or her actions cannot be held against
25  him, (*Griffin v. California* (1965) 380 U.S. 609, *Doyle v. Ohio* (1976) 426 U.S.
    610,) it is appropriate to give some weight to the consideration that the Board has
26  failed to offer any direct evidence or explanation on its own behalf.  While the
    case of *Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095 stands for the
    proposition that Petitioner may not inquire into the Board members mental
27  processes, Respondent is not precluded from offering such direct evidence if they
    were able to testify as to their good faith and conscientious efforts.

28

1380

1  *Hansen* (1967) 269 F.Supp. 401, 507, the watershed Washington D.C.

2  school desegregation case in which the court determined from a

3  statistical and factual analysis that racial bias was influencing

4  policy.)

5         In the case of *People v. Adams* (2004) 115 Cal.App.4th 243, 255,

6  a similar claim of biased decision making was asserted and it was

7  rejected because, although the defendant clearly articulated it, "he

8  has not demonstrated it.  Therefore, he has failed to bear his burden

9  of showing a constitutional violation as a demonstrable reality, not

10  mere speculation."  In the present cases Petitioners have provided

11  overwhelming concrete evidence.  It is difficult to believe that the

12  Board's universal application of §2402(c)(1) has been an inadvertent

13  mistake or oversight on their part.  It is hard to credit the Board's

14  position that it does not know its own patterns and practices reveal

15  a complete lack of standards or constraints on their power.

16  Respondent's protestations ring hollow, and it seems a statistical

17  impossibility, that the Board's use of "detailed" criteria in such a

18  fashion that they are rendered meaningless is a result of good faith

19  efforts on their part.  That <u>every</u> murder is "especially heinous,

20  atrocious or cruel," and can therefore be an exception to the rule

21  that a parole date should be set, does not seem to be an accident on

22  their part.

23         Although no court has thus far agreed with the accusation that

24  the Board approaches its duties with a predetermination and a bias,

25  no court has previously been presented the comprehensive evidence

26  outlined herein.  (While this Court does not turn a blind eye to the

27  reasonable conclusion that the Board's unconstitutional practices are

28

1381

1  willful, there is another possibility. The pattern of errors
2  demonstrated by the discovery in this case, and the continuously
3  growing body of Court of Appeal opinions finding consistent and
4  persistent abuse of discretion, may instead be caused by the fact
5  that the Board is simply overworked and substantively untrained. The
6  impossibility of the blanket applicability of §2402(c)(1) may be only
7  the result of sloppy preparation and inadvertent carelessness.

8      The Board must first be given an opportunity to comply with the
9  necessary remedy provided by this court before it is possible to
10 enter a finding of conscious bias and illegal sub rosa policy. To do
11 otherwise would ignore the complexities and magnitude of the largely
12 discretionary duties with which that Board is vested.

13

14                          **CONCLUSION**

15     The conclusive nature of the proof in this case, and the
16 suggestion of institutional bias do not preclude formulation of an
17 remedy which will guarantee adequate restrictions on, and guidance
18 for, the Board's exercise of discretion in making parole suitability
19 determinations. The Board can be made to lawfully perform its duties
20 if given explicit instructions.

21     As noted supra, a reason the proof in this case irrefutably
22 establishes constitutional violations is because the Board does not,
23 in actual fact, operate within the limiting construction of the
24 regulations. The Board's expansive interpretation allows it to
25 operate without any true standards. Although numerous rulings of
26 both state and federal courts of appeal have invalidated the Board's
27 application of the §2402(c) criteria to particular facts, the Board

28

                                                     **1382**

                                26

1  does not take guidance from these binding precedents and ignores them
2  for all other purposes.   In the most recent of these cases, *In re*
3  *Roderick*, (2007) ___ Cal.App.4th ___ (A113370), the First District
4  held four of five §2402 factors "found" by the Board to be
5  unsupported by any evidence.   At footnote 14 the court took the time
6  to criticize the Board for its repeated use of a "stock phrase"
7  "generically across the state."   The court also clarified that "at
8  minimum, the Board is responsible for articulating the grounds for
9  its findings and for citing to evidence supporting those grounds."
10       There is nothing in the evidence presented that would allow any
11  conclusion but that, without intervention of the Courts, the Board
12  will ignore the lessons of these rulings in the future and continue
13  to employ its formulaic approach of citing a criteria from
14  §2402(c)(1), repeating the facts of the crime, but never
15  demonstrating a logical connection between the two.   This is the
16  core problem with the Board's methodology -- they provide no
17  explanation or rationale for the findings regarding the crime itself.
18       This practice results in violence to the requirements of due
19  process and individualized consideration which are paramount to the
20  appropriate exercise of its broad discretion.
21       The only solution is one that compels the Board to identify the
22  logical connection between the facts upon which it relies and the
23  specific criteria found to apply in the individual case.   For
24  example, the Board often finds that an inmate's motive is "trivial"
25  without ever suggesting why, on these facts, that motive is not just
26  as trivial as the motive behind any other murder.   What motive is not
27  trivial?   By any definition "trivial" is a word of comparison and
28

**1383**

1  only has meaning when there can be examples that are not "trivial."

2  Similarly, although the Sixth District made it plain four years

3  ago that "all [] murders by definition involve some callousness," (In

4  re Smith (2003) 114 Cal.App.4th 343, 345) the Board has continued to

5  deny countless paroles labeling the crime "callous" without ever

6  suggesting what crime would not qualify as "callous" and without

7  consistently explaining why the individual case before it

8  demonstrates "exceptional" callousness.

9  Respondent has consistently refused to suggest what possible

10  instances of murder would not fit the Board's amorphous application

11  of the §2402 criteria.  Citing Dannenberg, Respondent insists such

12  comparative analysis is unnecessary.  Respondent fundamentally

13  misunderstands the Dannenberg holding.

14  The PC § 3041(b) exception to the rule can only be invoked when

15  the "gravity of the current convicted offense or offenses, or the

16  timing and gravity of current or past convicted offense or offenses,

17  is such that consideration of the public safety requires a more

18  lengthy period of incarceration for this individual."  The word

19  "gravity" is a directive for comparison just as "more lengthy"

20  indicates a deviation from the norm.  While Dannenberg held there

21  does not need to be intra case comparison for the purposes of term

22  uniformity or proportionality, there necessarily has to be some sort

23  of comparison for the purposes of adhering to the legislative mandate

24  that parole is available.  This is implicit in §2402 because the

25  qualifier "especially," in "especially heinous atrocious or cruel,"

26  requires that some form of comparison be made.  While the original

27  drafters of §2402 seemed to have recognized this fact, the ongoing

28

1384

28

1  conduct of the Board has completely ignored it, and this is the

2  essence of the due process violation Petitioners have asserted.

3  　　As noted in his dissent in the recent case of *In re Roderick*,

4  *supra*, Justice Sepulveda would have deferred to the Board's

5  'exercise' of discretion because "Board members have both training

6  and vast experience in this field. They conduct literally thousands

7  of parole suitability hearings each year. The Board therefore has

8  the opportunity to evaluate the egregiousness of the facts of a great

9  number of commitment offenses ... The Board's training and

10 experience in evaluating these circumstances far exceeds that of

11 most, if not all, judges." The evidence in this case, however,

12 suggests a flaw in granting such deference. Since the Board

13 continues to place every murder in the category of offenses "tending

14 to show unsuitability," something is certainly wrong. Since the

15 Board's vast experience is undeniable, the problem must be in the

16 Board's training and understanding of the distinguishing features of

17 the guidelines and criteria. Although Justice Sepulveda presumes

18 that Board members receive substantive training, there is no evidence

19 before this court to suggest that it does, and substantial

20 circumstantial evidence to suggest that it does not.

21 　　In the vast numbers of Santa Clara County cases reviewed by this

22 Court, the Board's formulaic decisions regarding the commitment

23 offense do not contain any explanation or thoughtful reasoning.

24 Instead, the Board's conclusionary invocation of words from

25 §2402(c)(1) is linked to a repetition of the facts from the Board

26 report by the stock phrase: "These conclusions are drawn from the

27 statement of facts wherein ..." Thereafter the inmate files a habeas

28

**1385**

1  corpus petition and Respondent, after requesting an extension of
2  time, files a boilerplate reply asserting the Board's power is
3  "great" and "almost unlimited" and thus any "modicum" of evidence
4  suffices.  Respondent does not cite or distinguish the expanding body
5  of case law that is often directly on point as to specific findings
6  made.  Thereafter, if the writ is granted, the Board is directed to
7  conduct a new hearing "in compliance with due process" and that order
8  is appealed by Respondent.  On appeal the order is usually upheld
9  with modifications and in the end, after countless hours of attorney
10 and judicial time, the Board conducts a new two hour hearing at which
11 they abuse their discretion and violate due process in some different
12 way.

13     This system is malfunctioning and must be repaired.  The
14 solution must begin with the source of the problem.  The Board must
15 make efforts to comply with due process in the first instance.  The
16 case law published over the last five years provides ample and
17 sufficient guidelines and must be followed.  Although the Board
18 methods suggest it believes this to be optional, it is not.

19

20                          **THE REMEDY**

21     Thus, it is the order of this Court that the Board develop,
22 submit for approval, and then institute a training policy for its
23 members based on the current and expanding body of published state,
24 and federal, case law reviewing parole suitability decisions, and
25 specifically the application of §2402 criteria.  In addition to
26 developing guidelines and further criteria for the substantive
27 application of §2402 the Board must develop rules, policies and

28

**1386**

30

1  procedures to ensure that the substantive guidelines are followed.

2      This Court finds its authority to impose this remedy to flow

3  from the fundamental principles of judicial review announced over two

4  centuries ago in *Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137.

5  Citing that landmark case, the California Supreme Court has

6  recognized "Under time-honored principles of the common law these

7  incidents of the parole applicant's right to 'due consideration'

8  cannot exist in any practical sense unless there also exists a remedy

9  against their abrogation." (*In re Sturm* (1974) 11 Cal.3d 258, 268.)

10     In *Strum* the court directed that the Board modify its rules and

11 procedures so that thereafter "The Authority will be required [,]

12 commencing with the finality of this opinion, to support all its

13 denials of parole with a written, definitive statement of its reasons

14 therefor and to communicate such statement to the inmate concerned."

15 (*Sturm* at p. 273.)

16     Similarly, in the case of *Minnis, supra*, the California Supreme

17 Court held the Board's policy of categorically denying parole to drug

18 dealers was illegal.  Based on its analysis the court there was

19 clearly prepared to order that Board to modify its rules and

20 procedures however such was unnecessary because the Board

21 "voluntarily rescinded" the illegal policy.  While the remedy in this

22 case is of greater scope than that necessary in either *Strum* or

23 *Minnis, supra*, so too has been the showing of a systematic abuse of

24 discretion and distortion of process.

25     The most recent case to address the court's roles and duties in

26 overseeing the parole suitability process has been *In re Rosenkrantz,*

27 *supra*, 29 Cal.4th 616.  In that case the court explained that

28

**1387**

1  judicial review of a Governor's parole determination comports with,

2  and indeed furthers, separation of powers principles because the

3  courts are not exercising "complete power" over the executive branch

4  and do not "defeat or materially impair" the appropriate exercise or

5  scope of executive duties. (*Rosenkrantz* at p. 662.) Citing *Sturm*,

6  *supra*, the court reaffirmed that a life term inmate's "due process

7  rights cannot exist in any practical sense without a remedy against

8  its abrogation." (*Rosenkrantz* at p. 664.)

9      The *Rosenkrantz* court also put forth what it believed was an

10  extreme example but which, unfortunately, has been shown to exist in

11  this case. The court stated: "In the present context, for example,

12  judicial review could prevent a Governor from usurping the

13  legislative power, in the event a Governor failed to observe the

14  constitutionally specified limitations upon the parole review

15  authority imposed by the voters and the Legislature." This is

16  exactly what the evidence in this case has proven. As noted above

17  the Board has arrogated to itself absolute authority, despite

18  legislative limitations and presumptions, through the mechanism of a

19  vague and all inclusive, and thus truly meaningless, application of

20  standards. The remedy this Court is imposing is narrowly tailored to

21  redress this constitutional violation.

22      The consequence of the Board's actions (of giving § 2402(c)(1)

23  such a broadly all encompassing and universal application) is that

24  they have unwittingly invalidated the basis of the California Supreme

25  Court's holding in *Dannenberg*. The reason the four justice majority

26  in *Dannenberg* upheld the Board's standard operating procedures in the

27  face of the Court of Appeal and dissent position is because "the

28

**1388**

1 | Board must apply detailed standards when evaluating whether an
2 | individual inmate is unsuitable for parole on public safety grounds."
3 | (*Dannenberg* at p. 1096, footnote 16. See also page 1080: "the
4 | regulations do set detailed standards and criteria for determining
5 | whether a murderer with an indeterminate life sentence is suitable
6 | for parole.") However, Petitioners in these cases have proven that
7 | there are no "detailed standards" at all. Instead the Board has
8 | systematically reduced the "detailed standards" to empty words. The
9 | remedy this Court orders, that there truly be "detailed standards,"
10 | requires the promulgation of further rules and procedures to .
11 | constrain and guide the Board's powers. This remedy differs in
12 | specifics, but not in kind, from what courts have previously imposed
13 | and have always had the power to impose.

14 |    The Board must fashion a training program and further rules,
15 | standards and regulations based on the opinions and decisions of the
16 | state and federal court cases which provide a limiting construction
17 | to the criteria which are applied.[8] The Board must also make
18 | provisions for the continuing education of its commissioners as new
19 | case law is published and becomes binding authority. This Court will
20 | not, at this point, outline the requirements and lessons to be taken
21 | from the above cases. It is the Board's duty, in the first instance
22 | to undertake this task. The training program, and associated rules
23 | and regulations, shall be served and submitted to this Court, in

24 | 
25 | [8]While the showing and analysis in this case was limited to § 2402(c)(1), the
conclusions that the evidence compelled, that the Board has been carelessly
distorting and misapplying the regulations, is not so limited. Accordingly, the
training program that is necessary for the Board can not reasonably be limited to
26 | just § 2402(c)(1). Thus, to the extent case law recognizes, clarifies and
establishes remedies for other due process violations they must also be
27 | incorporated into the necessary rules and training the Board is required to abide
by.
28 |

**1389**

1  writing, within 90 days.  Counsel for Petitioners, and any other

2  interested parties, may submit briefs or comments within 30 days

3  thereafter.  After receipt and review of the materials this Court

4  will finalize the training program, and associated rules, and the

5  Petitioners in these cases shall receive a new hearing before a Board

6  that does not operate with the unfettered discretion and caprice

7  demonstrated by the evidence here presented.

8                              ORDER

9      For the above reasons the habeas corpus petition is granted and

10 it is hereby ordered that Petitioner be provide a new hearing which

11 shall comply with due process as outlined above.  Respondent shall

12 provide weekly updates to this Court on the progress of its

13 development of the new rules and regulations outlined above.

14

15

16

17 DATED: _Aug 30_, 2007    _Linda R Condron_

18                          LINDA R. CONDRON
                            JUDGE OF THE SUPERIOR COURT

19

20 cc:  Petitioner's Attorney (Jacob Burland)
        Attorney General (Denise Yates, Scott Mather)

21

22

23

24

25

26

27

28

**1390**



Ms. Linda Ludwig
Attorney at Law
637 Third Avenue, Ste. G
Chula Vista, CA 91910

October 11, 2005

Re: BPT Hearing; Ramirez-Salgado, Jose   C-11124

Dear Ms. Ludwig:

In the past, both the DA's Office and Police Department have filed documents with the BPT claiming that the homicide was an execution style premeditated murder. Which is in direct contradiction to the plea bargain offered and accepted by myself and the court. In the case of In re Scott ((2004) 119 C.A.4th 871, 15 C.R.3d 32, 45) the Court pointed to the same situation, stating that it is not possible for the prosecuting attorney to have made such an offer, if they had evidence to prove execution-style murder. Therefore, it is not proper for them to claim such at a BPT hearing.

15 CCR Sect. 2402(b) states that only relevant, reliable information shall be considered by the board, in accordance with applicable legal standards. (In re Ramirez (2001) 94 C.A.4th 549, 114 C.R.2d 381, 390.) Only particularly egreious offenses will justify the denial of parole. (In re Dannenberg (2002) 125 C.R.2d 458, 469.) A prisoner's Sixth Amendment Rights are implicated when ever the state seeks to impose a sentence that is not based solely on the facts reflected by a jury verdict or admitted to by the defehdant. (Blakely v. Washington (2004) U.S. Law Weekly (06/29/04) pp. 4546; Apprendi v. New Jersey (2000) 530 U.S. 466, 476-97, 120 S.Ct. 2348, 147 L.Ed.2d 435, 466-___; et al.) If a state makes an increase of a defendant's punishment contingent on the finding of a fact, that fact, no matter how the state lables it, must be found by a jury beyond a reasonable doubt, (Ring v. Arizona (2002) 536 U.S. 584, 605, 153 L.Ed.2d 556) or expressly admitted to by the defendant in court. It must have a factual basis, and not be based on whim, caprice, or rumor. (In re Powell (1988) 45 C.3d 894, 898-902, 248 C.R. 431, 755 P.2d 881.)

A plea of guilty is more than a confession, it is in itself a conviction, nothing remains but to give judgement and determine punishment. (Boykin v. Alabama (1969) 395 U.S. 238, 242, 89 S.Ct. 1709, 23 L.Ed.2d 274, 279; Kercheval v. U.S. (1927) 274 U.S. 220, 223, 47 S.Ct. 582, 71 L.Ed. 1009.) A confession discloses the guilt of the charged offense(s) and which excludes the possibility of any inferences to the contrary. (People v. Kilpatrick (1980) 105 C.A.3d 401, 413, 164 C.R. 349, 356; et al.) Any fact, other than prior conviction(s), that increases the maximum penalty for a crime charged, must be submitted to a jury, and proven beyond a reasonable doubt. The High Court analysis concerns the required proceedures for finding the facts that determines the maximum permissible punishment. In the cases of Winship and Patterson, the Court recognized a limit on the state's authority to reallocate traditional burdens of proof. (Jones v. U.S. (1999) 526 U.S. 227, 243 & n.6, 119 S.Ct. 1215, 143 L.Ed.2d 311, 326; Apprendi, supra, 530 U.S. at 484-85, 489; et al.)

- 1 -

To; Ms. Linda Ludwig, Attorney at law.
Re: BPT Hearing: Ramirez-Salgado, Jose C-11124   Continued

At the time of my actions, law permitted the defenses of dimished
capacity and voluntary intoxication (Cal P.C. Sects. 22 & 25). The
determination of 'Insanity' (CALJIC 4.02) during that time was based
upon Model Penal Code Sect. 4.01, according to People v. Drew (1978)
22 C.3d 333, 149 C.R. 275, 583 P.2d 1318, where the Court abolished
the M'Naghten test in favor of M.P.C.'s test. (Prop. 8 is not retro-
active. People v. Wells (1983) 22 C.3d 318, 330, 149 C.R. 265, 583
P.2d 608.) Due to my head injury that caused epilepsy, my nearly
constant alcohol and marijuana use from the time I was 12 to the
time of the crimes, and the fact that I had drank and smoked myself
into unconsciousness and do not remember what happened that night,
the DA offered the plea bargain, because he could not prove anything
more than Felony-murder of the second degree. See also PC. Sect.
1192.2 - Specification of degree in Plea of Guilty.

15 CCR Sect. 2402(d)(4) applies to this hearing. My Mother left me
with my Grandfather in a small village when I was 11 years old, to
come to the U.S. to build a better life for her children. At 12, due
to the constant teasing of the other childern there, I believed that
my Mother did not want me, nor love me. So I left the little village
of San Jose, and hitch hiked to Guadalajara. There I was told to get
a bus ticket to Tijuana, which took all of my money. After traveling
over 1500 miles to Tijuana, I was hungry, scared, and flat broke.
This occured in the early 1970's. What I had to do to survive until
I found away across the boarder, is not pleasent to think about,
even to this day, and I will not talk about what went on them.

When I did make it to my Mother's house in San Diego, I found that
my Mother had a Boyfriend. I blamed him for my Mother not wanting me
anymore. My fears of being un-loved and un-wanted over whelmed me.
Being stubborn, did not help me either. I tried to break them appart
so that my Mother would want and love me again. I got into drugs and
alcohol to deal with my problems, since all of the older guys I knew,
that were not afraid of anything used drugs and drank. When that did
nothing for me, except cause my Mother to get angry at me, I figured
that these guys were 'not afraid' because they carried knives. So I
got one of my own. That did not help. They carried a gun, so I wanted
one. I finally found one and my Mother took it from me and her boy-
friend sided with her. So one day, after drinking and smoking pot,
I got enough courage up to get back my gun, after they both left for
their jobs. I returned to a friend's place and continued to drink and
smoke pot. We talked about how to make people respect you, etc.. I
passed out or lost consciousness there and awoke the next morning at
my Mother's house. It was not an unusual occurance by that time. I
was later arrested and charged. My Mother and Attorney told me what
I had done that night, but to this day, I do not actually know or
remember anything. In People v. Kelly ((1973)(In Bank) 10 C.3d 565,
573-76, 111 C.R. 171, 177-78, 516 P.2d 875) the Court cites various
cases and research papers as their view on what alcohol and drugs
do to a person in regards to insanity. Even the U.S. Dept. of Edu-
cation back in 1992 put out a report on the sever mood swings that
marijuana and alcohol can cause when used together.

In People v. Dillon ((1983)(In Bank) 34 C.3d 441, 476, 478-79, 194
C.R. 390, 411, 413-14, 420, 668 P.2d 697) the Court discusses that

To: Ms. Linda Ludwig, Attorney at Law.
Re: BPT Hearing: Ramirez-Salgado, Jose C-11124      Continued

punishment could be disportionate, thus illegal, even if it is not
cruel or unusual. On 194 C.R. pp. 420, it states on point to my case:
> "(T)he shooting in this case was a response to a suddenly
> developping situation that the defendant perceived as putting
> his life in danger. To be sure, he largely brought the
> situation on himself, and with hindsight his response
> might appear unreasonable; But there is ample evidence that
> because of his immaturity he never foresaw the risk he was
> creating nor was able to extricate himself without panicking
> when that risk seemed to eventuate."

While Dillon and friends were not intoxicated when they went to steal
pot plants and had armed themselves prior to going to the pot field,
to protect themselved from the grower(s), the court viewed that
Dillon was not guilty of first degree murder, etc.. Footnote 26 refers
to In re Lynch (1972) 8 C.3d 410, 426-29, 105 C.R. 217, 503 P.2d 921,
to techniques to be used by the courts to aid in determining the
pproportionality, such as examination of the nature of the offense
and/or the offender.

While the Board may see me as being 18 years old at the time of the
crimes, in all actuality, I was no more mature then as I was at the
age of 12. They need to see this, and the fact that the situation
and stressors of that time period are no longer a problem. The Board
still accepts the claims of the D.A.'s office and Police Department
at the hearings. How much influence that has on their determinations
has remained unclear to me. But I need to have a written objection
to those claims filed to get them to put it in the records, so I
can challenge their decision in court. If they deny the objections,
they are admitting to violating the Rules of Court, Common Laws, and
thus are violating my Constitutional Rights to have my sentence
determined by the facts of the case found true by the court in my
plea of guilty to the plea bargain. The Court accepted my plea and
by law, the determination of facts are legally binding on the BPT.
For them to use the claims of the DA and Police that are contrary to
the findings of the court and my guilty plea, is illegal.

Since the recent cases decied by the U.S. Supreme Court, supra, are
binding on the state in its determination of the maximum sentence in
my case, and the Board is an extension of the Sentencing Court because
it determines the actual lenght of sentence over the minimum term of
15 years, based on the facts of the case, and my actions in prison
to add time to the minimum time set upon determing suitability, it
to is bound by the High Court's ralings. The fact that I can challenge
their denial in court, tells me that courts holds jurisdiction in
the determination of the lenght of sentence and can order the BPT to
find a lifer suitable for parole. That the Board is only an exten-
sion of the Court to handle the Court's ongoing supervision of the
sentence. Therefore are required to follow the same laws that bind
the Courts in sentencing determinations.

To prepare for the post-hearing petitions for Habeas Corpus, I need
to ask you to assist me in the following items:

> 1) Obtain Court recognized or recognizable scientific reports
>    on the effects of long term use of alcohol and marijuana

- 3 -

To: Ms. Linda Ludwig, Attorney at Law.
Re: BPT Hearing: Ramirez-Salgado, Jose  C-11124  Continued.

has the human brain and how it effects children's develope-
ment emmotionally and psychologically.

2) Obtain the Court's Ruling in the Eastern District Court
   case of In re Coleman May 2005. The prison's Law Libbary
   does not get any advance sheets anymore, since there are
   temporary soft covered volumes of cases published, even
   though they are two to three years behind in those and
   are missing large sections of the ones they did purchase.

3) File a written objection to the D.A.'s and police's claims
   that contradict the facts found in court.

4) Present the facts of the case leading upto the day of the
   crimes, stressing the stress that I was suffering from the
   time that my Mother left me in Mexico, thru the time in
   Tijuana (especially the problems faced by any young teen-
   ager from the farm, faces in the big city even now.) To
   use of alcohol and marijuana on a nearly daily bases from
   the age of 12 to the day of the crime.

5) That such constant use of alcohol and marijuana reduced
   my abilities to determine right from wrong and caused
   insanity, which by law governing my case, is a legal defense
   to premeditation, etc..

6) Present my Parole Plan (enclosed) for returning to San Jose
   Mexico, to farm the land that my Grandfather left in his
   will for my use upon relaese of prison. That the funds
   left to me in my Mother's will, is suffcient to keep me
   alive and well, for about 12 years, even if the farm
   does not provide me with any food. That this plan is due
   to my extensive considerations of the views and opinions
   of the previous Board hearings.

7) That I know the hurt and pain that I caused to the family
   of the person that I killed. I lost my Father at an early
   age, and have lost both my Mother and Granfather since
   this incarceration started. That this has helped me to
   mature and see that the actions of my youth deprived many
   people of love ones, and caused great pain and grief for
   many.

8) Since I have left the prison gang and entered the Special
   Needs Program/Yard, I have been a MAC Rep. for the Mexicans
   in two separte Buildings. That I am using my past history
   in dealing with conflcts, and problems in a positive manner,
   quelling anger and potential violence. Where as a gang
   member, I would have fostered the opposite in these immates.

9) That if I were released, it would be a death sentence for
   me to try to get re-involved with any gang, since I left
   the gang in here. That I know thatI can not even go to any
   boarder town near the U.S. Boarder without risking being
   identified as a drop-out and death.

10) That by releasing me, that Mexico would be receiving a
    mature man, who will spend his time in raising crops and
    some animals for food. Which will help feed others and
    myself for the remainder of my lifetime. That it would also
    reduce the burden of the system for my incarceration and
    medical needs. THE COST WILL INCREASE WITH MY AGE IN HERE.

11) Positive actions while in prison, encluding those stated
    herein.

- 4 -

To: Ms. Linda Ludwig, Attorney at Law.
Re: BPT Hearing: Ramirez-Salgado, Jose    C-11124    Continued.

12) Present the written letters and declarations from family, friends, etc., of their support of my parole plan, my release, etc., both the Spanish written letters and their english translations. Last counsel failed to have the letters translated and the Board made several racist remarks about the language and Mexicans in general. Please be ready to object to any possible attitudes here.

13) Present my written statement (enclosed) to the Board. As well as assist me in its proper presentation of the message that I am trying to present to them. (Right now, I have a fellow prisoner assisting me in the research and prep for the petitions, but I will need your help in polishing the parole plan, statement, and objections for the BPT hearing. Your experience in this area is important to my success in the hearing and/or the petition challenging their denial.)

14) Creat the record for filing a Heabeas Corpus Petition if the Board denies parole suitability, so that I will have a stronger case in court. and,

15) Anything else you believe that will help me at the Board Hearing and court challenging the denial.

I know that I am asking for a lot from you, and that they don't pay you alot of money for the work they claim they want you to do in such a hearing. But I need your help in this if I am ever to gain my freedom.

Also, the prison is refusing to provide me with any threat assessment evaluation update as required by the BPT and law. This will violate my rights since the board will not beable to find suitability without it. There have been no updates of BPT Forms: 1000(A), 1001, 1001(A), 1000a, et al. Thus a violation of Toussant v. McCarthy (    ) 801 F2.d 1080, and my legal rights. This is my fifth full Board Hearing for me.

The prison has been on lock down since August 18, 2005 due to an incident on Fac. C. And I just received the paperwork assigning you to my hearing. I appoligize for the late timing of this letter because of it.

Sincerely,


Org: Attorney, Ms. L. Ludwig                Jose Ramirez-Salgado, C-11124
                                            Calipatria State Prison
  cc: Personal file                         D2-233
                                            P.O. Box 5003
Encl: Parole Plan                           Calipatria CA 92233-5003
      Statement
      CDC - BPT Memo of 05/24/04
          (Hand copied)
      Copy of 07/05/05 letter to BPT on the lack of Psyc. Evaluation.

                        - 5 -

P.S. PLEASE CHECK OUT http://www.nih.gov/ResearchReports/Marijuana/Marijuana4.html
pp1 ¶3; pp2 ¶2§3; MARIJUANA & ALCOHOL ABUSE
/Marijuana3.html. pp1 ¶4&5; pp4 ¶6-7;    - MARIJUANA ABUSE
http://pubs.niaaa.nih.gov/publications/arh25-1/66-71.htm ALCOHOL & VIOLENCE IN THE LIVES OF

STATE OF CALIFORNIA
COUNTY OF SAN LUIS OBISPO

## DECLARATION OF ALBERT M. LEDDY

I, ALBERT M. LEDDY, hereby declare:

1) I was an attorney at law, currently retired. After graduating from Boalt Hall, University of California at Berkeley, I practiced law until 1983 including serving as Deputy District Attorney and then District Attorney of Kern County, California from 1952 to 1965 and again from 1970 to 1983.

2) Between 1983 to 1992 I served as a Commissioner and then as Chairman of the Board of Prison Terms (BPT) pursuant to my appointment and re-appointments to those positions by Governor George Deukmejian.

3) During approximately 9 years of service as BPT Chairman and Commissioner, parole hearings were conducted as now for "life" prisoners (with a maximum prison term of life and a minimum of between 7 and 25 years, reduced for work and good behavior) by 3-member BPT panels at intervals prescribed by the California Penal Code statutes and the parole regulations in the Code of Regulations, Title 15, Division 2, Board of Prison Terms, §§ 2000 et seq.

4) From 1983 to 1990 BPT panels became more reluctant to grant paroles in accordance with Penal Code § 3041(a) (which requires that at the initial hearing a parole date shall "formally" be set) resulting in a substantial, steady decline in the percentage of parole dates granted at hearings. This decline was caused by increasing political pressure and new BPT Commissioner appointees who disfavored paroling life prisoners.

5) After Governor Wilson's election in 1990, he substantially intervened to reduce parole grants. In actual effect his policy practically eliminated paroles. He accomplished this first by appointing and re-appointing BPT Commissioners known to disfavor parole or to favor a "no-parole" policy. These appointees were all crime victims, former law enforcement personnel or Republican legislators who had been defeated in elections and needed a job.

6) Governor Wilson made his "no-parole" policy known in several ways including, I believe, through statements quoted by the media and possibly through the Youth and Adult Correctional Agency Secretary, although I can't say I know this to be fact. I am aware that he wanted previously set parole dates rescinded.

7)   The new BPT appointments by Governor Wilson violated Penal Code § 5075 which required that "[t]he selection of persons and their appointment by the Governor and confirmation by the Senate shall reflect as nearly as possible a cross-section of the racial, sexual, economic, and geographical features of the population of the state." Governor Wilson's appointments have been mostly from his home area of San Diego. Most are not qualified by training or experience for the position of BPT Commissioner, and they do not fulfill the statutory cross-section requirements of racial, sexual, economic or geographical proportion.

8)   My knowledge of these facts is based on publication and my awareness of said appointments, my daily dealings with them as panel members at BPT hearings at which paroles were denied contrary to the laws and regulations, and Mr. Wilson's public statements disavowing parole policy as set forth in the statutes and regulations, and proclaiming during his campaigns that he would not have "another Willie Horton episode." On one occasion Joe Sandoval, former Secretary of YACA (a cabinet level appointment) personally warned the Commissioners to be careful about granting paroles. Chairman John Gillis told two Commissioners, "Stop giving these dates."

9)   Governor Wilson also accomplished his "no-parole" policy by having the BPT use a previously unused law to void practically all grants of parole by BPT panels while not using it to overturn any decision denying parole. This law was Penal Code § 3041.2.

10)  Governor Wilson also had the BPT use a seldom-used regulation, 15 CCR § 2451(c), to rescind nearly all of its previous grants of parole to prisoners awaiting their release. This regulation, known as the "improvident grant" clause, became routinely used to rescind those previously set dates. On one occasion, after I refused to recommend rescission on a panel, I was told by Ted Rich, BPT's Executive Officer, to recommend rescission when it is the Governor's desire. It was obvious to myself and other Commissioners that we would not be re-appointed if we did not comply.

11)  At one point I became concerned enough about the "no-parole" policy that I wrote a 9-page brief about how we were not complying with the laws. I gave a copy to each Board member, pointing out that we could be sued. I asked that this brief be a topic on the Board's agenda. Ted Rich, as Executive Officer, said, "That's not going to be on the agenda. You can't have it on the agenda."

Declaration of Albert M. Leddy                                    Page 3 of 5

Inasmuch as I expressed my dissatisfaction verbally and in my brief, I'm sure that my objections helped me not to get re-appointed.

12) Accordingly, the effect that Governor Wilson has exerted upon BPT personally, through his politically-based policy, by his BPT appointments, and by his intervention to rescind and reverse parole grants, has been to remove any reasonable possibility of parole for practically all of the thousands of California prisoners serving terms of life with the possibility of parole.

13) Such a "no-parole" policy is contrary to Penal Code § 3041 which requires that BPT "shall normally" set a parole date in most cases, i.e., unless the prisoner is shown to pose a threat to public safety, and that BPT panels shall declare prisoners "suitable" for a future release date and set that release date unless a preponderance of the evidence presented at the hearing demonstrates that the prisoner "will pose an unreasonable risk of danger to society if released from prison."

14) Although the reluctance to grant parole began in the early 80's, under Governor Wilson's regime BPT panels denied parole in over 99% of cases by employing procedures that violate the parole statutes and regulations. Primarily used are offense factors. BPT panels find prisoners "unsuitable" for parole based mainly or entirely on the facts and circumstances of their offense instead of their level of dangerousness, as reflected by performance, rehabilitation and expert evaluation in their prison records. Because the facts and circumstances of crimes do not change, the procedure effectively increases all such sentences from life with possibility of parole to life without any possibility of parole. Despite contrary regulations and statutes, BPT's chief counsel and Executive Officer urged me and the other Commissioners to deny paroles based on the prisoners' offenses.

15) The procedure also eliminates BPT's duty to set parole dates because parole can't be granted for those found "unsuitable." This renders illusory BPT's term-setting obligation and lifers' opportunity to parole. Even the most deserving prisoners shown overwhelmingly not to pose an unreasonable risk (or any) risk of danger to the public if released have not, cannot and will never receive parole under such a policy.

16) After 1992, when my final term as BPT Commissioner expired, I re-entered the private practice of law. I represented an inmate at his BPT hearing. Although the inmate had a statutory right to call witnesses, who could have refuted the allegations the panel used to deny

<u>Declaration of Albert M. Leddy</u>                    Page 4 of 5

parole, the BPT denied the witness. Additionally, the BPT substituted Commissioner Carol Bentley, a former Assemblyperson who was appointed after she was not re-elected. I had never known Ms. Bentley to grant parole to any lifer. She was the panel chairperson. She was rude, her hostility was obvious and it was evident she was pre-determined to oppose parole.

17) Prior to the commencement of his parole hearing, I personally heard Ron Koenig, a Commissioner on the hearing panel, and former BPT Chairman, inform Rick Erwood, the Riverside County District Attorney attending the hearing, "don't worry" because "we won't parole this guy," in those approximate words. This is consistent with my experience described above in which BPT's hearing panels often made decisions to deny parole prior to the hearings.

18) It has been clear to me that there is a general conspiracy to prevent life prisoners from paroling, especially those whose offenses include murder. Obviously, such a "no-parole" policy means that no murder offender can get a fair hearing as the law requires. If you can deny a prisoner "suitability" solely on the basis of the crime, you can deny him forever. The crime won't change. The parole law is based on the idea that prisoners do change and become no danger to public safety. Statistically the murder offender rarely repeats at crime once released.

19) As a taxpayer, I believe it is a waste of perhaps millions of dollars each year to incarcerate those life prisoners whose prison records I adequately demonstrate they are no longer a threat to public safety. The correctional system spends millions on programs to teach them trades and marketable skills, to give them a general education, and until its discontinuation, psychological therapy to help them change their lives. I believe the law must be followed, that the Governor cannot create his own set of punishments in defiance of the clear legislative intent. Every man is entitled to a fair hearing where the burden of proof is set and adhered to, and the results aren't just what is politically expedient for one person, the sitting governor.

20) I am informed that Governor Gray Davis has expressed his policy that no murder offender will be paroled on his watch. As a former Commissioner and as a lawyer, such a policy is clearly contrary to the statutes and

regulations governing the parole process. Such a policy
will exacerbate an already unacceptable situation which
is backlogging hundreds, perhaps more, of life prisoners
who are already beyond the term they would normally have
served but for the "no-parole" policy.

I declare, under penalty of perjury, that the facts I
have stated are true and correct. My expressions of belief as
to each specified facts are based on the reasons I have given
as to each such fact. I would be willing to testify to same
in a court of law. I so swear, this ___5th___ day of
___March___ 1999, at Los Osos, California.

Albert M. Leddy
Declarant

## PAROLE PLAN OF JOSE RAMIREZ-SALGADO, C-11124

My Grandfather left me ten (10) acres of farm land for my
uses upon release from prison in his will. My Mother left me
50,000 dollars in her will for my release. Untill such time as
being determined suitable for parole and released by the Board, the
land and funds remain frozen. The funds and land will assist me in
becoming a productive citizen of Mexico upon parole. At the current
rate of exchange, the funds and interrest earned, will be more than
600,000.00 Pesos. According to the World Almanac, 2002 Edition, the
minimum wage in Mexico is 2.31 dollars per hour. That is 92.40 per
week (at 40 hours) — 4804.8 per year (at 52 weeks) that most Mexicans
earn. In Pesos — about 48,048.00 per year. The funds left by my
Mother is equilivant to about twelve (12) years of work.

I plan to return to the farm that my Grandfather left me in the
small village of San Jose. A place about 30 Km southeast of the
town of Atotonilco, and about 380 Km northeast of Mexico City, if
one could travel in a straight line. By road, it is alot farther.
San Jose is a small farming village far from the beaten path. It is
extreamly rare that anyone not having buisness there to come to
visit that sleepy place. Tourism is non-exsistant there. When I
left there in the early 1970's, there was not much there, only one
phone, and no power lines coming into the area. While some of the
modern conviences has arrived there since then, such as electricity
and more phones, the village has not changed very much.

I plan on honoring my Grandfather's dying request that I live
on the land and farm it. Using part of my inheritance from my Mother,
as security for a loan to build a house, barn, sheds, a greenhouse,
septic system, seeds for the feilds and garden, chickens, hogs, and
a few goats, and a new water well, I will be able to get the old
farm up and in operation. I plan on share croping the wheat fields
the first couple of years, until I relearn the skills needed to
plow, plant, and harvest the feilds myself. By that time, I sould be
able to find and purchase any equipment needed at a reasonable price.

According to my family, it will take less than 150,000 pesos
to get the place in working condition. Leaving about 450,000 pesos
in the bank. Nine (9) acres of wheat, even share croped, with the
produce of the garden and greenhouse, and the milk, eggs, and meat
from the animals, will provide food for myself and enough income to
pay the loan(s) off and continue to improve the land. Many water

- 1 -

PAROLE PLAN OF JOSE RAMIREZ-SALGADO, C-11124 CONT.

dependant crops are raised in the area, and upon a close review of
the market for them and the availability of underground water sup-
ply, will detemine if I will beable to grow such crops. I would have
to have more wells drilled and pumps installed. With the current
alternative energy technologies available, I will also be looking
into solar and wind generators. We have an average of 12-20 inches
of rain per year, and the average tempatures for summer is below
68 degrees F. and below 50 deg. F in winter. So water is a concern
and a green house is a good idea to have for year-round freahh
vegatables.

The Board has raised a few concerns in the past, about my plans
and my actions as a teenager, and the chances of returning to such
actions. I admit that I did a lot of things in my youth that were
not, especially in hind sight, proper or legal. But many things
have changed since them that reduces the likelyhood of my chances
of repeating them. I modified my parole plans to help reduce even
those small chances.

I dropped out of the prison gang and became apart of the
Special Needs Program/Yard. If I were to visit any Mexico-U.S.
boarder town, I will most likely identified as a drop-out and
marked for death. If Government officials are assisanated with all
of their protection, what chance would I have? And if I were visiting
family there, I would be jeapordizing their lives as well. My family
visits San Jose yearly, for about three(3) weeks or so, to take care
of family business and visit family still there. We can safely
visit then.

My previous plans were swayed by my and my family's wishes
to be closer to each other. Moving to Tijuana and starting a business
there was based on those wishes. The Board's concerns were well
founded. It took me several readings and descusions with family,
friends, and fellow prisoners for me to understand this. I am hard
headed. The proxicimity to gangs, drugs and alcohol, not to mention
the boarder was the concerns of the board. I thank them for these
concerns that I was blinded to.

While this plan may appear simple on paper, I know what the
farm life is like. I was raised on it untill I was 12 years old. I
know that it is not easy. It will keep me busy each and every day.
There is a family there who earns their living by hauling produce

- 2 -

PAROLE PLAN OF JOSE RAMIREZ-SALGADO, C-11124, CONT.

to market in the larger towns/cities for the farmers and hauling
back things that the farmers need. This will benifit me in several
ways: 1) I don't need to learn how to drive for awhile; 2) I don't
have to find out how to sell the materials or to whom right away;
3) I won't have to buy a truck to haul produce to market; 4) It
keeps me out of the areas that alcohol and/or drugs are redilly
available; 5) It keeps me away from such temptations that would
interfer with my success; 6) It will allow family and friends to
help me re-adjust to the life of a farmer; etc...

Many of my family remaining in the San Jose area, and friends
there, have offered me a place to stay until the house, etc., is
ready for me to move into. They have also extended the offers to
help re-teach and teach me what I will need to know to successfully
run the farm. And will be there to help me if I need it.

I respectfully submit this revised parole plan to this board
in hopes that it will show that, unlike past plans, this one has
taken alot more work and introspective into my needs and wellfare
to be a success on parole. I have tried to view things from the
Board's point of view. My family in San Diego, was just recently
in San Jose checking out the needs of the farm and the current costs
to get it back up and running. It took them over four weeks to get
the information on the costs estimates. For simplicity, I did not
make an itemized list of the information they found out for me, and
since anything can and will change from day to day, the estimated
will of course already be out dated. Plus, I have yet to determine
the lay-out of the buildings, or their sizes wanted or needed for
my purposes.

Respectfully,
Dated:_____

_____

Jose Ramirez-Salgado, C-11124

- 3 -

STATEMENT

I would like to let this Board know that I have read and re-read each of the previous Boards' decisions and comments. I have tried to act on each of their suggestions and to address their concerns to the best of my ability, and to those things that I could influence. Anything outside of my abilities to put into motion, I have sought help of staff, prisoners, and my family.

I would like to start out with a short fable about a mouse: 'It is said that a mouse was very much afraid of a cat; constantly in fear, anxiety. He could not sleep; he would dream about the cat and he would tremble. A magician, just out of pity, transformed the mouse into a cat. Immediately, the cat was afraid of a dog. The anxiety and trembling continued, the anguish remained, the dreams were still of fear.

So the magician changed the cat into a dog. Immediately the dog became afraid of the tiger. The same anxiety, the same disease, the same fear remained. The magician changed the dog into a tiger. Immediately the tiger became afraid of a hunter. So the magician said to the tiger, 'now be a mouse again. While I can change your body, I can not change you. You have the heart of a mouse, so what can I do?''

As a young child, my father was taken from us. After years of trying to provide for her children, my Mother decied that the best course of action was for her to go to the United States to build a better life for her family. She left me with my Grandfather on his ranch/farm outside of a small village of San Jose while she went to the U.S.. I was 11 years old at that time. I did not understand why she had to leave me behind.

As I am sure that each of us here can remember how insensitive children can be. It was no different then. Being a small place, everyone knows everyone's business. The children, even cousins, teased me that my Mother left me behind because she did not want me and did not love me. At first, I called them liars, etc., but Christmas came and went, and my Mother did not come. My 12th birthday passed, and she did not come for that. During all of that time, the children teased me that my Mother did not love, nor want me. I came to believe them. I came to fear that they were right.

I took what money I could find, and went to find my Mother.

- 1 -

STATEMENT, Cont.

I hitched hike all the way to Guadalajara, about 180 Km. There, I finally found someone who told me how to get to the United States. That I needed to take the bus to Tijuana. The bus ticket took all of the money I had. It took several days to travel the 2600 plus Km to Tijuana. I was hungry, tired, afraid. I was a small villager in a big city, with no idea of what to do, or who to trust, with no money or food.

I am sure that each of you have seen or read about the dangers that teenagers from the farms and ranches of the mid-west face when they runaway to the big cities of this country. I am talking about the early 70's in Tijuana. I had to eat, while I found a way into the U.S.. I still will not talk about what I went through to survive there, it is too painful to remember and I hope that noone else ever has to go through that. But, I do know that people do everyday. I just wish that it were not so.

When I finally found my way accross the boarder, and finally found my Mother, I was hurt to find that she had a boyfriend, and how angry she was with me for coming to the U.S.. I did not understand that my actions could cause all of her hard work to be wasted. That my Mother could lose her Green Card and be deported because of me sneaking into the country. I thought that she was mad that I did not stay away from her in Mexico were she left me. I did not understand that she could guess at what I had done to stay alive, and that she did not want me to have gone through all of that. Had I waited at my Grandfather's farm, that she would have come and brought me when she was permitted. Her love and fear for my safety appeared to me at the time as being angry at me for interfering with her new life without me and with her new boy-friend.

All of the fears, the teasing, the pain that was inside of me turned into anger and fear. Just like the mouse, my situation had changed, but I had not changed for the better. I started to hang out with tough guys. Those who did not appear to be afraid of anything. I started to drink alcohol and smoke pot. Because the others did and I thought that it was a way to over come my fears. When it did not work, I started to copy other things that the others did, assuming that by doing so, I would no longer be

- 2 -

STATEMENT, Cont.

afraid. I started to carry a knife like they did. Some even carried
guns. Since carring a knife did not cause the fears to go away. I wanted a
Gun. All it did cause, was more problems with my Mother and me, which
due to my youth, I did not understand that it came from her love
for me.

One day I found a gun that someone had thrown away or lost.
I thought it was the answer to my prayers and fears. My Mother
found it and took it from me. To me, it appeared that she wanted
to keep me in fear. That she wanted to keep me from being a man.
It made me angrier when her boyfriend sided with her. I had hated
him for taking my place in my Mother's life and love, now I was
was inraged that he would take away my new found manhood.

I admit, that I was not very rational about alot of things
back then, and that I was very immature back then, either. In
fact, I had ran-away, getting myself deported back to Mexico, in
my attempt to get my Mother's attention away from her boyfriend
and back to me. When those stunts did not go as I had invisioned,
I was even more upset and fearful. My fears and anger combined
with the constant use of alcohol and drugs, I lost what little
common sense I had.

I was drinking and smoking pot on the day I decided to get my
gun back from my Mother. I waited until she had left for work, and
took it from where she had placed it. I went back to my friends'
and continued to drink and smoke pot. I felt strong, brave, and
I wanted to prove my manhood to my friends. The higher and drunker
I got, the less I remembered. This occured, I do not remember how
it started, or why I started to do what I did, nor do I remember
anything of that night. I woke up at my Mother's home. I remember
being arrested, and being told what I had done that night. But I
still do not know nor remember that night.

I was offered a plea bargain by the prosecutor, My attorney
told me that due to my drug and alcohol use and my epilepsy which
was caused by a head injury, that if I were to go to trial, all
that I would be found guilty of is what the prosecutor was offering
to me. That, If I took the deal and plead guilty, the court and
parole board would take a more favorable view of such actions,
than if I were to take it to trial. He also explained that since
I was committing several felonies at the time that I shot and killed

STATEMENT, Cont.

the father of a family, that by law, I was guilty of Felony-
Murder of the second degree.

Since I had lost my own father at an early age, I knew what I
had done was going to cause these people alot of heartache and pain
for years to come. What I have done to this family has haunted me
every day since then, and will till the day of my death. Seeking
their forgiveness will not reduce their pain nor release me from
mine. May 'self-help' groups, including most religions, say that
you must be able to forgive yourself, before you can ask for the
forgiveness of others. Since I can not find forgiveness in me for.
for my actions, I can not expect them to forgive me for what I did.

Since my incarceration, I have matured enough to understand
why my Mother left me in the care of my Grandfather while she had
to struggle to build a better life for all of us here in the United
States. That my fears caused actions, could have caused it all to
come to naught. My Mother married her boyfriend, and through the
years, he and I became friends.

Both my Mother and Grandfather have passed away during this
incarceration. Due to it, I was unable to attend either funerals,
nor say goodbye to them prior to their passing away. So, because of
my actions, the grief that I caused to the victim's family - that
they could not say goodbye to their Father and Husband and Brother
and Son, has returned to me two fold. I can not change what I did
to them, but what I did has forced me to face my fears and self
here in the living hell called prison. While being sorry for one's
action is supose to make one a better person, it doesnot change or
fix what I did. Nothing can. All that is left for me to do, is to
make myself a better person in hopes that in some way, I can make
the difference in another's life and keep them from doing what I have
done to deserve time in prison.

When I was arrested and booked into jail, I was a pre-primed
target for gang recruitment. Many there had already done time and
were very egar to pass on all the horror stories in graphic detail
to a fresh fish. They told me of the race wars and prison life,
were you are either the prey or the preditor. That to survive, you
had to have 'friends' there to protect you and you helped to protect
them as well. Strength in numbers. If you did not join a gang, you

- 4

STATEMENT, Cont.

were a target of everyone, including the gaurds. The stories and
statements played right into my fears. I was now primed for the
actual recruitment once I hit prison. Entering the prison and the
gang life at the same time.

What they did not tell me, was as a gang member, the gang preyed
upon you. You have to earn their protection and respect by doing
many things for the gang. You had to be ready to protect the gang's
interrests at all costs. Failing to do that, or backing down from
a fight, or failing to do as ordered by the gang, was a stabbing
offense by the gang. May who 'earned such a punishment' did not
survive it. Minor infractions were dealt with by assaults, such
as being beat up by one or more members, to worse things. You learn
quickly to obey orders without a question or hesitation.

The fear of reprisals, protected the members from random
attacks, most of the time. New members were often sent to attack
the members of rivals to prove their loyalty. Everyone lived in
fear. But to show it was worse than death, because you then became
the target for what ever they wanted to do to you. To fail to be
ready for war at anytime could mean one's death of at the least,
being the victum of someone else. You then had to face your own
gang for your error.

What I had to do to survive as a gang member, was done out of
fear, to survive in the prison. While there has been very few that
have been strong enough to stay out of the gangs in here. They don't
usually last very long on the main line. Which is why, when I realized
that the gang life was not the answer, that by staying with them
would mean my death in prison, sooner or later. That I needed more
than what they could offer me, I left the gang. I became a 'Drop-
Out' marked forever for death by the gang. I left the main line and
entered the Special Needs Program. I had to face myself and look at
what I had done. I had to learn a better way to deal with problems
in prisonlife, other than violence. It took some time, but I started
to learn. I started to help those that I would have abused and used
when I was a gang-banger. I became a MAC Rep. for Mexicans, twice
now in two seperate buildings. I use my background to defuse potential
violence and find non-violent solutions. I get along with other prisoners
of other races and backgrounds. Some who were members of rival gangs.

- 5 -

STATEMENT, Cont.

In the last few years, I have matured. While I still have a lot of fears, and most likely will always have, I am learning to deal and face them. I am learning that a true man (person) has many fears, it is the mark of such a person on how they deal with them. That a true man does not instill fear into others to over come his own fears. That he does not put others down to make himself look bigger and more of a man. He earns respect by helping others help themselves. He keeps his word and does not betray confidences.

I am still learning how to be an adult. It is not easy to grow-up after years of being immature, nor in a place that fosters immaturity in people. It is not easy to learn this lesson. It took the passing of my Mother to wake me up. I want to become the person she believed that I could become, if only I would grow-up and face myself and my actions. I have started that road.

While I will be sent back to Mexico upon release, and can not return to this country, I know that I can make the difference to some people in Mexico. My experiences can teach others what not to do. Many of my fellow Mexicans come to this country both legally and illegally. Some will fail in their plans for a better life and turn to drugs, alcohol and crime. Many are imprisoned prior to being deported back to Mexico. I plan on sharing my life's story with my countrymen and women, in hopes that they learn from my mistakes.

Once I have re-established the farm and started earning a living there. I would like to find a person called a 'Ghost-Writter' to help me write about my experiences. I hope that others will learn from such a manuscript and avoid costing others like I have. I do not plan to profit from such work. Any monies earned from it will go to repay those that I have harmed and to help keep others from following in my footsteps. But that is of course a hope that such a work will sell if a publisher can be found to print it. If I were to write it on my own, it wouldn't get passed the secretary's desk.

But, I want to make a difference to others.

My family visits San Jose every year to take care of business and visit both family and friends. Those visits will be better that any of the times that they had to enter the prison to visit. While it is a far distance from the boarder, my presence there will, I hope, make their drive there more meaningful. Family and friends there, will give me the support base that I need to make a new life.

- 6 -

STATEMENT, Cont.

They will also be there to give that life a strong foundation.

My decision to return to San Jose was not made over night. It has taken alot of consideration by myself, family, friends, and a few denials by the Board to get across to me that my best hope of making it in the world, is to put my roots back into the earth where they belong.

This statement is not intented to be a sob-story to get this Board or anyone else to feel sorry for me. It is a declaration that I have grown and fully accept responsibility for my past, present and future. I want the Board to know, that I have learned to face the fears within and not let them control my life and actions. While I am still a mouse with the fears of the mouse, I am no longer a victum of those fears. That I have and continue to learn how and what it takes to be a responsible adult. That I would be a good canidate for being returned to my country of Mexico, never to return to the life of crime or to this country.

All I ask is for the honest considerations of the Board members and their supervisors in their duties in determining my suitability for parole.

I have the means, the support and the will to make it on the other side of these prison walls as a productive citizen of the world. All I need is this Board's wisdom and understanding and belief for me to become such outthere.

I respectfully submit this to you.

July 5,2005

To: Board of Prison Terms Records (Calipatria State state prison)
Re:Updated Psychologist threat assessment evaluation

I have great concern regarding the Cal Staff Psychologist's refusal to give me an updated threat assessment evaluation for my upcoming August 2005, (5th) fith S.P.T. Suitability hearing. Absent specific order from the B.P.T. I have taken all the necessary steps available to rectify this matter.
In August 2005 the B.P.T. will be forced "NOT" to come to a ruling of Suitability for parole if there is NO update of B.P.T. forms 1000(A),1001,1009(A),1000a, Tis is a violation of my due process rights guaranteed by the U.S. Constitution in Toussant vs. McCarthy 801 F.2d 1080.
I request this vital portion of the B.P.T. frms 1000,1000(A), 1001,1001(A),be completed (1) one year before my full B.P.T. Suitability hearing (post August 2005).
I will reiterate this will be the (5th) fith Full Board for me,to my knowlege this completed Psychologist evaluation is mandated by the B.P.T.
Thank you for your time & effort.

Sincerely

_____
Jesse Ramirez-Salgado
C-11124

cc:Board of Prison Terms
    Chairwoman
    Ms. Margarita Perez
1515 "K" street
    Sacramento,California
        95814

cc:Warden (A) C.S.P.
    Mr. Stuart J. Ryan
    7018 Blair road
    P.O.Box 5001
    Calipatria,California
        93233

STATE OF CALIFORNIA                    DEPARTMENT OF CORRECTIONS

MEMORANDUM

DATE: MAY 24, 2004

TO: REGIONAL ADMINISTRATORS, INSTITUTIONS DIVISION WARDENS
CLASSIFICATION AND PAROLE REPRESENTATIVES
CORRECTIONAL COUNSELOR IIIS - RECEPTION CENTERS
CLASSIFICATION STAFF REPRESENTATIVES
CORRECTIONAL CASE RECORDS MANAGERS

SUBJECT   AGREEMENT TO FACILITATE PAROLE CONSIDERATION HEARINGS.

ON SEPTEMBER 4, 2003, STAFF FROM THE BOARD OF PRISON TERMS (BPT) AND THE
CALIFORNIA DEPARTMENT OF CORRECTIONS' (CDC) INSTITUTIONS DIVISION AND HEALTH CARE
SERVICES DIVISION (HCSD) MET TO DISCUSS OPERATIONAL PROBLEMS CURRENTLY IMPACTING
THE PAROLE CONSIDERATION HEARING PROCESS. ALTERNATIVE PROCEDURAL METHODS WERE
EXPLORED TO IMPROVE CURRENT PRACTICE.

THE STAFF PARTICIPANTS CONSIDERED POSTPONEMENTS OF PAROLE CONSIDERATION HEARINGS
RESULTING FROM CLINICAL EVALUATION ADDENDUM REPORTS EITHER NOT PREPARED OR NOT
CONTAINING THE SPECIFIC INFORMATION REQUESTED BY THE BPT. IN 1998, AN AGREEMENT
WAS REACHED BETWEEN THE CDC AND THE BPT THAT A FULL CLINICAL EVALUATION REPORT
WOULD BE PREPARED FOR ALL INITIAL PAROLE CONSIDERATION HEARING, BUT SHORTER
ADDENDUM REPORTS, ADDRESSING SPECIFIC AREAS IDENTIFIED BY THE BPT, WOULD BE MADE
AVAILABLE IN SUBSEQUENT HEARINGS WHEN REQUESTED. AS OF THIS DATE, HOWEVER, THIS
AGREEMENT HAS BEEN NEITHER FULLY NOR UNIFORMLY IMPLEMENTED.

IN AN EFFORT TO ENSURE REQUIRED CLINICAL EVALUATION INFORMATION IS PREPARED IN ADVANCE
OF BPT HEARINGS, HCSD, INSTITUTIONS DIVISION AND THE BPT HAVE AGREED TO ADHERE TO
THE FOLLOWING PROCESS FOR PAROLE CONSIDERATION HEARINGS SCHEDULED FORM THIS DATE FORWARD.

SUBSEQUENT TO THE INITIAL PAROLE CONSIDERATION HEARING, WHEN PAROLE IS DENIED AND
SPECIFIC CLINICAL EVALUATION INFORMATION IS REQUIRED TO CONDUCT THE NEXT SUBSEQUENT
PAROLE CONSIDERATION HEARING, THE BPT PANEL MEMBER WILL CLEARLY INDICATE IN THE
"MISCELLANEOUS" SECTION OF THE BPT FORM 1001 THAT A CLINICAL EVALUATION REPORT IS
REQUIRED. SECTION 11 OF THE BPT FORM 1000(A) SHALL ALSO BE COMPLETED,
DETAILING THE SPECIFIC INFORMATION REQUIRED. THE PANEL MEMBER WILL THEN LEAVE THE
BPT FORM 1000(A) WITH THE BPT FORM 1001.

IF DURING A HEARING, A PANEL MEMBER DETERMINES A NEED FOR ADDITIONAL CLINICAL
EVALUATION INFORMATION CONCERNING A INMATE IS REQUIRED IN ORDER TO CONDUCT THE
HEARING, HE/SHE WILL POSTPONE THE HEARING AND MAKE A WRITTEN REQUEST FOR THE
ADDITIONAL INFORMATION IN THE MANNER NOTED ABOVE. NO LATER THAN THE FIRST WORKING
DAY AFTER THE PAROLE CONSIDERATION HEARING, THE CORRECTIONAL CASE RECORDS NUMBER (CCRM)
OR DESIGNEE SHALL REVIEW THE "MISCELLANEOUS" SECTION OF THE BPT FORM(S) 1001 TO ASCERTAIN
THE DECISION RENDERED BY THE BPT. IF THE BPT ORDERED A CLINICAL EVALUATION ADDENDUM
REPORT, THERE SHALL ALSO BE A BPT FORM 1000(A). IF THE BPT FORMS 1000(A) AND 1001
HAVE NOT BEEN PREPARED, OR ADDITIONAL CLARIFICATION IS REQUIRED, THE CLASSIFICATION AND
PAROLE REPRESENTATIVE (C&PR) OR DESIGNEE SHALL BE NOTIFIED. IF THE BPT COMMISSIONER WHO
CONDUCTED THE HEARING IS STILL ON INSTITUTIONAL GROUNDS, THE C&PR OR DESIGNEE SHALL
RETURN THE FORM(S) FOR COMPLETION. IF THE BPT COMMISSIONER HAS ALREADY LEFT
INSTITUTIONAL GROUNDS, BPT HEADQUARTERS WILL BE CONTACTED AND SHALL ENSURE THE
COMMISSIONER WHO CONDUCTED THE HEARING PROVIDES THE REQUIRED INFORMATION TO THE
INSTITUTION. WHEN THE TWO FORMS ARE RETURNED FORM THE BPT, RECORDS OFFICE STAFF SHALL
ATTACH THE BPT FORM(S) 100(A) AND 1001, AND THEN FILE THEM IN THE BPT SECTION OF THE
CENTRAL FILE (C-FILE).

PAGE 2

FOR HEARINGS THAT HAVE BEEN POSTPONED FOR A CLINICAL EVALUATION ADDENDUM REPORT, THE CCRM SHALL IMMEDIATELY NOTIFY THE HEALTH CARE MANAGER (HCM) OR DESIGNEE IN WRITING THA A CLINICAL EVALUATION REPOR IS NEEDED AND SPECIFY THE DATE THE COMPLETED REPORT IS TO BE RECEIVED BY THE CASE RECORDS OFFICE. A COPY OF THE BPT FORM 1001 AND BPT FORM 1000(A) SHALL BE ATTACHED TO THE NOTIFICATION. THE HCM OR DESIGNEE SHALL ENSURE THAT THE REQUESTED ADDENDUM REPORTS ARE PREPARED AND SUBMITTED TO THE C&PR WITHIN THE TIME FRAME SPECIFIED IN THE MEMORANDUM AND RECEIVED BY THE SPECIFIED DATE. THE INMATE SHALL THEN BE SCHEDULED FOR A PAROLE CONSIDERATION HEARING IN ACCORDANCE WITH THE DECISION RENDERED BY THE BPT.

PURSUANT TO DEPARTMENT OPERATIONS MANUAL SECTION 74040.3.2, CASE RECORDS STAFF WILL PREPARE A TENTATIVE CALENDAR OF INMATES WHO ARE DUE TO BE SCHEDULED FOR PAROLE CONSIDERATION HEARINGS. IN PREPARING THE TENTATIVE CALENDAR, THE CCRM SHALL ENSURE A PRE-BOARD AUDIT HAS BEEN COMPLETED AND A DETERMINATION MADE AS TO WHETHER ADDITIONAL CLINICAL EVALUATION INFORMATION WAS REQUESTED AT THE LAST SCHEDULED HEARING. IF AN ADDENDUM CLINICAL EVALUATION REPORT IS REQUIRED, IF WILL BE IDENTIFIED ON THE TENTATIVE CALENDAR PRIOR TO DISTRIBUTION. A COPY OF THE TENTATIVE CALENDAR SHALL BE FORWARDED TO THE HCM OR DESIGNEE.

THE C-FILES FOR THOSE INMATES LISTED ON THE TENTATIVE CALENDAR SHALL BE MADE AVAILABLE TO CLINICAL AND COUNSELING STAFF FOR THE PREPARATION OF THEIR REQUIRED REPORTS. UPON BEING NOTIFIED THAT A CLINICAL EVALUATION REPORT IS REQUIRED, THE CLINICAL STAFF MEMBER ASSIGNED TO COMPLETE THE REPORT SHALL REVIEW THE BPT FORMS 1001 AND 1000(A) IN THE C-FILE TO ENSURE SPECIFIC CLINICAL EVALUATION INFORMATION REQUIRED TO CONDUCT THE HEARING IS INCLUDED IN THE ADDENDUM REPORT.

IF YOU SHOULD HAVE ANY QUESTIONS REGARDING THIS PROCEDURE, "CONTACT LINDA RIANDA." CHIEF, CLASSIFICATION SERVICES UNIT AT (916) 322-2544; JENET RODRIGUEZ, CHIEF, CASE RECORDS ADMINISTRATION AT (916) 324-2242; OR DAVID HINCHEE, FORENSIC SUPPORT SERVICES, HCSD AT 916 327-1454.


CHERYL. PLILER                          ROSANNE CAMPBELL
DEPUTY DIRECTOR.                        DEPUTY DIRECTOR
INSTITUTIONAL DIVISION                  HEALTH CARE SERVICES DIVISION


CC: MARVIN E. SPEED II      J.C. WOODFORD        JOHN DOVEY

    STEVEN MOORE            WENDY STILL          FRANK E. RENWICK

    E.A. MITCHEL           KATHLEEN KEESHEN      SUZAN L. HUBBARD

    JANET SALE             OMBUDSMEN'S OFFICE    LINDA RIANDA

    JO JANET RODRIGUEZ.    DAVID HINCHEE         RENEE KANAN, M.D.

    DAVID GRANSEE

Ms. Linda Ludwig
Attorney at Law
637 Third Avenue, Ste. G
Chula Vista, CA 91910

Octtober 11, 2005

Re: BPT Hearing: Jose Ramirez-Salgado, C-11124

Dear Ms. Ludwig:

My name is Joseph H. Sherman. I am serving a 'LWOP' sentence since
1992. This is my third prison term, second in California. I saw
the early 80's in Susanville, CCC, on the lvl. 2 yard for 18 months.
I have been on the special needs yard since 2001, when I knew that
I would have to start behaving like the inmates in here to survive,
if I stayed on the mainline.

I am writting you on the behalf of Mr. Ramirez-Salgado (Jose) whom
I have known for just over a year now on this yard. I do not help
alot of people in here in their leagal work. Most of them deserve
the punishment of spending their entire life in here. But occasionally
one will come to my attention that deserves the chance for a new
beginning out there.

Jose is one such person.

If you were permitted to review my case file, you would find that
I am not and never have been a gang member. I survived nine years
on level four yards – Old Folsom, Pelican Bay, Here, and High Desert,
as an independant. Which is not easy. At HDSP, the Prison's Gang
Unit tried to affiliate every prisoner there with some gang or another.
With me, they found that I could and did talk to every group on the
yard every day that we were not on lock down. So they could not pin
any affiliation on me. So I have a unique perspective of life in
here.

Fear drives gangs and it's members. If you stand alone, you are a
target for all of the gangs. As a member of a gang, the fear of
retaliation protects you most of the time. Most that join a gang,
do so out of fear. To get respect with in these groups, you have
to do things to earn it. Failure to do as you are told, will cause
the gang to turn on you. To fail to have a weapon handy, is usually
a stabbing offense. Either by your own gang or a rivial gang.

Prison fosters the gang mentallity. It serves as a way for them to
keep the violence directed at prisoners and away from staff, most
of the time. It also justifies their demands for more money and
higher wages. It is used to flood the media with negative infor-
mation to help spread fear among them, to help justify more laws.
Dropouts are mistreated by the staff to force them into violence,
thus justifing their removal from the Special Needs Yards.

For Jose to have lasted as long as he has on this yard, shows to me
that he has learned that violence against others is not the cure
for his onw fears. That true men do not need to intimidate others
to get respect. That violence breeds violence and the fear of such,
not respect. If I believed that Jose did not deserve the chance to

- 1 -

To: Ms. L. Ludwig, Attorney at Law.

become a productive citizen and to get out of this rat race, I would not be helping him in his case work. I have my own in the Ninth Circuit and really don't have the time to waist on cases I don't believe in. I am not a Jail House Lawyer looking to earn money off of those unable or unwilling to do their own work. I don't need a hussel, the demand for my work ethic and skills in here has provided me with the funds that I need to get the basic needs taken care of, that I don't need to do legal work for others.

So when I say that Jose is the exception to my rule of not helping inmates in their legal work, it means alot. I really believe that he deserves the best chance he can get from the system to gain his freedom. He will need your help. The last attorney did very little to assist him. I read the BPT transcripts and am not surprised at they blantent disrespect shown by the Board. Had they been like that in any other contexts, they would have been sued for their racist remarks and disregard for the laws. Counsel failed to bring it to their attention or do much of anything for that matter.

He needs for you to set-up the Board for future court actions. If you chose the job of being a lifer represenitive at board hearings because you care and want to help those truely ready for release, then this is a case for you. If you are only doing this for a quick buck, then you can still help him without putting a lot of work into it.

I doubt that the Board would consider the opinion of a prisoner in its hearing, so my personal beliefs will not help him there. His family are not like the families of many prisoners here. He is the only one in prison. They do not fully understand what is needed to be done to give him the help needed at the hearing. They could use your help in formulating the proper letters, etc.. I can't help, this is the first BPT hearing that I have ever looked at, and I have no idea on what will work and what will not.

I know that the laws cited in the letter from Jose to you, on the Supreme Court's veiws on the required evidence for the sentencing of a defendant, has not been applied to a BPT hearing yet. But it is a logical extension of the rulings that will possibly get Jose the review by the courts. He needs the Board to reject the application of the High Court's rulings on the record, to set-up for review in the court's. He can't do it, nor can I. The rules say that counsel can file a written objection to the introduction of 'evidence'. Please do so for Jose and other lifer's here. Hopefully, I have done enough research to give you an idea and a start on how to challenge the current policy(ies) of the board and state.

Thank you, Pax Vobiscum.

Joseph H. Sherman, H-41665
D2-147
P.O. Box 5003
Calipatria CA 92233-5003

- 2 -

Ms. Linda Ludwig
Attorney at Law
637 Third Ave Ste G
Chula Vista CA 91910

January 02, 2006

RE: BPH Hearing of Jose Ramirez-Salgado, C-11124

Dear Ms. Ludwig:

I am writing to you about the parole hearing and what has not occured since then in hopes that you could assist me with the problems.

As I am sure that you are aware of the duty of the BPH to provide transcripts of the hearing to the prisoner, this may or may not come as a surprise to you — they have not turned over anything to me. Nor have they responded to my many lettersmand requests for them. If I am going to be able to challenge their actions in court, I need to have the transcripts. Could you please contact them about the transcripts, and see if you can get them in gear to supply them to me soon?

Second, I would like you to send me all of the non-confidential materials sent to you by the BPH/BPT and the other sources of files/metrials for the hearing. Especially the items from the District Attorney and Law Enforcement, and your notes.

Under Rule 3-700(D)(1) of the State Bar's Rules of Professional Conduct, I have the legal right to obtain them from you, upon the ending of the Attorney-Client relationship, even if you were appointed to represent me, and upon my request.

I need to have the reconmendations of the DA and Law Enfocement since I will be challenging those reconmendations in court, under applicable laws and case rulings.

Thank You for your time and assistance in these matters.

<div style="margin-left:50%">

Jose Ramirez-Salgado, C-11124
D2-233-L
P.O. Box 5002
Calipatria CA 92233-5002

</div>

Org: Ms. Ludwig, Attorney
cc: Personal File



INMATE COPY

LIFE PRISONER EVALUATION
SUBSEQUENT PAROLE CONSIDERATION HEARINGN #5
APRIL 2005 CALENDAR

I.    **COMMITMENT FACTORS:**

A.    **LIFE CRIME:** Ramirez-Salgado, C11124, is a 44 years old, Hispanic, 1st termer, received by the California Department of Corrections on 12/05/79 at CA. Inst. For Men Reception Center (CIM-RCC) from San Diego County, case #CR47435, for Murder 2nd, Penal Code (PC) 187, with a PC 12022.5 enhancement for Use of a Firearm, Robbery PC 211, and Assault with a Deadly Weapon PC 245(a) with a total term of eighteen (18) years to Life. The victim was James Edward Lang, age 28.

1.    **SUMMARY OF CRIME:** On 06/16/79, at 10:30 P.M., Ramirez-Salgado robbed at gunpoint victims Sidney Pierce and Matthew Foster while they were walking on Wilson Avenue in San Diego, CA. After taking $6.00 and some cigarettes from the victims, Ramirez-Salgado told the victims to start running. As they ran away, Salgado fired a couple of shots, one striking Pierce in the neck. Ramiez-Salgado then ran down an alley firing several more shots. Salgado ran up to and started banging on a vehicle, which had entered the alley. The vehicle was occupied by victim Alan Holley and his young son. Ramirez-Salgado then fired three shots, missing them, and fled down the alley. Subsequently, victim Lang came out of his residence to investigate the gunshots and was shot three times in the chest, abdomen and back, fatally wounding him. Victim Lang was dead upon arrival at the hospital. Victim Daniel McLeod was walking to his van when Ramirez-Salgado approached him and demanded his wallet at gunpoint. Victim McLeod told Ramirez-Salgado he had no wallet and handed him five $1.00 bills, his shaving kit and his keys. Ramirez-Salgado then searched victim McLeod for a wallet, and when he found none, told victim McLeod to run. Victim McLeod ran a short distance, heard a shot, turned, and started back towards Ramirez-Salgado. Seeing victim McLeod turning, Ramirez-Salgado then ran down the street and fired another single shot. On 6/17/79, the following morning, Ramirez-Salgado was taken into custody. A 22 caliber semi-automatic pistol was recovered from the residence of his mother.

2.    **PRISONER'S VERSION:** (As noted in prior BPT report). Ramirez-Salgado stated that he had been smoking marijuana since about 10:00 A.M. on the day of the offense. He had left the house and gone to Market Street to look for a friend who was not at home. He bought a small bottle of tequila and drank it at a local park. He also had smoked some cigarettes made with hashish, and stopped by a friends house, drank a six-pack of beer, and left to buy some more marijuana. He smoked a total of six (6) marijuana cigarettes during this period of time. In reference to the pistol, he states that he had previously found it while walking down the street. He encountered a paper bag and kicked it and found the .22 Caliber pistol inside. The pistol was to be taken to Mexico to sell, but his mother took it away. He retrieved it at a later date without her being aware of it. Ramirez-Salgado stated that he knows he was acting crazy on the street when he decided to rob some guys. Ramirez-Salgado stated he had no intentions of killing anyone at the time. He stated that he was randomly shooting and when victim Lang came out of the house it just happened. He stated that he started running and shooting and doesn't remember all the victims. He then went home. His mother opened the door and told him to go to bed. The following morning, he was taken into custody, but at the time, did not remember what had happened. On 12/31/04, Ramirez-Salgado noted the above version of his crime as accurate. He declined to make any additional statements, and stated that he would share his feelings regarding his crime during his Board of Prison Terms (BPT) hearing.

SENT INMATE COPY  1 / 20 / 05

INMATE COPY

RAMIREZ-SALGADO, JOSE   C11124   CAL                                    04/05

Lifer Prisoner Evaluation
Subsequent Parole Consideration #5
April 2005 Calendar
Page 2

**INMATE COPY**

**B.    AGGRAVATING/MITIGATING CIRCUMSTANCES:**

**1.    AGGRAVATING FACTORS:**

a.    The victim was particularly vulnerable.
b.    Ramirez-Salgado had the opportunity to cease but continued with the crime.
c.    The murder was senseless and served no purpose in completing the crime.
d.    A weapon was used.
e.    Alcohol and drugs were used.

**2.    MITIGATING FACTORS:**

Ramirez-Salgado had minimal or no history of criminal behavior prior to incarceration.

**II.    PRECONVICTION FACTORS**

**A.    JUVENILE RECORD:**

None noted.

**B.    ADULT CONVICTIONS AND ARRESTS:**

Adult arrest history includes the instant offense only.

**C.    PERSONAL FACTORS:**

Inmate Ramirez-Salgado is the second of five children born to Jose and Teresa Salgado in Mexico. His father died when he was about seven (7) years old. His mother moved to the United States when he was about ten (10) years old, leaving him in Mexico with relatives. He entered the United States illegally and was residing in the mother's home at the time of his arrest. He had no formal education prior to incarceration. He was involved in a common law relationship which produced one (1) child. He was never in the military. He worked at various jobs as a general laborer prior to incarceration. (Information in this section was obtained from page 8 of the Institution Programming Summary prepared at CIM-RCC.

**III.    POSTCONVICTION FACTORS**

**A.    SPECIAL ACCOMMODATIONS/DISABILITY:**

Per a CDC 128-C Medical Chrono dated 4/9/01, Ramirez-Salgado has a seizure disorder. There are no other medical or psychiatric issues noted and no special accommodation appear to be necessary.

SENT INMATE COPY ___1/20/05___

**INMATE COPY**

RAMIREZ-SALGADO, JOSE    K-61124    CAL    04/05

Lifer Prisoner Evaluation
Subsequent Parole Consideration #5
April 2005 Calendar
Page 3

**INMATE COPY**

B.    **CUSTODY HISTORY:**

Ramirez-Salgado's custody history from 12/5/79 until 1/10/02 has been documented in prior BPT reports and appears accurate. 1/11/02 to 1/10/05: Ramirez-Salgado began this review period at Calipatria State Prison (CAL-IV), Facility "D", Sensitive Needs Yard (SNY), at MED custody, Work Group/Privilege Group (WG/PG) A1-A effective 3/7/00, and assigned to the Culinary. On 1/29/02, he was removed from his assignment in the Culinary due to medical restrictions associated with his seizure disorder. On 4/16/02, he appeared before the BPT for Subsequent Parole Consideration Hearing #4. The Board denied his parole for three (3) years and recommended that he become disciplinary free and work towards reducing his custody level so program opportunities would become more available. The Board also recommended that he upgrade vocationally and educationally and participate in self-help and therapy programming if available. At his Annual Review on 2/4/03, his Placement Score (PS) was reduced from 226 to 222 due to disciplinary free behavior. On 3/6/03, he was assigned to the Literacy Lab. On 11/6/03, he achieved a Reading Grade Point Level (GPL) of 12.6 on the Test of the Adult Basic Education (TABE). At his Annual Review on 12/10/03, his PS was reduced from 222 to 216 due to disciplinary free behavior and average or above performance in his assignment. On 12/10/03, he was removed from his assignment in the Literacy Lab due to having a General Education Diploma (GED) and having achieved a reading GPL of 12.6. On 4/6/04, Ramirez-Salgado was placed in Administrative Segregation (Ad-Seg) relative to a pending Rules Violation Report (RVR) dated 4/2/04 (Log # 04-04-D007) for Battery on an Inmate Without Serious Injury with Weapon. This RVR was adjudicated on 12/29/04, and was dismissed due to Insufficient Evidence. The RVR is currently pending review by the Chief Disciplinary Officer. Ramirez-Salgado was, however, found Guilty on two (2) RVR's dated 4/6/04 for Possession of Dangerous Contraband and Refusing to Submit a Urine Sample. Ramirez-Salgado is currently designated MAX custody and WG/PG D2-D effective 4/6/04 as a result of his placement in Ad-Seg and the pending charge.

C.    **THERAPY & SELF-HELP ACTIVITIES:**

There is no documentation in Ramirez-Salgado's Central File (C-File) indicating participation in therapy or self-help activities since his last BPT hearing on 4/16/02, however, as documented on his prior BPT Report of 4/2002, Ramirez-Salgado completed the Life Skills Program between 8/2/00 and 12/2/00.

D.    **DISCIPLINARY HISTORY:**

Inmate Ramirez-Salgado has received the following CDC-128A Custodial Counseling Chronos:

| | |
|---|---|
| 07/29/80 | Contraband |
| 08/16/80 | Disrespect Towards Staff |
| 11/23/88 | Confiscated 1 Set of Drill Bits |
| 07/02/99 | Grooming Standards |
| 07/13/00 | Failure to Remove Window/Light Covering |

**INMATE COPY** 1 /20 /05

**RAMIREZ-SALGADO, JOSE**    C11124    CAL    04/05

Lifer Prisoner Evaluation
Subsequent Parole Consideration #5
April 2005 Calendar
Page 4

**INMATE COPY**

Inmate Ramirez-Salgado has received the following CDC-115's:

| | |
|---|---|
| 01/17/80 | Assault With a Weapon |
| 05/08/80 | Destroying State Property |
| 05/12/80 | Stimulants and Sedatives |
| 08/21/80 | Possession of Pruno |
| 09/14/80 | Possession of Pruno |
| 12/24/80 | Flooding |
| 01/06/81 | Fighting |
| 01/19/81 | Possession of Pruno |
| 03/12/81 | Fighting |
| 03/24/81 | Assault on an Inmate |
| 05/20/81 | Possession of Prison Made Weapon |
| 09/02/81 | Contraband |
| 09/27/81 | Conduct: Seizing a Key From a Officer |
| 12/19/81 | Possession of a Prison Made Weapon |
| 06/23/82 | Physical Altercation |
| 08/23/82 | Possession of Inmate Manufactured Alcohol |
| 04/22/83 | Stabbing Assault |
| 09/22/83 | Force & Violence-Stabbing Assault |
| 11/13/83 | Force & Violence-Stabbing Assault |
| 10/05/93 | Fighting |
| 08/10/97 | Possession of a Controlled Substance (Heroin) |
| 07/14/98 | Falsification of Documents (Forgery) |
| 07/07/99 | Mutual Combat |
| 01/27/00 | Fighting |
| 04/02/04 | Battery on an Inmate With Serious Injury With Weapon (Pending) |
| 04/06/04 | Possession of Dangerous Contraband |
| 04/06/04 | Refusing to Submit a Urine Sample |

*WAS DISMISSED* (handwritten annotation pointing to 04/02/04 entry)

## IV.    FUTURE PLANS

### A.    RESIDENCE:

Inmate Ramirez-Salgado stated he plans to live in Tijuana, Mexico if released. He has a USINS hold. He has one (1) brother and four (4) sisters who reside in San Diego. Ramirez-Salgado stated he owns a ranch in San Jose, Mexico that he plans to sell. Ramirez-Salgado provided a document dated 2/21/92 to verify his ownership of the property. This document is located in the Miscellaneous section of his C-file.

### B.    EMPLOYMENT:

Inmate Ramirez-Salgado stated he plans to open a restaurant in Tijuana, Mexico using his savings, money from the sale of his ranch and help from his brother and sisters. Ramirez-Salgado stated he would provide the BPT with current letters of support from his family members at his hearing.



INMATE COPY  1/20/05

Lifer Prisoner Evaluation
Subsequent Parole Consideration #5
April 2005 Calendar
Page 5

## INMATE COPY

**V.    USINS STATUS**

Inmate has an active USINS hold #A71 808 213. He entered the United States illegally from Mexico as a teenager.

**VI.    SUMMARY**

**A.**    In accordance with memo dated 08/05/2004 (Temporary Elimination of the Risk of Threat Assessment in the Model Board Report) this section will not be completed.

**B.**    Prior to release, the prisoner could benefit from:

  1.    Becoming and remaining disciplinary free.
  2.    Participating in self-help programs..
  3.    Upgrading academically and vocationally.

**C.**    This report is based on an interview with the prisoner on 12/31/04 lasting approximately thirty (30) minutes and a complete review of the C-file lasting six (6) hours.

**D.**    Inmate was afforded an opportunity to examine his central file on 12/31/04, however, declined.

Prepared by:                             Reviewed by:

J. KELLERMAN, CCII                       D. PARAMO, C&PR

INMATE COPY / 30 05

INMATE COPY

RAMIREZ-SALGADO, JOSE    C11124    CAL    04/05



**BOARD OF PRISON TERMS**
**LIFE PRISONER DECISION FACE SHEET**

**STATE OF CALIFORNIA**

| | |
|---|---|
| [ ] **PAROLE GRANTED – (YES)**<br>CDC: Do not release prisoner before<br>Governor's review. | <u>Records Use Only</u><br><br>Parole Release Date_____<br>                       YR     MO    DAY<br><br>Attach Prison Calculation Sheet |

[X] **PAROLE DENIED – (NO)** 5 years
       (11/10) * 3year review

[X] **AGREED UNSUITABLE** (Attach 1001A Form) FOR _____5_____ YEAR(S)
[ ] **HEARING POSTPONED/REASON:**_____

## PANEL RECOMMENDATIONS AND REQUESTS

**The Board Recommends:**

[X] No more 115's or 128A's      [X] Stay discipline free      [X] Earn positive chronos
[X] Work to reduce custody level    [X] Learn a trade*             [ ] Get a GED*
[X] Get self-help*                   [ ] Get therapy*

[ ] Recommend transfer to _____
[ ] Other _____
*These programs are recommended if they are offered at your prison and you are eligible/able to participate.

**Penal Code 3042 Notices**    [X] SENT    (Date) <u>09/27/05</u>

Commitment Offense(s) ____<u>PC187/P12022.5</u>____      <u>MURDER 2ND / USE OF FIREARM</u>
                             Code(s)                                  Crime(s)

                                <u>CR47435</u>                            <u>06</u>
                                  Case #(s)                            Count #'s

| Date Inmate Came to CDC | Date Life Term Began | Minimum Eligible Parole Date |
|---|---|---|
| 12/05/79 | 12/05/79 | 05/30/92 |

[ ] Initial Hearing    [X] Subsequent (Hearing No.) __5__    Date of Last Hearing <u>04/16/2002</u>

**CDC Representative:** D. Paramo, C&PR

**Attorney for Prisoner:** LINDA LUDWIG      Address: 637 3RD AVE. #G CHULA VISTA, CA 91910

**D.A. Representative:** DAN RODRIGUEZ      County: SAN DIEGO

This form and the Board's decision at the end of the hearing is only <u>proposed</u> and NOT FINAL. <u>It will not become final until it is reviewed.</u>

Chair _____      Date 11/1/05

Panel Member _____      Date 11-1-05

Panel Member _____      Date

| NAME | CDC # | Prison | CALENDAR | DATE |
|---|---|---|---|---|
| RAMIREZ-SALGADO, JOSE | C11124 | CAL-IV | 10/2005 | 11/01/2005 |

BPT 1001 (REV. 08/03)

SENT INMATE COPY 11-10      [X] PERMANENT ADDENDA

BOARD OF PRISON TERMS                                    STATE OF CALIFORNIA
LIFE PRISONER:  PAROLE CONSIDERATION PROPOSED DECISION:
                              DENY PAROLE

---

[ ] PAROLE DENIED FOR:          1      2      3      4     (5)      YEARS

Place the prisoner on the ___11-10___ calendar for his next subsequent hearing.

If this decision is final, you WILL NOT get paroled.  The Board will send you a copy of the decision.  It will indicate the reasons you did not get paroled.  If this decision is not final, the Board will set up another hearing.  You can read the laws about your hearing.  You can find the laws at California Code of Regulations, Title 15, section 2041.

**RECOMMENDATIONS**

**The Board Recommends:**
[X] No more 115's or 128A's            [X] Learn a trade*
[X] Work to reduce custody level       [ ] Get therapy*
[X] Get self-help*                     [X] Earn positive chronos
[X] Stay discipline free               [ ] Get a GED*

[ ] Recommend transfer to _____
[ ] Other _____
_____
_____

*  These programs are recommended if they are offered at your prison and you are eligible/able to participate.

**HEARING PANEL**

Name _____     Date ___H-1-0___

Name _____     Date _____

Name _____     Date _____

| NAME | CDC# | PRISON | DATE |
|------|------|--------|------|
| Ramirez - Salgado Jose | C11124 | | |

BPT 1005(b)
(REV 04/04)

Distribution: White-C File
Canary-BPT
Pink-Prisoner

SENT INMATE COPY ___11103/05___

BOARD OF PRISON TERMS                                                      STATE OF CALIFORNIA

# LIFE PRISONER PAROLE CONSIDERATION WORKSHEET

☐ INITIAL HEARING          ☒ SUBSEQUENT HEARING # 5

| PRISONER'S NAME | CDC NUMBER |
|---|---|
| RAMIREZ-SALGADO, JOSE | C11124 |

| DATE OF HEARING | LOCATION |
|---|---|
| NOVEMBER 01, 2005 | CALIPATRIA STATE PRISON, FAC. "B" BPT HEARING ROOM |

## LEGAL STATUS

| DATE RECEIVED | DATE LIFE TERM STARTS (IF DIFFERENT) | COUNTY |
|---|---|---|
| 12/05/99 | 12/05/79 | SAN DIEGO |

| OFFENSE | | CASE NUMBER |
|---|---|---|
| MURDER 2ND USE OF FIREARM | | CR47435 |

| COUNT NUMBER(S) | PENAL CODE SECTION(S) VIOLATED |
|---|---|
| 06 | PC187 /PC12022.5 |

| TERMS | MEPD |
|---|---|
| 15 YRS TO LIFE PLUS 4 YEARS. | 05/30/92 |

## OTHER COMMITMENT OFFENSES OR STAYED COUNTS

| STAYED | OFFENSE | CODE SECTION | COUNTY | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|---|---|
| ☐ | ROBBERY | PC211 | SAN DIEGO | CR47435 | 02 |
| ☐ | ASSAULT W/DEADLY WPN | PC245(a) | SAN DIEGO | CR47435 | 08 |
| ☐ | POSS OF WPN BY PRISONER | PC4502 | SAN BERNARDINO | CCR6648 | 01 |

## PRESENT AT HEARING

| PANEL MEMBER | PANEL MEMBER | PANEL MEMBER |
|---|---|---|
| Lee | Saldamando | Armenta |

OTHERS PRESENT:

☒ PRISONER (IF ABSENT, WHY?) _____

☒ ATTORNEY _____ LINDA LUDWIG, 637 3RD AVE., CHULA VISTA, CA 91910

☒ DEPUTY D.A.  DAN RODRIGUEZ _____ COUNTY OF  SAN DIEGO

☐ OTHERS: _____

## STATEMENT OF FACTS

☐ THE HEARING PANEL INCORPORATES BY REFERENCE FROM THE DECISION OF THE HEARING HELD

ON _____ , PAGES _____ THROUGH _____

☑ THE STATEMENT OF FACT IS

☒ QUOTED FROM THE BOARD REPORT, DATED ___10/05___ PAGE(S) ___1___

☐ QUOTED FROM THE PROBATION OFFICER'S REPORT, PAGE(S) _____

☐ QUOTED FROM THE COURT OPINION, PAGE(S) _____

BPT 1000  (Rev. 8/90)                          SENT INMATE COPY 71 1 23/05

NAME: Ramirez Salgado, J.  CDC: C-11124

## ACCOMMODATION FOR DISABILITIES

- *An ADA form is attached. If the inmate understands what these rights mean and chooses to waive further investigation please sign the waiver below. (This document is for SUBSEQUENT parole hearings only.)*
- *If the inmate does not understand ADA please go over the following:*
- *The record reflects that you signed BPT Form 1073, which is the reasonable accommodation notice and request in accordance with the provisions of the Americans with Disabilities Act. Disability as defined under the ADA.    Is that information still current and correct?*
- *Did the inmate have any problem walking or getting to the hearing room or to examine his central file?*
- *Does the inmate need glasses or a magnifying device in order to see or to read documents?*
- *Does the inmate have any hearing impairments?*
- *Has the inmate ever been included in the CCCMS (Triple CMS) or EOP programs? Has the inmate ever taken psychotropic medication either in prison or on the streets? Please inform the panel if the answer is yes to any of the above.*
- CCCMS (Correctional Clinical Case Management System)
  EOP (Extended Outpatient Program) programs
  (Both are part of the MHSDS– Mental Health Services Delivery System).
- *Does the inmate suffer from ANY disability that would prevent him from participating in today's hearing?*
- *Inmate's attorney shall indicate to the panel if they have any comments or concerns regarding the ADA rights or the inmate's ability to participate in the hearing.*

## OUTLINE OF HEARING PROCEDURE

*This hearing is being conducted pursuant to Penal Code Sections 3041 and 3042 and the rules and regulations of the Board of Prison Terms governing parole consideration hearings for life inmates.*

*The purpose of today's hearing is to consider your suitability for parole. In doing so the panel will consider the number and nature of the crimes the inmate was committed for, inmate's prior criminal and social history, and inmates behavior and programming since your commitment. The panel has had the opportunity to review your central file and you will be given the opportunity to correct or clarify the record. We will consider your progress since your commitment, your counselor's report and your psychological report and any other relevant information. Any change in parole plans should be brought to our attention.*

Exhibit 2 SENT INMATE COPY (1 0 3)05

*The Panel will reach a decision today and inform you whether or not we find you suitable for parole and the reasons for our decision. If the inmate is found suitable for parole, the length of the inmate's confinement will be explained.*

*Nothing that happens here today will change the findings of the court. We are not here to retry your case. We are here for the sole purpose of determining your suitability for parole. Do you understand?*

*This hearing will be conducted in three phases. I will discuss with you the crime you were committed for, your prior criminal and social history*

*The Deputy Commissioner will discuss with you your progress since your commitment, your counselor's report and your psychological evaluation.*

*The Commissioner will then discuss with the inmate, his parole plans, and any letters of support or opposition that may be in the file*

*Once that is concluded, commissioners, the District Attorney (if one is present) and your attorney will be given the opportunity to ask you questions. The questions from the district attorney shall be asked through the chair and your answers shall be directed to the panel.*

*Before we recess for deliberations, the District Attorney, your attorney, and the inmate will be given an opportunity to make a final statement regarding your parole suitability. Inmates' statement should be directed to why you feel you are suitable for parole. The victim (if present or victim's next of kin or representative) will then have the opportunity to give a statement regarding the crime and your responsibility. We will then recess, clear the room and deliberate. Once we have completed our deliberations we will resume the hearing and announce our decision.*

*The California Code of Regulations states that regardless of time served, a life inmate shall be found unsuitable for, and denied parole, if in the judgment of the panel the inmate would pose an unreasonable risk of danger to society if released from prison.*

## INMATES RIGHTS

*You have certain rights. Those rights include the right to a timely notice of this hearing, the right to review your central file, and the right to present relevant documents. You also have the right to be heard by an impartial panel.*
*You will receive a copy of our written tentative decision today. That decision is subject to review by the Decision Review Unit and by the entire Board meeting as a body. It will become effective within 120 days. It is also subject to review by the Governor. A copy of the tentative decision and a copy of the transcript will be sent to you.*

*As of May 1, 2004 there were major changes limiting your former right to "appeal" board decisions or actions directly to the Board. The old board regulations were*

SENT INMATE COPY 1 1 1 03 05

*repealed. The current policy is entitled "Administrative Appeals, Correspondence, and Grievances Concerning Board of Prison Terms Decisions." It is available at the prison law library.*

*You are not required to admit your offense or discuss your offense if you do not wish to do so. However, this panel does accept as true the findings of the court and you are invited to discuss the facts and circumstances of the offense if you desire. The Board will review and consider any prior statements you have made regarding the offense in determining your suitability for parole.*

### CONFIDENTIAL MATERIAL

The Panel will indicate if any confidential material exists in the file and whether or not it will be used. The Deputy Commissioner must respond both to whether or not the material exists and whether or not it will be used. If any is used, it must be recorded during deliberations on a separate tape marked "Confidential - do not transcribe".

*I affirm that I am the Attorney for Inmate and*

*1) I have gone over and fully discussed the ADA Questions and Statement with the inmate. To my knowledge he has no ADA issues and wishes to waive further inquiry.*

*2) I have gone over and fully discussed the subsequent hearing procedures including the grievance procedure and the inmate desires to waive re-reading of the admonitions.*

*3) The inmate's rights regarding evaluation of his central file, producing evidence and timely notice for this hearing have been met.*

*DATED:* 11.01.05

_L.A. LUDWIG_          _Linda A. Ludwig_
**Inmates Attorney**

**Inmate concurs**

SENT INMATE COPY  11.03.05

The Americans with Disabilities Act (ADA) is a law to help people with disabilities.

You have a right to receive help for your hearing. If you need help talking, reading, hearing, seeing, understanding or getting to your hearing, you have a right to that help. You have a right to receive help in meeting with your attorney. If you do not speak English, you have a right to an interpreter. If you are deaf and use sign language, you have a right to a sign language interpreter. If you cannot read, the BPT or CDC must provide you with help to read the forms and papers. If you need special transportation, the BPT or CDC must provide it for you.

SENT INMATE COPY 1620308



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FILED

FEB 1 5 2006

MARIN COUNTY SUPERIOR COURT
By: R. Wilson Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF MARIN

In the Matter of the Application of:   )
JERRY RUTHERFORD (C-19059),            )
                                       )   Case No.: SC135399A
         Petitioner,                   )
                                       )   ORDER GRANTING APPLICATION
for a Writ of *Habeas Corpus*.         )   FOR WRIT OF *HABEAS CORPUS*
                                       )
                                       )
_____)

This matter came on regularly for hearing on January 11, 2006, on Petitioner's Petition for a Writ of *Habeas Corpus*, filed May 26, 2004.[1] Petitioner was not personally present but was represented by counsel, Keith Wattley, Esq; Respondents were not personally present but were represented by Deputy Attorneys General Anya Binsacca and Patricia Heim.

This court has reviewed all documents filed by the parties in this case, Exhibits 1 through 8 and Exhibit A, received in evidence at the January 11 hearing, and the testimony and oral arguments made at the January 11, 2006 hearing.

_____

[1] The court issued an Order to Show Cause on May 28, 2004. Thereafter, Petitioner sought and obtained extensions of time in which to file his denial. On August 31, 2004, Petitioner filed a motion for class certification, which was granted on November 29, 2004. Subsequently, by stipulation and orders filed December 30, 2004; January 3, 2005; February 4, 2005; February 17, 2005; March 18, 2005; April 7, 2005; June 6, 2005; and August 5, 2005, the parties told the court that they were negotiating and requested a continuance of the evidentiary hearing. When they sought a ninth continuance, the court refused to approve it, and this matter proceeded to an evidentiary hearing.

1    Petitioner, JERRY RUTHERFORD, was convicted of kidnapping to commit

2  robbery (PC §209) in Fresno County in 1980. His sentence is life, plus 7 years. He

3  attained his minimum eligible parole date (MEPD) on April 12, 1991; thereafter he has

4  had a number of parole eligibility hearings. His current application for a writ of *habeas*

5  *corpus* asserts that on February 25, 2003, Respondents denied him parole for one year,

6  per PC §3041.5(b), and that as of the date of filing his application (May, 2004) he still

7  had not had his subsequent hearing.

8    In its order filed November 29, 2004, this court defined the class as all prisoners

9  serving indeterminate terms of life with the possibility of parole, and who have

10  approached or exceeded their MEPD's without receiving their parole hearings within the

11  time required by Penal Code §§3041 and 3041.5. After this court issued its order on

12  November 29, 2004, the parties stipulated that it was not necessary to give notice to

13  class members. At that time, the court had not ruled on Petitioner's application on its

14  merits.

15    For the reasons set forth below, this court has concluded that the application

16  should be granted, that class counsel should be appointed, that notice of judgment

17  should now be furnished to the class, as specified in California Rule of Court 1856, that

18  a remedial plan should be adopted, and that class counsel compensation should be

19  ordered.

20

21                                DISCUSSION

22

23    After a prisoner attains his MEPD, Penal Code §3041.5(a) provides that the

24  prisoner is to be given a parole suitability hearing. If the prisoner is denied a parole

25  date, PC §3041.5(b)(2) specifies that, subject to exceptions not pertinent here, "the

26  board [of prison terms] shall hear each case annually thereafter."

27

28

1    This court has already found that Respondents have failed to furnish Petitioner

2  with a parole eligibility hearing that was timely within the meaning of PC 3041.5(b)(2),[2]

3  and in this case it has ruled that because Petitioner's application raised an issue of

4  general public concern, that is likely to be repeated, it is not moot by reason of the fact

5  that the ensuing ruling may no longer be binding on Petitioner.[3]

6    Having carefully reviewed the evidence in this case, the court finds inescapable

7  the conclusion that Respondents are failing to furnish timely parole eligibility hearings

8  to prisoners serving indeterminate sentences, and that the backlog of such overdue

9  hearings is increasing at an alarming rate.  According to Michael Keith Brady, the

10  CDCR's "Rutherford" task force project manager, the backlog of such prisoners whose

11  parole eligibility hearings were overdue on May 30, 2001, was 2058, and now it is

12  3200.  It is noteworthy that in July, 2001, in Marin County Superior Court case number

13  SC118698A (In re Sanders), Respondents' counsel represented to this court that

14  Respondents estimated that the backlog would be eliminated in 21 months.  Instead, 55

15  months later, the backlog has not been eliminated, but rather it has *increased* by 55%.

16    Mr. Brady testified to antiquated procedures[4] and inadequate staffing, among

17  many other deficiencies in the current system.

18    Respondents offered the testimony of Dennis Kenneally, who is charged with

19  management oversight at the Board of Parole Hearings.  Mr. Kenneally acknowledged

20  the problem of overdue hearings but testified that commissioner vacancies are the

21  primary reason for it.  He estimated that if the Governor's draft budget is adopted

22  *without change on the subject of funding for the Board of Parole Hearings,*[5] the backlog

23  will be eliminated in 14 months.  This prediction echoes the inaccurate prediction of

24  Respondents back in July 2001.

25

26

27  [2] In SC118989A.
    [3] Order filed November 29, 2004, page 2, lines 8-19.

28  [4] Such as keeping inmate records on note cards, and the total lack of centralized databases relating to parole eligibility
    hearings.
    [5] By no means a certainty.

1    Petitioner has demonstrated to this court's satisfaction that the remedy of

2    individual judges granting individual applications for writs of *habeas corpus* cannot

3    adequately address this problem.  Indeed, at a hearing in this court on August 31, 2004,

4    Respondents admitted their policy that they will comply with the mandate of PC

5    §3041.5 only if and when an inmate seeks and obtains relief in *habeas corpus*;

6    otherwise, Respondents conceded that they will continue to do what they have done in

7    the past, which has resulted in a backlog of overdue hearings totaling 3200.

8    Petitioner has also convinced this court that allowing Respondents to address this

9    problem by doing what they have done in the past will not only fail to solve the problem,

10   it will exacerbate it.  Indeed, in 2018, when the "three strikes" inmates become eligible

11   for parole, both sides of this issue agree that the pressure on the parole board will

12   increase logarithmically.

13

14                                ORDERS

15

16   For the foregoing reasons, and good cause appearing therefor, it is hereby ordered

17   as follows:

18   1.  Petitioner's application for a writ of *habeas corpus* is granted.  Respondents are

19   ordered to take immediate measures to comply with the statutory time limits for holding

20   parole hearings, barring exceptional circumstances.

21   2.  Appointment of Class Counsel.

22   The Prison Law Office is appointed as Class Counsel for the class designated by

23   this court in its order filed November 29, 2004.

24   3.  Class Notice of Judgment.

25   As authorized by California Rule of Court 1861, which requires the "judgment

26   must include and describe those whom the court finds to be members of the class.

27   Notice of the judgment must be given to the class in the manner specified by the Court,"

28

1  Class Counsel is ordered to prepare and give the notice to the class.  Since this involves
2  state prisoners, Class Counsel is ordered to discuss with Respondents' counsel the best
3  methods to accomplish this notice.  The cost of providing notice of judgment is to be
4  borne by Respondents.

5      The Notice of Judgment shall contain:

6          a)    Description of the Class;

7          b)    Brief description of the legal and factual issues raised by
8          parties;

9          c)    Name of Class Counsel;

10         d)    Statement that this Court has previously certified this as a
11         mandatory Class, without right to opt-out;[6]

12         e)    Summary of relevant dates: date petition filed; date Class
13         certified; date evidentiary hearing held;

14         f)    Summary of Order granting relief requested.

15  4.  Remedial Plan.

16     The court's intention is to adopt a plan effectuating this order in a fashion which
17  is as minimally intrusive as possible, in order to accord substantial deference to the
18  CDC's legitimate interest in managing a correctional facility.  (See e.g., *Madrid v.*
19  *Gomez* (N.D. Cal. 1995) 889 F. Supp. 1146, 1283 et seq.)

20     Therefore, both counsel are ordered to confer and agree upon a plan to implement
21  the court's order, and report that agreement to the court within 30 days of this order.  If
22  by that date, the parties cannot agree on a plan, they are directed to submit any part of
23  the plan agreed to, or a statement that the parties were unable to agree on any aspect of a
24  remedial plan.  The court notes that in their stipulation filed April 7, 2005, the parties
25  represented to the court that they had already made specific and significant progress on
26  this project.

27
28
---
[6] Previously, some inmates have sought and received permission to opt-out, but that was before the Notice of Judgment was given to the members of the class.

1    This Court retains jurisdiction over this action until such time as the Court is

2    satisfied that all the statutory violations found herein have been fully and effectively

3    remedied.

4    5.  Class Counsel Compensation.

5    Attorney fees may be awarded to prevailing party in habeas corpus proceedings to

6    enforce statutory rights under the Private Attorney General Doctrine, as codified in Code

7    Civ. Proc. § 1021.5. (See *In re Head* (1986) 42 Cal.3d 223, 226, 232 – 233.)

8    Attorney's fees are appropriate in this case in favor of Petitioners and against

9    Respondents, because Petitioners vindicated an important statutory right affecting the

10   public interest.  (See e.g. *In re Head, id.* at p. 230.)

11

12   Respondents are ordered to pay Class Counsel's reasonable attorney fees as the

13   prevailing party, and for post-hearing work, under Code Civ. Proc. §§1021.5 and

14   1032(a)(1)(B), (b)(5).  Respondents are ordered to reimburse Marin County for the legal

15   fees the County has heretofore paid to the Prison Law Office in connection with this

16   case.

17   Class Counsel is ordered to file a noticed motion for reasonable fees.

18   6.  Status Date.

19   This matter will be heard in Department J of the Marin County Superior Court on

20   Thursday, March 23, 2006, at 9:00 A.M. for a status report on class notice and the

21   remedial plan.  The parties are ordered to appear at that time without further notice of

22   hearing.  Petitioner's presence is not required.

23

24   Dated:  February 15, 2006

25

26   Verna A. Adams

27   Verna A. Adams
     Judge of the Superior Court

28

1   BILL LOCKYER
    Attorney General of the State of California
2   JAMES M. HUMES
    Chief Assistant Attorney General
3   FRANCES T. GRUNDER
    Senior Assistant Attorney General
4   ROCHELLE C. EAST
    Supervising Deputy Attorney General
5   ANYA M. BINSACCA, State Bar No. 189613
    Supervising Deputy Attorney General
6     455 Golden Gate Avenue, Suite 11000
      San Francisco, CA  94102-7004
7     Telephone: (415) 703-5713
      Fax:  (415) 703-5843
8
    Attorneys for Respondent
9   SF2004400636

10

11                    SUPERIOR COURT OF CALIFORNIA

12                         COUNTY OF MARIN

13

14

15   In re                              No. SC135399A

16   **JERRY RUTHERFORD (C-19059),**    **STIPULATED PROCEDURES**

17                      Petitioner,

18   **On Habeas Corpus.**

19        1.    For all policies, procedures, forms, and plans developed under this Order, the

20   parties shall use the following process: Respondents shall meet periodically with Petitioners'

21   counsel to discuss their development of policies, procedures, forms, and plans.  In preparation for

22   such meetings, Respondents will provide Petitioners' counsel with copies of the proposed

23   policies, procedures, forms, and plans in draft form no later than 21 days before the meeting.  If

24   the petitioners do not agree with any element of the policy, procedure, form, or plan, they may

25   seek further orders form the court and ask the court to hear the matter on shortened time.

26        2.    The California Department of Corrections and Rehabilitation (CDCR) and the

27   Board of Parole Hearings (BPH) shall develop and implement Policies and Procedures that will

28   ensure continuous compliance with all of the requirements of the attached Remedial Plan.

                                        1

Stipulated Procedures
*In re Jerry Rutherford*                              Case No. 135399A

1 | Respondent shall submit the completed Policies and Procedures to the Court no later than 180

2 | days after the approval of the remedial plan.

3 |     3.    The parties shall cooperate so that the Petitioners' counsel has access to the

4 | information reasonably necessary to monitor Respondent's compliance with this Order and the

5 | Policies and Procedures adopted in response thereto.

6 |     4.    BPH shall provide Petitioners' counsel with monthly reports from existing data

7 | bases and the Lifer Scheduling and Tracking System when operational, including the number of

8 | inmates in the backlog, and the reasons for any canceled hearings.

9 |     5.    The parties shall meet regularly, at least once every 90 days, to discuss

10 | implementation issues.

11 |     6.    At least once every 90 days, Respondents shall provide the Court and Petitioners'

12 | counsel with a progress report on compliance with this court order/remedial plan.

13 |     7.    The parties shall agree on a mechanism for promptly addressing concerns raised

14 | by Petitioner's counsel regarding individual class members and emergencies.

15 |     8.    The Court shall retain jurisdiction to enforce the terms of this Order.  The Court

16 | shall have the power to enforce the terms of this Order through specific performance and all other

17 | remedies permitted by law or equity.

18 |     9.    If at any time Petitioners' counsel asserts that Respondents are not making

19 | significant and steady progress in reducing the backlog, or are not complying with any of the acts

20 | required by this Order, the Remedial Plan, or Policies and Procedures produced pursuant to it,

21 | they shall notify the Respondents in writing of the facts supporting their belief.  Respondents

22 | shall investigate the allegations and respond in writing within 30 days.  If Petitioners' counsel is

23 | not satisfied with Respondents' response, the parties shall conduct negotiations to resolve the

24 | issue(s).  If the parties are unable to resolve the issue(s) satisfactorily, Petitioners may move the

25 | Court for any relief permitted by law or equity.

26 |     10.    When the backlog has been reduced to not more than five percent (05%) of the

27 | monthly hearings and remains at that level or less continuously for 12 consecutive months,

28 | Respondents will be considered in compliance with this remedial plan and this Court will order

2

1  this matter dismissed.

2      11.    Respondent may modify the Policies and Procedures at any time, provided that as
3  modified the Policies and Procedures will advance the goal of providing timely hearings.
4  Respondent will provide Petitioners' counsel with a copy of the original Policies and Procedures,
5  the modified version, and a strikeout version with the changes 30 days before implementation.
6  Petitioners shall have 30 days from the time they receive the changes to meet and confer with
7  Respondent.  Petitioners shall file objections, if any, through a regularly noticed motion within
8  30 days from the end of the meet and confer process.  Respondents may not implement any
9  policy or procedure in dispute until the Court rules on it, but may require that petitioner's counsel
10  comply with an expedited briefing schedule if necessary.

11  ///

12  ///

13  ///

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Stipulated Procedures
*In re Jerry Rutherford*

Case No. 135399A

03/22/2008 15:20 FAX         EMPLOYEE RELATIONS       ☑005/012

MAR-22-2006 08:20 WARDEN OF JUSTICE     Case 3:08-cv-00562-WQH-WMC   Document 1-3    Filed 03/25/2008   415 389 5431   Page 72 of 78   P.05

1   **IT IS SO STIPULATED.**

2

3                                              DONALD SPECTER
                                             KEITH WATTLEY
                                             PRISON LAW OFFICE

4

5   Dated: _3/22/06_

6                                              By:_____
                                             KEITH WATTLEY
                                             Counsel for Petitioner

7

8                                              BILL LOCKYER
                                             ATTORNEY GENERAL'S OFFICE

9

10   Dated: **3/22/06**

11                                              By:_____
                                             ANYA M. BINSACCA
                                             Counsel for Respondents

12

13                                              DEPARTMENT OF
                                             CORRECTIONS AND

14                                              REHABILITATION

15

16   Dated: _____

17                                              By:_____
                                             JEANNE WOODFORD
                                             Acting Secretary

18

19

20

21

22

23

24

25

26

27

28

Stipulated Procedures
*In re Jerry Rutherford*

                                                            Case No. 135399A

1  **IT IS SO STIPULATED.**

2

3                                    DONALD SPECTER
                                    KEITH WATTLEY
                                    PRISON LAW OFFICE
4

5  Dated: _____          By: _____
                                    KEITH WATTLEY
6                                    Counsel for Petitioner

7

8                                    BILL LOCKYER
                                    ATTORNEY GENERAL'S OFFICE
9

10 Dated: **3/22/06**               By _____
                                    ANYA M. BINSACCA
11                                   Counsel for Respondents

12

13                                   DEPARTMENT OF
                                    CORRECTIONS AND
14                                   REHABILITATION

15

16 Dated: **3-22-06**               By: _____
                                    JEANNE WOODFORD
17                                   Acting Secretary

18

19

20

21

22

23

24

25

26

27

28

4

Stipulated Procedures
*In re Jerry Rutherford*                                    Case No. 135399A

1

## ORDER

2    The Court adopts the parties' Stipulation and orders the California Department of

3    Corrections and Rehabilitation to comply with the terms stated above.

4    **IT IS SO ORDERED.**

5    Dated: 02-23-06

6

7    VERNA A. ADAMS
     Superior Court Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# REMEDIAL PLAN

## I.  INTRODUCTION

1.  Petitioner filed this action on May 26, 2004.

2.  The Court certified the class on November 29, 2004.

3.  On April 8, 2005, the parties stipulated that respondent was not providing timely parole consideration hearings as required by the Penal Code.

4.  On February 15, 2006 the Court granted the petition.

## II.  PARTIES

5.  The petitioner class consists of all prisoners serving indeterminate terms of life with the possibility of parole who have approached or exceeded their minimum eligible parole dates without receiving their parole consideration hearings within the times required by Penal Code sections 3041 and 3041.5.

6.  The named respondent is the Acting Warden of San Quentin State Prison. However for purposes of this case, which affects and involves actions of the Department of Corrections and Rehabilitation (CDCR), the proper respondent under Penal Code sections 1474 and 1477 is the Acting Secretary of CDCR, Jeanne Woodford.

## III.  TERMS

7.  CDCR shall develop and implement a statewide networked scheduling and tracking system (known as the Lifer Scheduling and Tracking System) for parole suitability hearings conducted pursuant to sections 3041 and 3041.5 of the Penal Code.  The development of the aforementioned statewide networked lifer scheduling and tracking system shall begin with a Feasibility Study Report (FSR).  The time for completion of the System will be determined by further order of the Court.

8.     In August of 2005, the backlog of life parole suitability hearings was identified as approximately 3200 cases. The Board of Parole Hearings shall eliminate the backlog of parole suitability hearings within 18 months of the court's approval of the Remedial Plan. "Backlog" shall mean the group of inmates who have not received an initial or subsequent parole consideration hearing as required by Penal Code sections 3041 and 3041.5, excluding inmates who choose to forego or postpone their hearings, from the date the order is entered and forward.

9.     CDCR shall maintain sufficient staffing levels and resources to meet all of the obligations of this Order.

10.     BPH shall make attorney appointments for parole suitability hearings at least 120 days in advance of an inmate's scheduled suitability hearings. The time for implementing this change will be determined by further order of the Court.

11.     CDCR shall make the final Board Packets, including Psychological Evaluations, available to the inmate and the inmate's attorney at least 60 days prior to the inmates scheduled parole suitability hearing. The time for implementing this change will be determined by further order of the Court.

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS**

Jose Ramirez-Salgado

DEFENDANTS

Ochoa, et al

FILING FEE PAID
Yes    No
IFP MOTION FILED
Yes    No
COPIES SENT TO
Court    Pro Se

2008 MAR 25  PM 4:09
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____DEPUTY

**(b) COUNTY OF RESIDENCE OF FIRST LISTED**
**PLAINTIFF**   Imperial
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Jose Ramirez-Salgado
PO Box 5002
Calipatria, CA 92233
C-11124

ATTORNEYS (IF KNOWN)

'08 CV 0562 WQH WMc

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX**
(For Diversity Cases Only)   FOR PLAINTIFF AND ONE BOX FOR DEFENDANT

|  | PT | DEF |  | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

## 28 U.S.C. 2254

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment &Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 RR & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☒ 530 General | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ Security Act | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding   ☐ 2 Removal from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23   DEMAND $   Check YES only if demanded in complaint:   JURY DEMAND: ☐ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):**   JUDGE   Docket Number

DATE   March 25, 2008

SIGNATURE OF ATTORNEY OF RECORD

14904  $5.00  SU 3/25/08

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 149104      — SH**

**March 25, 2008
16:13:50**

**Habeas Corpus**
USAO #.: 08CV0562
Judge..: WILLIAM Q HAYES
Amount.:                      $5.00 MO
Check#.: 11978350896

**Total—>   $5.00**

FROM: RAMIREZ-SALGADO V. OCHOA